IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Cartwright International Van Lines, Inc., et al., | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Civil Action No. |
| Lurita Alexis Doan, Administrator of General Services, | ) ) ) | |
| Defendant | ) ) ) | |

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Cartwright International Van Lines, Inc. and Foremost

Forwarders, Inc., by their undersigned attorneys, hereby move the Court, pursuant

to rule 65(a) of the Federal Rules of Civil Procedure, for issuance of a

preliminary injunction prohibiting defendant and the officers, agents and

employees of the General Services Administration (GSA), and all other persons

in active concert or participation with them from deducting by offset from monies

indisputedly due each plaintiff for transportation services performed for the

government since such offsets were made without following the requirements of

GSA's regulations by failing to accord to each of the plaintiffs its right to be

advised in the GSA Notice of Overcharge of the specific basis for the offset and

the opportunity to submit a written opposition to the Notice of Overcharge before

the deductions from plaintiffs' funds were effected by offset.  We ask that this injunction remain in effect until final decision of this Court.

The grounds for this motion are fully set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction and the Declarations submitted on behalf of plaintiffs.

Plaintiffs request that the Court hold an oral hearing on this motion at the earliest date available on the Court's calendar.

Respectfully submitted,

Alan F. Wohlstetter DC Bar No. 112797
Stanley I. Goldman DC Bar No. 109405
DENNING & WOHLSTETTER
888 Seventeenth Street, NW
Suite 700
Washington, DC  20006
Tel: (202) 833-8884
Fax: (202) 833-8886
Attorneys for Plaintiffs
Cartwright International Van Lines, Inc.,
Foremost Forwarders, Inc.

Dated: August 10, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Cartwright International Van Lines, Inc., <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| Lurita Alexis Doan, Administrator of General Services, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

<u>STATEMENT OF THE ISSUE</u>

The case before the Court involves a simple issue which is whether GSA acted arbitrarily and capriciously by taking hundreds of thousand of dollars from plaintiffs without following its own regulations which specifically provided for notice of the basis for the offset (the method by which the money was collected) and the opportunity of plaintiffs to be heard <u>before</u> the deductions took place. It is not subject to question that GSA failed to follow its own regulations in taking these huge sums from plaintiffs and other baggage carriers. It is important to note that the complaint does not place in issue the merits of plaintiffs' contention which involves an interpretation of Item 433 of the solicitation. That subject is not before the Court. The purpose of the Head Declaration, which goes to merits of plaintiffs' position, is

furnished the Court solely to demonstrate that plaintiffs are not merely raising a technical or frivolous violation by GSA of its own regulations, but to show that GSA's action has deprived plaintiffs of a substantive right which they will exercise after GSA has made compliance with its own regulations, hopefully under order issued by this Court.[1]

Plaintiffs do not have an adequate remedy at law on this issue since unless enjoined, GSA will continue to deduct monies from plaintiffs without advising them of the basis for the deduction in its Notices of Overcharge and without giving them the opportunity to rebut the contention advanced by GSA <u>before</u> deductions or offsets are made from plaintiffs' funds, both as specifically provided for in the GSA regulations.

## STANDARDS FOR ISSUANCE OF THE PRELIMINARY INJUNCTION

Plaintiffs individually meet all of the standards for issuance of preliminary injunctive relief which are set forth in <u>Virginia Petroleum Jobbers Association</u> v. <u>F.P.C.</u>, 259 F.2d. 921, 925 (D.C. Cir. 1958). The requirements are that the moving party establish that it is likely to prevail on the merits, that it will suffer irreparable injury unless the injunctive relief is granted, and that the granting of injunctive relief is in the public interest. In evaluating these from factors, the Court is to balance the

---

[1]  The merits of plaintiffs' claim is subject to the Contract Disputes Act and therefore will be brought either before a Board of Contract Appeals or in the United States Court of Federal Claims. In giving the United States Court of Federal Claims Appeals exclusive jurisdiction over government contracts for the procurement of products and services, Congress did not oust this Court's jurisdiction over arbitrary and capricious actions by an agency as here alleged.

evidence presented on each factor so that a particularly strong showing on one factor lessens the amount of proof required for the other factors. <u>Washington Metropolitan Area Transit Authority</u> v. <u>Holiday Tours, Inc.</u>, 559 F.2d 841, 843, (D.C. Cir. 1977).

ARGUMENT

I.    PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF
      PREVAILING ON THE MERITS.

GSA's Transportation Payment and Audit Regulations, 41 C.F.R. Part 102-118, specifically provide that when GSA determines in a post-payment audit that a carrier has allegedly been overpaid it is to issue a Notice of Overcharge setting forth the specific reason for the alleged overcharge. The regulations accord the carrier the right to submit a written request for reconsideration to demonstrate that the payment to the carrier was proper <u>before</u> any offsets or deductions are made from the carrier's funds. GSA's governing regulations provide:

> "§102-118.435  **What procedures does GSA use to perform a postpayment audit?**
>     When GSA performs a postpayment audit, the GSA Audit Division has the delegated authority to implement the following procedures:
>
> *        *        *
>
> (f) Issue a Notice of Overcharge stating that a TSP owes a debt to the agency. This notice states the amount paid, the basis for the proper charge for the document reference number, and cites applicable tariff or tender along with other data relied on to support the overcharge. A separate Notice of Overcharge is prepared and mailed for each bill...."
>
> *        *        *

> "§102-118.600  **When a TSP disagrees with a Notice of Overcharge resulting from a postpayment audit, what are the appeal procedures?**
> A TSP who disagrees with the Notice of Overcharge may submit a written request for reconsideration to the GSA Audit Division at...."

By offsetting monies for a reason not stated in any of its Notices of Overcharge, defendant clearly violated 102-118.435 and by not according plaintiffs their rights to object prior to offset on the basis of "waiting time", the basis on which GSA ordered the offsets, without issuing a Notice of Overcharge setting forth that basis for the offset (Complaint, para. 13), and by not according plaintiffs any opportunity to respond to this new contention, before taking plaintiffs' monies, defendant has violated, and continues to violate, the specific terms of its own regulations.

We maintain that GSA"s actions in offsetting monies from plaintiffs in violation of the governing regulations is arbitrary and capricious and thus is unlawful in violation of the APA, 5 U.S.C. §706(2) (A).

As the Court stated in <u>Clean Ocean Action</u> v. <u>York</u>, 57 F.3d 328, 333 (3rd Cir. 1995):

> "An agency is bound by the express terms of its regulations until it amends or revokes them.

In the <u>Clean Ocean Action</u> case, the Court held that a permit for ocean dumping of toxic materials was wrongfully issued by the Army Corps of Engineers

and the Environmental Protection Agency (EPA) in violation of the governing

regulation because the prescribed testing procedure was not followed.

Another case on point is <u>Reuters, Ltd.</u> v. <u>F.C.C.</u>, 781 F.2d 946, (D.C. Cir.

1986) in which the Court held that the Federal Communications Commission

violated its own regulations in revoking 13 validly issued licenses for microwave

radio stations which had been issued to the plaintiff. The Court stated:

> "…it is elementary that an agency must adhere to its own rules and
> regulations. <u>Ad hoc</u> departures from those rules…cannot be
> sanctioned." (781 F.2d at 950) (Citation omitted).

See also <u>Service</u> v. <u>Dulles</u>, 354 U.S. 363, 388, 77 S. Ct. 1157, 1165 (1957) (holding

that the Secretary of State wrongfully acted in violation of State Department

regulations); <u>Brooks</u> v. <u>Clifford</u>, 409 F.2d 700, 706 (4th Cir. 1969) (holding that the

Army acted in violation of its regulations).

Clearly, GSA did not followi its own regulations. None of the Notices of

Overcharge issued to either Cartwright or Foremost, or to any other Code J carrier,

stated the basis for the offset relied on by GSA. Each of the Notices of Overcharge

set forth as the only basis for the offset the unsupported contention that Item 433

does not apply to Code J shipments. GSA advised the carriers, at a meeting held on

August 2, 2007, in the offices of GSA, this is not the basis for its deductions but

GSA failed to set forth its current basis for deductions of the alleged overcharge in

any Notice of Overcharge, as required by section 102-118.435 of its regulations.

Further, and most important, is the fact that GSA made these deductions without

giving Cartwright, Foremost, or any other Code J carrier, the opportunity to rebut the

basis for the alleged overcharge, as specifically provided for in section 102-118.600

of GSA regulations.  If GSA had complied with its regulations, we would not be

before this Court.  Since it did not, we respectfully ask the Court's assistance in

requiring GSA to follow the specific terms of its own regulations and to strike down

any actions taken without such compliance.  GSA's taking of money from

Cartwright and Foremost without giving them the opportunity to be heard on the

basis for that taking, destroys the procedural due process requirements set forth in

the governing regulations and we respectfully request that the Court enjoin GSA's

taking of plaintiffs monies until it complies with its own regulations.

II.    <u>PLAINTIFFS WILL SUFFER IRREPARABLE HARM.</u>

Plaintiffs will suffer irreparable harm unless this Court enjoins GSA from

ceasing to offset monies previously paid plaintiffs (which have all paid out by

plaintiffs to their respective port agents) until the Court issues a final decision on the

this complaint.

As shown by the Declaration of Andrew Cartwright for Cartwright

International Van Lines (Attached), 90 percent of the company's revenues is

attributable to the servicing of military shipment.  The deduction of hundreds of

thousands of dollars will impair the working capital of the company and make it

impossible for it to properly service military household goods shipments which in

turn will result in its disqualification from the Military Personal Property program.

This will result in reducing the company's revenues by 90 percent. Under those circumstances, the company be forced to go out of business and will not be around even if it prevails on the merits of its contention, namely that there is no basis for the deduction of the funds in question. As previously stated, after GSA issues a Notice of Overcharge which sets forth the actual basis for the deductions or offset, as required by its regulations, and evaluates the rebuttal of that contention, which will be submitted by the carrier involved, and still intends to proceed with the offset, we will seek a resolution of the merits of that controversy at that time.

The Foremost case is even stronger since the potential deductions from its funds are over $1,745,000 and that amount is due to increase by the issuance of subsequent Notices of Overcharge. (Declaration of Kenneth Sullivan, attached).

Since 100 percent of the revenue of Foremost is derived from the servicing of military household goods shipments, 85 percent of which relates to Code J shipments, the harm to Foremost is even greater than the harm to Cartwright.

We respectfully submit that when the harm to the plaintiffs is the direct result of the agency's violation of its own regulations, which violation has eliminated the right of the plaintiff to be heard before the agency involved before deduction is made, that alone establishes irreparable harm considering the extent of the deductions from plaintiffs' funds. That harm is not only irreparable but is immediate leaving plaintiffs without an adequate remedy at law.

III.   THE HARM THAT PLAINTIFF WILL SUFFER IF THE
       PRELIMINARY INJUNCTION IS NOT ISSUED OUTWEIGHS
       ANY HARM TO DEFENDANT.

We maintain that the balance of the harm in this case clearly favors the

granting of preliminary injunction.  As shown above, plaintiffs will suffer irreparable

harm by defendants' depriving them of such substantial revenues that the continued

existence of their businesses is at risk and the respective losses cannot be

compensated by actions at law for monetary damages.  On the other hand, if the

preliminary injunction is granted, defendant will be protected by consenting to an

expedited hearing by this Court on the merits.  If necessary, plaintiffs will post a

reasonable bond to protect the government pending the Court's decision.

IV.   THE PUBLIC INTEREST WILL BE SERVED BY GRANTING
       THE PRELIMNARY INJUCTION.

There is a strong public interest in having government agencies follow

published regulations and in seeing that government agencies accord contractors

their rights under the regulations.  See Clean Ocean Action v. York, supra; Reuters,

Ltd. v. F.C.C., supra.  See also, Service v. Dulles, supra; Brooks v. Clifford, supra.

For these reasons, we maintain that the public interest supports issuance of the

preliminary injunction to prevent defendant from continuing to offset monies from

plaintiffs without according them the rights provided in by GSA's regulations.

8

For the foregoing reasons, plaintiffs respectfully ask the Court to issue the requested preliminary injunction.

Respectfully submitted,

Alan F. Wohlstetter DC Bar No. 112797
Stanley I. Goldman DC Bar No. 109405
DENNING & WOHLSTETTER
888 Seventeenth Street, NW
Suite 700
Washington, DC 20006
Tel: (202) 833-8884
Fax: (202) 833-8886
Attorneys for Plaintiffs
Cartwright International Van Lines, Inc.,
Foremost Forwarders, Inc.

Dated: August 10, 2007

## DECLARATION OF ANDREW W. CARTWRIGHT

1.     My name is Andrew W. Cartwright (Andy) Cartwright.  I am president of Cartwright International Van Lines, Inc. a plaintiff in this proceeding and a participant for over 35 years in the military personnel property program, administered by SDDC and by MTMC before it.  My company is actively involved as one of the predominant carriers in the handling of Code J shipments of unaccompanied baggage which requires plaintiffs to transport these shipments from the origin residence to a military airport for movement by government-furnished air transportation to a military airport servicing the destination area, at which point plaintiffs are required to pick the Code J shipments up for delivery to the military member's new residence.

2.     Shortly after September 11, 2001, my port agents at the three military air terminals, namely Travis AFB in California, McGuire AFB in New Jersey and Dover AFB in Delaware, advised me that, due to tight security at the military air base which they serve as our agent, the time involved in making pick-ups and deliveries of Code J shipments substantially increased, which in turn increased their cost which they needed to pass on to me for payment.

3.     I communicated this to Terry Head, president of the Household Goods Forwarders Association of America (HHGFAA) which is the industry

association to which my company belongs. Terry Head, as president of HHGFAA, handles problems with MTMC and SDDC which generally affect the Association's membership. I told Mr. Head that my company and other participants in the Code J program would incur additional expenses as a result of the tightening of security at the military air bases which were not included in the single-factor rates which we file with MTMC and that an arrangement had to be made for carriers to be reimbursed for these costs if we were to continue to provide the service.

4. Mr. Head subsequently advised me that he had discussed this matter with both Colonel Patricia Hunt, U.S.A.F., who was then MTMC Deputy Chief of Staff for Passenger and Personal Property, and Mr. Hank Spieler, the Chief Civilian at MTMC at that time, who was responsible for matters relating to rates filed with MTMC. I was told that this additional expense would be handled as a pass-through under Items 432 and 433 of the solicitation and relying on this, I did not include these charges in any of my single-factor rates which I subsequently filed with MTMC and then with SDDC. Item 433 was amended to include a pass-through of a port congestion/security surcharge to be billed by the carrier only in those instances where the charge was assessed by our port agent as a result of this additional expense. I consistently billed this expense when incurred on Code J shipments as a pass-through under Item 433. This seems to be the fair way

2

to be reimbursed for the additional expense since if it were included in our
single-factor rates the government would pay these charges even when the
expense is not incurred and the port agent did not bill us.

5.    It is not my intention to make a profit on this charge.  It is a pass-
through that does not reflect any administrative expense incurred by my
company and does not reflect the expense of 1.2 percent of billed charges
charged Cartwright International by PowerTrack made mandatory by SDDC.

6.    For five years Cartwright International billed these charges under
Item 433 and they were paid in due course.  On April 3, 2006 Cartwright
International received a Notice of Overcharge in the amount of $241,210.84.
With the passage of time, these Notices of Overcharge have increased to
$287,967.95 and additional Notices will be issued.  As of August 8, 2007,
$46,696.06 has been deducted from our funds which means that over
$240,000 is still to be deducted unless otherwise ordered by the Court.

7.    By letter from GSA, dated November 1, 2006, GSA advised that
they were taking the position that these pass-through charges had been
improperly paid because they were required to be contained in tariffs on file
with a regulatory agency.  My attorney, Alan F. Wohlstetter, who is also the
attorney for a number of other participants in the SDDC Personal Property
Program as well as the General Counsel for the HHGFAA, wrote a response

3

to that contention by letter, dated January 23, 2007, and GSA has apparently abandoned that basis for the alleged overcharge.

8. Although, GSA held up the collection by offset of the funds which we paid over to our port agents, until they resolved the issue as to the need to file the charges with a regulatory agency. However, GSA subsequently put in motion the deduction of funds without notice to the carriers on the basis that the billings were not properly filed under Item 433, as we were previously advised, but were to be covered under waiting time, a different item of the solicitation. This new position is not only without merit but, as relevant to this case, it has never been set forth in any Notice of Overcharge, including recent notices that we have received. The sole basis for the deduction that appears in the Notices of Overcharge is that the Item 433 pass-through compensation to carriers for congestion/security at the military airports does not apply to Code J shipments. This is not the position of SDDC, as reflected in its communication to industry, dated March 25, 2006, where it stated that the surcharge for CON (port congestion/security) submitted under Item 433 applied to Code J shipments. No other basis for the deductions is set forth in any Notice of Overcharge. When GSA set forth a different basis for the deduction we will respond with the hope that the Court will overturn deductions made without according carriers the right of response before the seizing of the carrier's funds.

4

9.     The hundreds of thousands of dollars that have been taken away from my company, and the prospect of these deductions continuing significantly impairs my company's working capital and unless stopped, would interfere with our ability to properly service military shipments. Failure to properly service shipments would result in SDDC's disqualification of Cartwright International and we would receive no further shipments. Since 90 percent of the revenues of Cartwright International are derived from military shipments the continuation of GSA's action will destroy my company so that even if we eventually prove the correctness of our entitlement to this money, that action would be too late. For this reason, I have asked my attorney to try to get assistance from the Court.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my knowledge.


_Andrew W. Cartwright_
Andrew W. Cartwright

Date:  August 10, 2007

## DECLARATION OF KENNETH J. SULLIVAN

1.      My name is Kenneth J. Sullivan.  I am president of Foremost

Forwarders, Inc.  My company has been a participant in SDDC's International

Through Government Bill of Lading program for over fifteen years.  My

company is probably the largest carrier involved in the handling of Code J

unaccompanied shipments.

2.      We have billed consistently under Item 433 since these

surcharges began to be assessed by our port agents serving the military

airports after 9/11 and the government has consistently made those payments,

although I had understood our billings had gone through both a pre-payment

and post-payment audit.  That was the situation until April 3, 2006 when we

received a Notice of Overcharge on this issue totaling $1,202,698.45.  Since

that time we have received additional Notices of Overcharge and the Notices

of Overcharge as of August 9, 2007 total $1,745,149.08.

3.    GSA held up the collection of the monies covered by these Notices of Overcharge until we resolved, through our attorney, and to the satisfaction of GSA, that these surcharges were not required to be filed with any regulatory agency. At that point, and without notice, GSA set in motion the deduction of our funds and as of August 9, 2007, there has been a deduction of $77,524.06 leaving $1,667,624 which will be deducted unless this Court intervenes. In addition, it is anticipated that we will continue to receive Notices of Overcharge and that the monies therein set forth will also be deducted from Foremost's revenues due from the government. Although we have received 355 Notices of Overcharge, they all set forth as the only basis for the deduction the contention that the surcharges provided for in Item 433 do not apply to Codes 5, T and J. This is in direct conflict with the statement of the governing agency, SDDC, which advised industry that this surcharge item does apply to Code J shipments.

4.    At the meeting with GSA held on August 2, 2007, which I attended, we were, at the end of that meeting furnished with a letter from GSA which stated: "GSA has reviewed the issue of Port Security Charges...We have determined that these charges are not proper and that the overcharges notice is correct as stated." This general statement does not meet requirements of the GSA regulations which require GSA to set forth

2

specific basis for the deduction. The only basis shown on any Notice of Overcharge for denial of the pass-through billing is that it does not apply to Code J. Not only is this in conflict with the communication from SDDC but orally, GSA advised me that is not the basis upon which the deduction has been made. Further, as I understand the GSA regulations, I was to have the opportunity to rebut the basis for the Notice of Overcharge before the monies were deducted. The fact is that the letter involving the deduction is dated July 27, 2007 but we were not given that letter until August 2 after more than half of the deductions had been made. It is my understanding that GSA regulations required GSA to advise us of this specific basis for the Notice of Overcharge and also to give us the opportunity to respond to the contention set forth before the monies are deducted by way of offset. This clearly has not been done.

5.      My company is faced with a deduction of almost $2,000,000 from its funds by virtue of GSA's action which violates its own regulations. 100 percent of my company's revenues is derived from military shipments, with 85 percent resulting from our handling of Code J shipments. Loss of these revenues would undermine my company's ability to service military shipments, the resulting disqualification by SDDC would mean that we would receive no further shipments and our sole revenue source would be

cut off. Since 100 percent of revenues of Foremost Forwarders are derived

from military shipments the continuation of GSA's action will destroy my

company. At the very least, we should have been specifically been advised

by the Notice of Overcharge as to the basis for the deduction and given the

opportunity to rebut that contention before the deductions had been made.

That is what the regulations require. If GSA does not agree with our rebuttal

and still determines to deduct the money after evaluating our response

(which we have not to date be given the opportunity to submit) we will take

Court action to obtain a ruling on the merits of GSA's contention. At

present, we are asking this Court's help to obtain what the regulations

guarantee us, namely to be advised of the specific basis relied on by GSA for

the offset and to be given the opportunity to show that GSA's contention is

not supportable before the deduction is made.

I declare under penalty of perjury that the foregoing statement is true

and correct to the best of my knowledge.

Kenneth J. Sullivan

Date: August 10, 2007

## DECLARATION OF TERRY R. HEAD

1.      My name is Terry R. Head.  I am president of the Household Goods

Forwarders Association of America, Inc. (HHGFAA).  HHGFAA is primarily

involved with representing carrier participants in the Military Personal Property

program administered by SDDC and previously administered by MTMC.  One of

my duties as president of HHGFAA is to negotiate the pass-through of charges

when the services performed by carriers are to be in addition to those performed

under single-factor rates, with carriers to be reimbursed for the costs incurred in

providing the additional services.

2.      I was advised the day after the attacks of 9/11 that military

installations had either closed their gates entirely or had severely restricted traffic

from entering military bases.  This heightened security was in full force and effect

at the military air bases of Dover AFB, Travis AFB and McGuire AFB.

3.      After 9/11, my office immediately began receiving emails and

telephone calls from HHGFAA members asking me to coordinate with the

Military Traffic Management Command (MTMC) to discuss this problem and

obtain compensation for this unexpected additional expense.  The need for

compensation was discussed at a Military/Industry (M/I) meeting and during the

Government Affairs Panel held as a part of the HHGFAA Annual Meeting which

took place in October of 2001.  This meeting was attended by high-level staff

members of the then MTMC Personal Property Division, including Colonel Patricia Hunt (USAF), who was the then MTMC Deputy Chief of Staff for Passenger and Personal Property.  I was in direct telephone communication and exchanged emails with Hank Spieler who at the time was head of the "Rates" Department of MTMC.  Specifically, on October 16, 2001, I sent an email to Mr. Spieler advising him I had received a communication from one of my members that, due to the tight security and the resulting delays in gaining access to the military airports, his port agents, who pick-up and deliver shipments at these installations, were assessing a surcharge on ITGBL carriers to offset their increased costs resulting from the security delays.  (Att. 1).  I was advised that these delays resulted not only from increased security but because in some cases port agents were required to use different access gates further from their installation and from the original access points used prior to 9/11.  This involved an increased number of man-hours and additional operating costs for their vehicles.

      4.     On the same day, Mr. Spieler emailed me a response advising: "Terry…charges would normally be covered under port congestion, however, we will make it easier, by changing 'port congestion' to 'port/security congestion'…the change will be made effective for 1 Oct 01 and Gail Collier will

2

add to the I-13…we will also permit pass thru of this surcharge by the Aerial Port agent to the ITGBL carrier for billing under 'port/security congestion'.

"Hope this helps, Gail will forward a copy of the change when done…" (Att. 1).

5.    Please note that Mr. Spieler's email showed a copy to Colonel Patricia Hunt, USAF (who was then MTMC's Deputy Chief of Staff for Passenger and Personal Property) as well as to Ms. Jolie Lay, (who was then Chief of MTMC Personal Property). Both Colonel Hunt and Ms. Lay were well-aware of this issue and of SDDC's need to take prompt action to provide relief for the industry.

6.    On November 7, 2001, again in response to inquiries from several of my members, I sent another email to Mr. Spieler to confirm the date to be used by a carrier to determine if a security or port congestion surcharge would be billable. (Att. 2). The question centered on whether it was the pick-up date of the shipment or the date the shipment was handled or invoiced by the port agent. Within the same email, I advised Mr. Spieler that "…other than the Port Agent invoice there would no paper trail, this is particularly true for such codes as J." (Att. 2). On November 8, 2001, Gail Collier advised that the pass-through became effective with shipments picked up on or after October 1.

3

(Att. 2). This was confirmed by Mr. Spieler on November 29, 2001 in response to my email of the same date. (Att. 3).

7.    Subsequently, I received a copy of Amendment 3 to the solicitation which had a summary of changes to Items 432 and 433 and contained the note "This item now includes security surcharges and authorizes surcharges from port agents and air carriers." (Att. 4).

8.    By email, dated October 17, 2001, Mr. Spieler advised that ITGBL carriers were to be reimbursed for port agents' charges under the port security/congestion surcharge contained in Items 432 and 433 of the solicitation (Att. 5)

9.    By message, dated March 25, 2006, SDDC clarified the application of security surcharges assessed by port agents, and based on "the feedback and invoices provided from industry" provided for the application of the pass-through of such charges inter alia, in connection with Code J shipments. (Att. 6).

10.    Mr. Spieler and I discussed the question of allowing compensation to the carriers by amendment of the waiting time item but Mr. Spieler believed, and I concurred, that placing it under that item would eliminate any uniformity of charges and would be very difficult to administer. As a result, the decision to compensate carriers under Items 432 and 433 remained the action to be followed.

11.     It was always my understanding that carriers would be reimbursed for the additional congestion charges occasioned by 9/11 when assessed their port agents by the pass-through contained in Item 432 and 433 of the solicitation and the first indication to the contrary that I received was the advice from various HHGFAA members that they had received Notices of Overcharge from GSA.

I, Terry R. Head, declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.


Terry R. Head

Date:  August 10, 2007

Att. 1

Subj:    RE: Security Fees
Date:    10/16/2001 2:37:58 PM Eastern Daylight Time
From:    SpielerH@MTMC.ARMY.MIL (Spieler, Hank)
To:      THead73168@aol.com ('THead73168@aol.com')
CC:      JayJ@MTMC.ARMY.MIL (Jay, Julie), HuntP@MTMC.ARMY.MIL (Hunt, Lt Col Patricia),
groger@suddath.com

Terry.........charges would normally be covered under port congestion , however, we will make it easier, by
charging "port congestion" to "port/security congestion" ..............the change will be made effective for 1 OCT 01
and Gail Collier will add to the I-13.....we will also permit pass thru of this surcharge by the Aerial Port Agent to
the ITGBL carrier for billing under "port/security congestion".....

Hope this helps, Gail will forward a copy of the change when done........ ....

Have a great day,

Hank Spieler
HQMTMC
Attn: MTPP-HR
DSN: 328-3084/Commercial: 703-428-3084
Fax: 703-428-3389
"Privacy Act-1974 as amended applies"

-----Original Message-----
From: THead73168@aol.com [mailto:THead73168@aol.com]
Sent: Tuesday, October 16, 2001 10:13 AM
To: SpielerH@mtmc.army.mil
Cc: JayJ@mtmc.army.mil; HuntP@mtmc.army.mil; groger@suddath.com
Subject: Security Fees

Hello Hank,
As you may or may not know, the subject of WAR Risk and "Security Charges" was a subject of
much discussion at the Military and Government Affairs Panel during the HHGFAA Annual Meeting
last Week.
I think everyone is pretty clear on the application of WAR when is charged by an Ocean or Air
as a line item on the AWB or OBL.

I had a member call me yesterday about how to handle "Security Fees" that are being charged by
other service suppliers, in this case and Ariel Port Agent. Refer to the contents of their follow-up
email below:

Per our telecon today, we have received a notification from an Ariel port agent that they will be
charging a surcharge of $5.00 GCWT to cover the necessary security restrictions and detention at
the gates. Our port agent is quoting the rate solicitation Item 433 (UB) pg4-24 (0), we are unable to
determine exactly how to apply this Item, any guidance we receive will be greatly appreciated.

Can you please provide guidance on how these charges on to be passed along to the Government?

Thanks,
Tony Head
HHGFAA

Tuesday, October 16, 2001 America Online: THead73168

Subj:     FW: Item 432
Date:     11/8/2001 8:33:54 AM Eastern Standard Time
From:     CollierG@MTMC.ARMY.MIL (Collier, Gail)
To:       THead73168@aol.com ('THead73168@aol.com')

Mr. Head,

Yes, the effective date is for shipments picked up on or after 1 Oct 01.

Thank you
Gail Collier
(703) 428-2903

-----Original Message-----
From: Moreno, Alex
Sent: Thursday, November 08, 2001 7:28 AM
To: Collier, Gail
Subject: FW: Item 432

See e-mail below from Terry Head.  Thanks.

-----Original Message-----
From: THead73168@aol.com [mailto:THead73168@aol.com]
Sent: Wednesday, November 07, 2001 3:35 PM
To: SpielerH@mtmc.army.mil
Cc: MorenoA@mtmc.army.mil
Subject: Item 432

Hello Hank ( and Alex )
I was asked to confirm "what date" is used for a carrier to determine if a "security or port congestion surcharge is
billable.  Is it the shipment PU date or the date handled/invoiced by the Port Agent?  Unfortunately, other than the
Port Agent invoice there is not paper trail, this is particularly true for such codes as J.
I assume that nothing handled before the Effective Date of October 1, can be invoiced.
Regards,
Terry Head

------------------- Headers -------------------
Return-Path: <CollierG@MTMC.ARMY.MIL>
Received: from rly-yg03.mx.aol.com (rly-yg03.mail.aol.com [172.18.147.3]) by air-yg01.mail.aol.com (v82.22)
ESMTP id MAILINYG13-1108083354; Thu, 08 Nov 2001 08:33:54 -0500
Received: from mailexch1.mtmc.army.mil (mailexch1.mtmc.army.mil [144.101.33.5]) by rly-yg03.mx.aol.com
(v82.22) with ESMTP id MAILRELAYINYG34-1108083329; Thu, 08 Nov 2001 08:33:29 -0500
Received: by mailexch1.mtmc.army.mil with Internet Mail Service (5.5.2653.19)
id <W259Z9XL>; Thu, 8 Nov 2001 08:33:27 -0500
Message-ID: <6318D0028701D3119DB30000D11BB1A903B3F86A@hq10.army.mil>
From: "Collier, Gail" <CollierG@MTMC.ARMY.MIL>
To: "'THead73168@aol.com'" <THead73168@aol.com>
Subject: FW: Item 432
Date: Thu, 8 Nov 2001 08:33:17 -0500
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: multipart/alternative;
    boundary="----_=_NextPart_001_01C16859.ECE39380"

Thursday, November 08, 2001 America Online: THead73168

Att. 2

Subj:    RE: Port/Security Surcharge
Date:    11/29/2001 3:41:55 PM Eastern Standard Time
From:    SpielerH@MTMC.ARMY.MIL (Spieler, Hank)
To:      THead73168@aol.com ('THead73168@aol.com')
CC:      CollierG@MTMC.ARMY.MIL (Collier, Gail), MorenoA@MTMC.ARMY.MIL (Moreno, Alex),
LuyJ@MTMC.ARMY.MIL (Luy, Julie)

Terry ...... The change in the solicitation is not based on date of pickup at port agent facility, it is based on date of actual pickup of shipment, according to PPGBL ...... in this case shipments would have to be picked up (according to a PPGBL) dated 1 Oct 01 or later to have this surcharge paid

Have a great day,

Hank Spieler
HQMTMC
Attn: MTPP-HR
DSN: 328-3004/Commercial: 703-428-3004
Fax: 703-428-3389
"Privacy Act-1974 as amended applies"

-----Original Message-----
From: THead73168@aol.com [mailto:THead73168@aol.com]
Sent: Thursday, November 29, 2001 3:06 PM
To: SpielerH@mtmc.army.mil
Cc: CollierG@mtmc.army.mil
Subject: Port/Security Surcharge

Hi Hank,
I got the Intra-theater material you sent.

Following the question and discussion at the Mtl, I want to follow-up on the "effective date" of the port/security congestion surcharge.

I know that the item was previously in the Solicitation, but only recently amended to include Port Agent facilities. So what impact does this have on shipments that may have been pick-up from residence prior to October 1, 01, but subject to a a port surcharge when handled and billed by the port agent after October 1?

Terry Head
NHGFAA

-----Headers-----
Return-Path: <SpielerH@MTMC.ARMY.MIL>
Received: from rly-ye05.mail.aol.com (rly-ye05.mail.aol.com [172.18.151.202]) by air-ye04.mail.aol.com (v82.22)
with ESMTP id MAILINYE45-1129154155; Thu, 29 Nov 2001 15:41:55 -0500
Received: from mailoxch1.mtmc.army.mil (mailoxch1.mtmc.army.mil [144.101.33.5]) by rly-ye05.mail.aol.com
(vc) with ESMTP id MAILRELAYINYE53-1129154130; Thu, 29 Nov 2001 15:41:30 -0500
Received: by mailoxch1.mtmc.army.mil with Internet Mail Service (5.5.2653.19)
id <X6ZGHMBR>; Thu, 29 Nov 2001 15:41:27 -0500
Message-ID: <6318D0028701D3119DB30000D11BB1A902DC673A@hq10.army.mil>
From: "Spieler, Hank" <SpielerH@MTMC.ARMY.MIL>
To: "THead73168@aol.com'" <THead73168@aol.com>
Cc: "Collier, Gail" <CollierG@MTMC.ARMY.MIL>,
"Moreno, Alex"
<MorenoA@MTMC.ARMY.MIL>,

Thursday, November 29, 2001 America Online: THead73168

Att. 4

SUMMARY OF CHANGES

AMENDMENT 3

EFFECTIVE I OCTOBER 01

I.  Chapter IV – Terms, Conditions & Rules

Item 432a.(4)(d) – Application of Transportation SFR – HHG

This item now includes security surcharges and authorizes surcharges from port agents.

Item 433a.(3)(d) – Application of Transportation SFR – UB

This item now includes security surcharges and authorizes surcharges from port agents and air carriers.

Att. 5

Steven Pfister

From:    Spieler, Hank <SpielerH@MTMC.ARMY.MIL>
To:      HNSKAA Terry Head (E-mail) <thead73106@aol.com>
cc:      Risley, Dennis (E-mail) <dennis.risley@sddc.mil>; James Fitzgerald (E-mail)
         <james.fitzgerald@gsa.gov>; Collier, Gail <CollierG@MTMC.ARMY.MIL>; Ley, Julie
         <LeyJ@MTMC.ARMY.MIL>; Hunt, Lt Col Pahl <HuntP@MTMC.ARMY.MIL>; Benveniste,
         Osime <benvenis@ntimail.usmc.mil>; Branesc, Debra <branesd@ntimail.usmc.mil>; Haslett,
         Tommy <haslettt@ntimail.usmc.mil>; Howard, Charles <howardce@ntimail.usmc.mil>;
         Kendrick, Peter <kendrikp@usscm.mil>; Willkins, Regalia <willksre@ntimail.usmc.mil>; Agena,
         Walt <AgenaW@MTMC.ARMY.MIL>; Bushong, Patrick <BushongP@MTPC.ARMY.MIL>; Olson,
         Max <OlsonM@MTPC.ARMY.MIL>; AF/ILTT Randy Tasho (E-mail)
         <randy.tasho@pentagon.af.mil>; AF/ILTT Sharen Goodson (E-mail)
         <sharen.goodson@pentagon.af.mil>; Estesmc@hqmc.usmc.mil (E-mail)
         <cstesmc@hqmc.usmc.mil>; HQUSMC-PF County W (E-mail) <CountyW@hqmc.
Sent:    Wednesday, October 17, 2001 12:49 PM
Attach:  amend3.doc
Subject: FW: Amendment 3

For Your Info, the attached pages will be posted to the ITGBL rate
solicitation on the MTMC website and are in line with the present world
situations.


The I-13 rate solicitation had WAR risk surcharge (WAR) and Port Congestion
surcharge (CON) clauses, however the words "security" and "port agent"
required addition for proper billing and auditing..........please, make
sure all ITGBL carriers use Item 432 (4) d and Item 433(3) d when they are
billed for these surcharges by ocean carriers, air carriers and/or port
agent for:

Any port security/congestion surcharges ("one" example of these charges:
based on present security restrictions and delay of port agent at the aerial
port gate for delivery of shipments) this port security/congestion surcharge
applies when billed by ocean carrier, air carrier and/or port agent.

Any war risk surcharges (" one" example of these charges: based on an Ocean
Carrier adding to Ocean Bill of Lading for movements in certain shipping
channels) this charge applies normally when billed by ocean carrier or air
carrier.


Have a great day;

Hank Spieler
HQMTMC
Attn: MTPP-HH
DSN: 328-3004/Commercial: 703-428-3004
Fax: 703-428-3389
"Privacy Act-1974 as amended applies"

> Cliff

25 March 2006

The below are clarifications regarding the recently published definitions, application, and personal property shipping office/transportation service provider (TSP) responsibilities of air fuel (100), bunker (BSC), war risk (WAR), port/terminal security handling (COF), and port congestion (CON) surcharges.

1. The definitions and applications were clarifications to the current International Personal Property Rate Solicitation. The clarification provided guidance as to how TSPs should have always billed and should continue to bill the listed surcharges. These clarifications will be incorporated into the next released rate solicitations. The March 1, 2006 effective date was applicable to date of publishing only, as SDDC has frequently been asked when a document was posted to our website.

2. Effective March 3, 2006, the war risk areas were redefined.

3. In alignment with Item 419 of the Domestic Solicitation, code 1 has been incorporated into billing codes BSC, COF, and CON.

4. SDDC has reviewed the feedback and invoices provided from industry and have incorporated codes I, J, and 5 into billing code COF.

5. In accordance with Items 432 and 433 of the International Solicitation, all customs clearance processes are to be included in the single factor rate. Agricultural inspection and AMS security fees are not reimbursable.

6. BSC and FAF are one and the same -- a surcharge, sometimes added to ocean TSP rates, justified by higher fuel costs. When invoicing, a TSP should be listing one line item for BSC OR FAF per shipment.

7. HQ SDDC solely authorizes alternate port usage, in the events of port congestion/closure. Authorization is provided via a supplement to the solicitation and disseminated via the SDDC website.

8. TSP's should only be invoicing for WAR according to the "JWC HULL War, Strikes, Terrorism and Related Perils." SDDC will provide updates to this list, as they occur. Invoices submitted that fall outside of the aforementioned listing are erroneous. Repetitious erroneous billing will result in letters of warning or other action(s), as SDDC deems appropriate.

9. CON may be billed by TSP's due to delays entering the port, in addition to extra charges billed to control the congestion of vessels entering/departing the port.

10. If there have been charges denied in the past, that were valid and fall under our recent clarification, TSP's have the ability to rebill those line items. When doing so, request that TSP's add a note in CWA to explain the rebilling.

11. Any TSP that is found to double bill the same charge will receive a letter of warning. If the TSP is found to continue to double bill the same charge, SDDC will take action, as appropriate.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Cartwright International Van Lines, Inc., <u>et al.</u>, )<br><br>Plaintiffs )<br><br>v. )<br><br>Lurita Alexis Doan, Administrator of General<br>Services, )<br><br>Defendant ) | Civil Action No. |

## PRELIMINARY INJUNCTION

This cause came to be heard on August 10, 2007 on plaintiffs' motion for a

preliminary injunction. The Court considered the complaint, the declarations in

support of the motion and in opposition to it, the memoranda of points and

authorities submitted by both parties and the argument of counsel. The Court finds

that plaintiffs have raised substantial questions as to the lawfulness of the action of

the General Services Administration (GSA) in directing the collection by offset of

monies from the respective plaintiffs without according them the rights specifically

provided in GSA's regulations, first, to be specifically advised in the Notice of

Overcharge of the basis relied upon by GSA for its offset and second, the right to

oppose in writing the basis asserted by GSA for the offsets from plaintiffs' funds.

The Court finds that there is likelihood that plaintiffs will prevail in this action and the granting by the Court of the requested preliminary injunction will not cause harm to defendants or to the public interest, while refusal to grant the injunction would appear to result in irreparable harm to plaintiffs.

Therefore, in accordance with these findings:

IT IS ORDERED that defendants and their officers, employees and agents and all persons acting in concert with them are preliminarily enjoined from continuing to collect by offset monies due the respective plaintiffs until the issuance by the Court of final judgment in this action or until further order of the Court, whichever first occurs.

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Cartwright International Van Lines, Inc., et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| Lurita Alexis Doan, Administrator of General Services, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

CERTIFICATE OF COUNSEL

I, Alan F. Wohlstetter, attorney for plaintiffs, hereby certify that on August 10, 2007, the following person was served, by hand delivery, copies of the pleadings in this case consisting of the Complaint, Motion for Temporary Restraining Order, Motion for a Preliminary Injunction, Memorandum of Points and Authorities in Support of the Preliminary Injunction, and Declarations of Andrew W. Cartwright, Kenneth J. Sullivan and Terry R. Head.

_____, Esq.
U.S. Attorney
555 Fourth Street, NW
Washington, DC  20001

Respectfully submitted,

Alan F. Wohlstetter DC Bar No. 112797
DENNING & WOHLSTETTER
888 Seventeenth Street, NW
Suite 700
Washington, DC 20006
Tel: (202) 833-8884
Fax: (202) 833-8886
Attorney for Plaintiffs