## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
CARTWRIGHT INTERNATIONAL VAN              )
LINES, INC. et al.,                       )
                    Plaintiffs,           )
                                          )
        v.                                )   Case Number:  1:07-1454 (EGS)
                                          )
LURITA ALEXIS DOAN, Administrator of      )
General Services Administration,          )
                                          )
                    Defendant.            )
                                          )
_____ )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## SUMMARY OF ARGUMENT

This case arises out of a dispute between the General Services Administration ("GSA") and plaintiffs Cartwright International Van Lines ("Cartwright") and Foremost Forwarders, Inc. ("Foremost") regarding overcharges billed for plaintiffs' shipments of household goods to military bases and military airports.  GSA conducted a post-payment audit of plaintiffs' bills, and determined that plaintiffs and several other transportation service providers ("TSPs") billed the government for surcharges that exceeded allowable rates.  GSA suspended its collection of those debts for fifteen months, while it reviewed the TSPs' justifications for those charges.  However, plaintiffs' arguments were unpersuasive, and GSA sustained the overcharges and resumed collecting the debts through administrative offsets.  Shortly thereafter, plaintiffs initiated this action, alleging that GSA did not afford them sufficient notice of the overcharges, and violated GSA regulations governing overcharges.  Plaintiffs seek an order barring GSA from collecting

the debt through offsets, and directing GSA to repay the money already collected through offsets.

"One cannot circumvent exclusive jurisdiction in the Claims Court by suing simply for declaratory or injunctive relief in a case where such relief would be the equivalent of a judgment for money damages." *Consolidated Edison Co. of New York v. United States Dep't of Energy*, 247 F.3d 1378, 1385 (Fed. Cir.), *cert. denied*, 534 U.S. 1054 (2001) (quoting *A.E. Finley Assoc., Inc. v. United States*, 898 F.2d 1165, 1167 (6th Cir. 1990). Yet that is precisely what Cartwright and Foremost seek to do, by couching their challenge to GSA's collection of debts attributable to overcharges in terms of an Administrative Procedure Act claim. Those claims fall within the scope of the Tucker Act, and therefore jurisdiction lies exclusively in the Court of Claims. Because that alternative relief is available, the APA does not provide a cause of action. Plaintiffs' claims should therefore be dismissed for lack of jurisdiction.

In the event that the Court determines it has jurisdiction over this matter, plaintiffs' preliminary injunction motion should be denied. Plaintiffs simply have not established that they are entitled to that extraordinary remedy. Plaintiffs do not seek to preserve the status quo, but instead want to alter it by enjoining GSA from continuing to collect the overcharges through offsets against plaintiffs' other billings, and forcing GSA to refund the previously collected offsets. Courts cannot grant requests for such sweeping mandatory injunctive relief absent a strong showing that all four elements of the preliminary injunction standard have been met, namely that: (1) plaintiffs will suffer irreparable harm absent an injunction; (2) plaintiffs have a substantial likelihood of success on the merits; (3) the injunction will not harm third parties; and (4) granting the injunction would be in the public interest. Plaintiffs fail all four elements of that test. They will not be irreparably harmed. They cannot establish that the Court has jurisdiction,

let alone that they will prevail on the merits of their claims.  The relief plaintiffs seek will undermine the public interest in ensuring that the Government pays no more than what carriers are authorized to charge pursuant to their government contracts, and deprive the public fisc of the funds GSA desires to recoup.  For all those reasons, plaintiffs' preliminary injunction motion should be denied.

## STATEMENT OF FACTS

### A.     Statutory and Regulatory Background

The Transportation Act of 1940 requires agencies to verify the correctness of bills "from a carrier or freight forwarder for transporting an individual or property for the United States Government."  31 U.S.C. § 3726(a)(1).  The Administrator of the General Services Administration ("GSA") may determine that certain bills, modes of transportation, and/or agencies may be exempted from pre-payment verification and audits, "and in lieu thereof require a postpayment audit."  *Id.* § 3726(a)(2).   The Administrator of GSA has authority to "conduct pre- or post-payment audits of transportation bills of any Federal Agency."  *Id.* § 3726(b).

Recognizing that audits may reveal that the Government has paid a carrier more than the carrier is due, Congress also has authorized the collection of debt through offset.  Specifically, when the Government has paid a carrier or freight forwarder more than the allowable rate, "the Government may deduct from an amount subsequently due a carrier or freight forwarder an amount paid on the bill that was greater than the rate allowed" under the tariff or other rate source.  *Id.* § 3726(d).  Those deductions may be made within three years of when the bill is paid. *See id.*

GSA has issued regulations that describe the process for post-payment audits of transportation payments. Those regulations authorize GSA to issue a notice of overcharge if it determines that a transportation service provider ("TSP") owes the Government a debt, and to offset overcharges against other payments due to that TSP. Specifically:

> When GSA performs a postpayment audit, the GSA Audit Division has the delegated authority to implement the following procedures:
>
> (a) Audit selected TSP bills after payment;
>
> (b) Audit selected TSP bills before payment as needed to protect the Government's interest (i.e., bankruptcy, fraud);
>
> (c) Examine, settle, and adjust accounts involving payment for transportation and related services for the account of agencies;
>
> (d) Adjudicate and settle transportation claims by and against agencies;
>
> (e) Offset an overcharge by any TSP from an amount subsequently found to be due that TSP;
>
> (f) Issue a Notice of Overcharge stating that a TSP owes a debt to the agency. This notice states the amount paid, the basis for the proper charge for the document reference number, and cites applicable tariff or tender along with other data relied on to support the overcharge. A separate Notice of Overcharge is prepared and mailed for each bill.

41 C.F.R. § 102-118.435(f).

If a TSP disagrees with an overcharge notice, the TSP can protest the overcharge by filing a Request for Reconsideration. *See id.* § 102-118.600. If GSA denies the Request, and then takes action to collect the amount it believes is due from the TSP, *e.g.*, takes an offset, the carrier can submit a claim to GSA for the amount taken. *See id.* §§ 102-118.450(b), 102-118.645. If GSA disallows the entire claim, it will issue a Settlement Certificate (GSA Form 7932) or a Certificate of Settlement for a partial disallowance (GSA Form 7931). *See id.* §§ 102-118.620, 102-118.610.

-4-

A TSP can seek reconsideration of the settlement action by submitting a Request for Review by the Administrator of General Services. *See id.* § 102-118.625. A TSP can ask for a review of a settlement action taken by the Administrator in the United States Court of Federal Claims or the Civilian Board of Contract Appeals ("CBCA"), which formerly was known as the GSA Board of Contract Appeals ("GSBCA"). *See id.* § 102-118.650.

B.    **The Overcharge Dispute Concerning Plaintiffs' Bills**

Plaintiffs Cartwright International Van Lines, Inc. and Foremost Forwarders, Inc. are carriers "exclusively engaged in the forwarding of military household good shipments." Compl. ¶ 8. The shipments at issue in this case are Code J shipments, which involve plaintiffs' movement of household goods to and from military bases and military airports. *See id.* ¶¶ 9, 10. Authorized charges for those services are set forth in single-factor-rates (SFRs) filed by plaintiffs and other carriers with the Surface Deployment and Distribution Command ("SDDC"), an agency of the Department of Army. *See id.* ¶ 8; Decl. of Mary Bates, ¶ 5 (Exh. 1). The terms of transportation contracts — which typically reference those SFRs — provide the basis for determining the correctness of TSPs' bills and whether the charges are excessive. *See* Bates Decl. ¶ 5.

Plaintiffs and other TSPs frequently submit bills through the Electronic Data Interface (EDI). *See id.* Those electronically submitted bills are sent to the Defense Finance and Accounting Service ("DFAS"), which pays the bills. *See id.* Bills submitted via EDI are paid without prepayment audit or verification, and effectively are paid automatically upon submission. *See* Fitzgerald Decl. ¶ 4. DFAS subsequently provides the EDI data to GSA for postpayment audits. *See* Bates Decl. ¶ 5.

When conducting the post-payment audits for several of plaintiffs' EDI billings, GSA auditors determined that the government had paid plaintiffs and other TSPs transportation charges that exceeded the amounts allowable under the SDDC International Rate Solicitation. *See* Bates Decl. ¶ 5. Specifically, surcharges coded as "WAR" and "CON" were being billed inconsistently with the terms of the SDDC rate solicitation, due to the TSPs' misapplication of items 432 (household goods) and 433 (unaccompanied baggage). *See id.* "WAR" is the war risk surcharge, Decl. of Joyce Clark, ¶ 6 (Exh. 3), which the SDDC has defined as "insurance coverage for loss of goods resulting from an act of war or as a result of the vessel entering the war risk area when billed by the ocean/air TSP." *Id.* ¶ 7. "CON" is the port congestion surcharge, *id.* ¶ 6, defined as "an extra charge that is billed to the TSP for controlling the congestion of trucks/vessels entering/departing the port." *Id.* ¶ 8. Although SDDC's February 24, 2006 clarification of the SFRs indicated that "CON" surcharges could not be used for Code J shipments, SDDC issued a second clarification on April 11, 2006 which extended "CON" surcharges to Code J. *See* Bates Decl. ¶ 6; Clark Decl. ¶ 8.

On April 3, 2006, GSA issued notices of overcharge to plaintiffs and 36 other carriers based on the misuse of the "WAR" and "CON" charges. *See* Bates Decl. ¶ 6. The notices and accompanying statements identified the relevant government bills of lading (GBLs), the amount of the overcharge for each GBL, the basis for the overcharge, and the rate authority. *See id.* The Cartwright overcharge notice listed the amount paid, which totaled $3,839,121.02, and indicated that the proper charge was $3,597,910.18, yielding an overcharge of $241,210.84. *See id.*; *see also* Exh. 4 at 1 (excerpt from TARPS Record of Notice of Overcharge to Cartwright). The Foremost overcharge notice also listed the amount paid, which totaled $ 4,752,569.92, and

indicated that the proper charge was $ 3,549,871.47, yielding an overcharge of $1,202,698.45. *See* Bates Decl. ¶ 6 ; *see also* Exh. 5 at 1 (excerpt from TARPS Record of Notice of Overcharge to Foremost). The basis for the overcharge notices sent to plaintiffs was that the "WAR" and "CON" surcharges did not apply to the disputed Code J shipments. *See* Bates Decl. ¶ 6. GSA relied upon a February 24, 2006 SDDC clarification of the "WAR," port congestion ("CON"), and port handling charges as the rate authority. *See id.*

The explanation of the rate basis provided with the overcharge notices also indicated that port security handling surcharge (now coded as "COF") was not applicable. *See* Bates Decl. ¶ 6. "COF" is the port security handling surcharge, defined as "an extra charge that is billed to the TSP for security of their cargo while at the port of embarkation/debarkation." Clark Decl. ¶¶ 6, 9. Prior to October 2003, there was no official separate code for port handling charges, and they were billed as either "WAR" or "CON." *See id.* ¶ 9. However, those charges were included within the "CON" code effective October 1, 2003. *See id.* On October 1, 2006, SDDC created the independent code of "COF" for port handling charges, removing those charges from the scope of "CON." *See id.*

After the overcharge notices were sent, plaintiffs and other industry members presented several arguments to GSA in an effort to defend the disputed charges. Terry Head, as head of an industry trade group representing TSPs in the household goods industry, advised GSA that SDDC had modified its prior clarification. *See* Fitzgerald Decl. ¶ 6. Mr. Head argued that this second clarification made the disputed charges permissible for the items being shipped. *See id.* Cartwright submitted a letter of protest on April 18, 2006, contending that the charges were justified. *See id.* ¶ 8. GSA denied the protest on June 23, 2006, sustaining its notice of

overcharge, and recommending that Cartwright enter into a repayment plan. *See id.* Foremost did not file a written protest of the overcharge notice, but its attorney, Alan Wohlstetter (who also represented the industry trade association and several other industry members) presented arguments concerning the validity of the disputed charges. *See id.* ¶ 9. Mr. Wohlstetter and GSA exchanged several emails and letters concerning the charges, and those discussions continued for over a year. *See id.* ¶¶ 9-14. GSA temporarily suspended the offset process until a final determination could be made on the issue. *See id.* ¶ 12; Bates Decl. ¶ 12.

On January 23, 2007, plaintiffs and other industry members submitted a letter which purported to rebut GSA's overcharge determination. *See* Fitzgerald Decl. ¶ 13; Exh. 6 (Jan. 23, 2007 letter). On July 25, 2007, GSA wrote a letter to Mr. Wohlstetter, expressing GSA's disagreement with the arguments raised in the January 23, 2007 letter. *See* Fitzgerald Decl. ¶ 14. GSA sent a letter to plaintiffs and other involved TSPs on July 27, 2007, advising them of GSA's decision. *See id.*

GSA met with industry representatives again on August 2, 2007. *See id.* ¶ 15. During that meeting, plaintiffs and the other TSPs stated that the charges billed as "WAR" or "CON" were for time spent waiting at the gate of the airbases or for moving from one gate to another at that base. *See id.* ¶ 16. The TSPs offered no reasonable explanation for why these charges would not have been billed under the existing codes applicable to "waiting time." *See id.*; Clark Decl. ¶ 12. The fact that these charges were attributable to such delays in no way justified billing those charges as "WAR," "CON," or even "COF." *See* Clark Decl. ¶¶ 7-10 (discussing definitions of "WAR," "CON," and "COF").

-8-

GSA resumed offset actions on July 25, 2007, after providing the carriers with notice that it would do so.  *See* Bates Decl. ¶ 8.  GSA rejected the TSPs' proposal that the offset action be suspended until plaintiffs had submitted a reply to the July 25, 2007 letter.  *See id.* ¶ 11.  By that time, GSA had suspended offsets for fifteen months, placing some of the debts beyond the three-year period in which offsets may be used to collect debts.  *See id.* ¶ 12; Fitzgerald Decl. ¶ 17.

Shortly thereafter, plaintiffs initiated this litigation and filed a preliminary injunction motion simultaneously with the complaint.  Plaintiffs allege that GSA did not give them sufficient notice of the basis for the overcharges, and argue that this violates GSA regulations and plaintiffs' due process rights.  In light of the complaint and preliminary injunction motion, GSA voluntarily adopted an additional 30-day abatement, beginning August 13, 2007, of offsets for plaintiffs' debts.  *See* Fitzgerald Decl. ¶ 17; Bates Decl. ¶ 12.

## **STANDARD OF REVIEW**

### A.     **Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) gives plaintiffs the burden of establishing that the Court has jurisdiction to review their claim(s).  *See* Fed. R. Civ. P. 12(b)(1); *Public Warehousing Co. KSC v. Defense Supply Center Philadelphia*, 489 F. Supp. 2d 30, 35 (D.D.C. 2007).  When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Thompson v. Capitol Police Bd.*, 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); *see also Vanover v. Hantman*, 77 F. Supp.2d 91, 98 (D.D.C. 1999).  "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192

(D.C. Cir. 2003). In addition, plaintiffs bear the burden of persuasion, and must establish

jurisdiction "by a preponderance of the evidence." *Thompson*, 120 F. Supp.2d at 81; *Vanover*, 77

F. Supp.2d at 98. To determine the existence of jurisdiction, a court may look beyond the

allegations of the complaint, consider affidavits and other extrinsic information, and ultimately

weigh the conflicting evidence. *See Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 197

(D.C. Cir. 1992); *Rann*, 154 F. Supp. at 64.

### B. Preliminary Injunctions

A preliminary injunction is an "extraordinary and drastic remedy." *Mazurek v.

Armstrong*, 520 U.S. 968, 972 (1997). The moving party must show:

> (1) a substantial likelihood of success on the merits; (2) that it would suffer
> irreparable injury if the injunction were not granted; (3) that an injunction would
> not substantially injure other interested parties; and (4) that the public interest
> would be furthered by the injunction.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Al-*

*Fayed v. Central Intelligence Agency*, 254 F.3d 300, 303 (D.C. Cir. 2001); *Serono Labs., Inc. v.*

*Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497,

1505-06 (D.C. Cir. 1995); *NTEU v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991);

*Randolph-Sheppard Vendors v. Weinberger*, 795 F.2d 90, 110 (D.C. Cir. 1986). Those four

factors "interrelate on a sliding scale and must be balanced against each other." *Serono Labs.,*

*Inc.*, 158 F.3d at 1318. However, if the moving party fails to show a likelihood of success on the

merits, the court may deny the preliminary injunction motion without reaching the other three

factors. *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) (finding preliminary

injunction "never will be granted unless a claimant can demonstrate a 'fair ground for

litigation'"). A party's failure to establish any irreparable injury can be equally fatal. *See*

-10-

*CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

The movant bears the burden of persuasion, and may obtain a preliminary injunction only upon a "clear showing" that it is entitled to that extraordinary remedy. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. That burden is even heavier where, as here, the preliminary injunction motion does not seek to preserve the status quo, but instead requests far-reaching mandatory relief. *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F.Supp. 2d 30, 36 (D.D.C. 2000). Such motions are disfavored, and "the movant must show *clearly* that she is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006) (emphasis added).

## ARGUMENT

**I.    PLAINTIFFS' CLAIMS SEEK RELIEF FOUNDED ON A CONTRACT DISPUTE WITH THE GOVERNMENT AND JURISDICTION THEREFORE LIES EXCLUSIVELY IN THE COURT OF FEDERAL CLAIMS.**

"Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity … together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). In this case plaintiffs rely on the waiver of sovereign immunity provided by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*[1] It is true that the APA has

---

[1] Neither the Declaratory Judgment Act nor 28 U.S.C. § 1331 waive the sovereign immunity of the United States.

"broaden[ed] the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by" its provisions. *Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988). However the waiver of sovereign immunity under the APA is limited. *See Bowen,* 487 U.S. at 904, n.39.

The APA waives sovereign immunity for suits to "set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a). But it applies only when the suit demands "relief other than money damages." *Id.* Further, the APA waiver applies only if "there is *no other adequate remedy in a court*..." 5 U.S.C. § 704 (emphasis added); *see Bowen*, 487 U.S. at 902; *Public Warehousing Co. KSC v. Defense Supply Ctr. PA*, 489 F. Supp. 2d 30, 36 (D.D.C. 2007) (explaining limitations of APA's waiver of immunity).

The Tucker Act, 28 U.S.C. § 1491(a), provides an adequate remedy for claims based on contracts with an agency of the United States. *See Spectrum Leasing Corp.*, 764 F.2d 891, 893 (D.C. Cir. 1985); *Deaf Smith County Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1210-1211 (D.C. Cir. 1998) (Court of Federal Claims "provides an 'adequate remedy' … which would preclude district court jurisdiction under § 704 of the APA"); *Consolidated Edison Co. v. United States*, 247 F.3d 1378, 1384 (Fed. Cir. 2001) (refund remedy in Court of Federal Claims held to be adequate remedy barring district court action under the APA). Only the Court of Federal Claims has jurisdiction to hear such suits when the claimed amount exceeds $10,000. 28 U.S.C. § 1491(a)(1); *see Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007). The Little Tucker Act gives federal district courts concurrent jurisdiction over claims for less than $10,000. *See* 28 U.S.C. § 1346(a); *Greenhill*, 482 F.3d at 572.

There is, therefore, no jurisdiction in this Court to hear a suit under the APA if that suit is, in reality, a suit for breach of contract in which the plaintiff is attempting to get money out of the Government. *See Wisconsin Electric Power Co. v. Department of Energy*, 211 F.3d 646, 648 (D.C. Cir. 2000) ("The Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes."); *Consolidated Edison Co.*, 247 F.3d at 1385 (concluding district court lacked jurisdiction over purported APA claim because Tucker Act provided alternate remedy in the Court of Claims. Put differently, "[a] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." *Consolidated Edison Co.*, 247 F.3d at 1385 (quoting *Rogers v. Ink,* 766 F.2d 430, 434 (10th Cir. 1985)). Those principles foreclose plaintiffs' claims. Plaintiffs' dispute with GSA arises out of their contracts with federal agencies. The notices of overcharge were based on excessive payments made on past bills pursuant to plaintiffs' government contracts, and the offsets apply against more recent and future bills pursuant to plaintiffs' government contracts. The relief plaintiffs' seek — an order precluding GSA from continuing to recoup the overcharges through offsets and ordering GSA to refund the prior offsets — is monetary in nature, and in essence is a request for contract damages. *See* Compl. at 9 (Prayer for Relief). In sum, this case concerns plaintiffs' desire to receive money pursuant to their contracts with federal agencies. The Tucker Act provides an adequate remedy for such claims, and precludes APA jurisdiction in this Court.

Plaintiffs appear to have anticipated this jurisdictional problem, and attempt to plead around it by framing their claims as a request for declaratory and injunctive relief pursuant to the

APA.  *See* Compl. ¶¶ 1-2.  Courts have rebuffed similar efforts by plaintiffs in other cases.  In

*Kidwell v. Department of Army, Bd. for Correction of Military Records*, the D.C. Circuit held

that:

> The plain language of a complaint … does not necessarily settle the question of
> Tucker Act jurisdiction.…  This is because plaintiffs can bypass Tucker Act
> jurisdiction by converting complaints which "at their essence" seek money
> damages from the government into complaints requesting injunctive relief or
> declaratory actions.  Because this forum shopping circumvents a primary purpose
> of the Act--to ensure that a central judicial body adjudicates most claims against
> the United States Treasury, *see United States v. Hohri,* 482 U.S. 64, 71-73, 107 S.
> Ct. 2246, 2251-52, 96 L.Ed.2d 51 (1987) (describing goal of uniformity behind
> creation of Federal Circuit); *Vietnam Veterans of America v. Secretary of the Navy,*
> 843 F.2d 528, 534 (D.C. Cir.1988) (recognizing the Tucker Act's interest in
> uniformity)….  To enforce this prohibition on the creative drafting of complaints,
> we look to the complaint's substance, not merely its form. *See, e.g., Amoco Prod.
> Co. v. Hodel,* 815 F.2d 352, 361 (5th Cir.1987), *cert. denied,* 487 U.S. 1234, 108
> S. Ct. 2898, 101 L.Ed.2d 932 (1988).  Absent other grounds for district court
> jurisdiction, a claim is subject to the Tucker Act and its jurisdictional
> consequences if, in whole or in part, it explicitly or "in essence" seeks more than
> $10,000 in monetary relief from the federal government.

56 F.3d 279, 284 (D.C. Cir. 1995); *see also Transohio Savings Bank v. Office of Thrift*

*Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) (APA jurisdiction to grant declaratory relief in

cases where a Tucker Act remedy is available limited to those "few cases where a Claims Court

remedy is 'so inadequate that the plaintiff would not be justly compensated.'").  Other courts have

reached the same conclusion.  *See Coggeshall Development Co. v. Diamond*, 884 F.2d 1, 4 (1st

Cir. 1989) (action for breach of contract remains "an action for breach of contract, irrespective of

how it is packaged"); *Brazos Electrical Power Co-op, Inc. v. United States*, 144 F.3d 784, 787

(5th Cir. 1998) (claim for monetary damages cannot be converted into a claim for declaratory

relief through "artful pleading"); *Metadure Corp. v. United States*, 490 F. Supp. 1368, 1372

(S.D.N.Y. 1980) (plaintiff "may not, by the simple expedient of lumping its contract claims

together and denominating them a constitutional violation, escape the procedural limitations of the Tucker Act").

*Spectrum Leasing Corporation* is particularly instructive. There, as here, the plaintiff relied on the APA as a source of the requisite waiver of immunity, and argued that GSA failed to comply with the procedural requirements governing the use of offsets to collect contract debts. *See Spectrum Leasing Corp.*, 764 F.2d at 892. Like Cartwright and Foremost, Spectrum framed its prayer for relief as a request for injunctive and declaratory relief, requesting that the court issue an order declaring that Spectrum was entitled to payment of the money being withheld through administrative offset, and an injunction requiring the government to pay the monies owed. *See id.* at 894. The D.C. Circuit concluded that this was "a contract dispute subject to the jurisdiction of the Claims Court under the Tucker Act," and not a proper APA claim. *Id.* at 894. Spectrum argued that its right to relief arose from the Debt Collection Act ("DCA") — which established the procedures for collecting debts — but the Court disagreed. "Although the DCA might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy Spectrum seeks." *Id.* at 894. Further, the orders Spectrum sought would compel the government to pay money owed under a contract. Accordingly, Spectrum's procedural claim "was founded upon a contract for purposes of the Tucker Act," and outside the scope of the APA. *Id.* at 895.

As was true in *Spectrum*, plaintiffs' claims are founded upon their government contracts. Although plaintiffs invoke the APA and allege that GSA has violated the procedural requirements of its regulations, the only relief they seek is monetary in nature. *See* Compl. at 9. Plaintiffs want to bar GSA from continuing its debt collection efforts, and also seek reimbursement of the monies

already offset.  *See id.*  Those claims arise under the contracts under which the excessive bills

were issued, and the contracts against which the offsets are applied, because those contracts are

the source of plaintiffs' alleged right to payment.  Such claims "at their essence" seek to recover

money from the government.  *Kidwell*, 56 F.3d at 284.  Accordingly, they are within the scope of

the Tucker Act, and, by definition, outside the scope of the APA.  *See Spectrum*, 764 F.2d at 891;

*see also Kidwell*, 56 F.3d at 284; *Consolidated Edison*, 247 F.3d at 1385.  Plaintiffs seek

significantly more than $10,000, thus triggering the exclusive jurisdiction of the Court of Claims.

*See* 28 U.S.C. § 1491(a)(1).

## II.    EVEN IF THE COURT HAD JURISDICTION, PLAINTIFFS WOULD NOT BE ENTITLED TO A PRELIMINARY INJUNCTION.

### A.    Plaintiffs Are Not Likely to Succeed on the Merits.

A plaintiff that cannot demonstrate a significant likelihood of success on the merits has no

hope of obtaining a preliminary injunction.  *See Trudeau v. Federal Trade Comm'n*, 456 F.3d

178, 182 n.2 (D.C. Cir. 2006); *Katz*, 246 F.3d at 688; *Apex, Inc. v. FDA*, 449 F.3d 1249, 1253-54

(D.C. Cir. 2006).  "[A]bsent a 'substantial indication' of likelihood of success on the merits,

'there would be no justification for the court's intrusion into the ordinary processes of

administration and judicial review.'" *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, (D.D.C. 2006)

(quoting *American Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C.

1999)).  Plaintiffs are unlikely to succeed on the merits for two reasons.  First, they cannot prove

that this Court has jurisdiction to review their claims.  Second, GSA reasonably determined that

plaintiffs' belated recharacterization of the disputed "war" charges as "waiting time" charges did

not require GSA to re-commence the postpayment audit process and issue a new notice of

overcharge.

### 1.     The Court Lacks Jurisdiction.

Plaintiffs have no chance of success on the merits because their claims will not survive defendant's motion to dismiss. As discussed *supra*, Plaintiffs should have filed this action in the Court of Claims. Given that plaintiffs cannot litigate (let alone prevail on) their claims in this Court, they cannot obtain a preliminary injunction. *See Tanner v. Federal Bureau of Prisons*, 433 F. Supp. 2d 117, 122 n.5 (D.D.C. 2006); *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 205 (D.D.C. 2005) ("[T]he plaintiff is not likely to succeed on the merits because this Court is barred by statute from having subject matter jurisdiction in this case.").

### 2.     GSA's Interpretation and Application of Its Regulations Was Not Arbitrary, Capricious, or Contrary to Law.

Even if this Court could review plaintiffs' claims on the merits, plaintiffs would be unable to satisfy the exceedingly high standard for having agency action declared arbitrary and capricious. "There is a presumption in favor of the validity of administrative action." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 216 (D.D.C. 1996). Thus courts apply a deferential standard under which agency action may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action must be upheld if it is rational, based upon relevant factors, and within the agency's authority. *See Motor Vehicle Mfrs. Ass'n of the United Sates, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003).

Where, as here, plaintiffs challenge an agency's interpretation of its own regulations, that standard requires courts to accord "substantial deference" to the agency's view. *National Wildlife Fed. v. Browner*, 127 F.3d 1126, 1129 (D.C. Cir. 1997); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997). The agency's interpretation is "controlling unless plainly erroneous or inconsistent with

-17-

the regulation." *Auer*, 519 U.S. at 461 (internal quotations omitted); *see also Mistick PBT v. Chao*, 440 F.3d 503, 511 (D.C. Cir. 2006) (quoting same); *Browner*, 127 F.3d at 1129 ("Provided the interpretation does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."). That is, courts must "defer to [the agency's] view unless an alternative reading is compelled by the regulation's plain language or by other indications of the agency's intent at the time of the regulation's promulgation." *Air Transport Ass'n of America v. FAA*, 291 F.3d 49, 53 (D.C. Cir. 2002). The agency may present its interpretation of the relevant regulation in a legal brief. *See Auer*, 519 U.S. at 462; *Drake*, 291 F.3d at 68-69.

To prevail on the merits of their claims, plaintiffs must show that GSA's issuance of notices of overcharge, and its subsequent initiation of the offset process, violated the plain language of the controlling regulations or statute, or was otherwise unlawful. Plaintiffs will be unable to make that showing. The notices of overcharge alerted plaintiffs to the nature of the overcharge, and referenced the SDDC definitions of the relevant surcharges. That is all the regulations required. The fact that GSA gave plaintiffs multiple opportunities to justify the disputed charges, and suspended offsets for over a year, forecloses plaintiffs' claim that they received an inadequate opportunity to be heard in violation of their due process rights. GSA concluded that the overcharges should be sustained, and was fully entitled to resume offsets after making that determination. To the extent plaintiffs seek further relief, they must file a claim for the amount of the offsets, and/or enter into a repayment plan.

      **a.**      **The Notices of Overcharge Complied With the Applicable Regulations.**

The notices of overcharge issued to Cartwright and Foremost contained the information contemplated by the GSA regulations. Section 102-118.435 indicates that a notice of overcharge "states the amount paid, the basis for the proper charge for the document reference number, and cites applicable tariff or tender along with other data relied on to support the overcharge." 41 C.F.R. § 102-118.435. GSA issued a notice of overcharge to Cartwright on March 31,2006. The Cartwright notice listed the amount paid, which totaled $3,839,121.02, and indicated that the proper charge was $3,597,910.18. *See* Exh. 4 (TARPS Record of Notice of Overcharge to Cartwright). As the Basis and Authority to support the overcharge, the notice stated as follows:

> This Notice of Overcharge is issued to recover charges that were  erroneously billed by your company for War Risk Surcharges (WAR),  Port/Terminal Security Handling Surcharges (COF), and Port Congestion Surcharges (CON), applied to codes T, 5, and J  shipments.
> The Surface Deployment and Distribution Command (SDDC) issued a letter dated February 24, 2006, clarifying the description and application of these surcharges. The letter states in Note 1 that, "Air fuel, bunker, War Risk, Port/Terminal Security Handling, and Port Congestion surcharges are not applicable on shipment codes of service T, 5, and J." Further, SDDC refers to this statement as a clarification of the billing procedure, not a change. In accordance with this explanation of the appropriate billing of surcharges, the Audit Division is requesting a refund of excess charges related to the improper application of surcharges to Codes T, 5, and J shipments.
> The following DRN's are included in this overcharge:  [a list of DRNs followed with the dollar amounts for each] .

*See id.* at 2-3.

GSA issued a notice of overcharge to Foremost on March 31,2006.  Like the Cartwright notice, the Foremost notice listed the amount paid, which totaled $ 4,752,569.92, and indicated that the proper charge was $ 3,549,871.47.  *See* Bates Decl. ¶ 6; Exh. 5 at 2-3 (excerpt from TARPS Record of Notice of Overcharge to Foremost).  That notice was supported by a Basis and Authority statement identical to the Cartwright notice in all respects except for the list of DRNs

included in the overcharge. *See* Exh. 5 at 2-3. Thus, both notices provided plaintiffs with the information referenced in the regulations, and put plaintiffs on notice of the basis for the overcharges.

After GSA issued the notices of overcharge, plaintiffs and other industry members who had billed the government for similar charges communicated with GSA concerning the legitimacy of the war risk ("WAR") and port-congestion ("CON") surcharges. *See* Fitzgerald Decl. ¶¶ 6-16. Cartwright submitted a written protest to the overcharge, but Foremost did not. *See id.* ¶¶ 8-9. However, plaintiffs' attorney — Alan Wolhstetter — participated in those written and oral discussions with GSA on behalf of the industry and several clients. *See id.* ¶ 9. In light of those discussions, GSA suspended its collection of the overcharges from plaintiffs and other TSPs for fifteen months. *See id.* ¶ 17. During that process, plaintiffs' attorney informed GSA that certain charges had been miscoded as "WAR," and should have been coded as port congestion ("CON") or port/terminal security handling surcharge ("COF"). *See* Fitzgerald Decl. ¶¶ 9, 10, 15. Plaintiffs' attorney subsequently informed GSA that due to tightened security at the military air bases after September 11, 2001, the time involved in the pick-up and delivery of Code J shipments had substantially increased for the port agents. *See* Fitzgerald Decl. ¶ 16; Exh. 6 at 3 (Jan. 23, 2007 letter). Plaintiffs contended that their charges were legitimate expenses incurred for that additional waiting time. *See* Exh. 6; Fitzgerald Decl. ¶ 16. Plaintiffs did not submit corrected bills listing the "CON" and "COF" codes instead of "WAR." *See* Fitzgerald Decl. ¶ 9.

GSA considered the arguments advanced by Mr. Wohlstetter and other industry representatives, but found them unpersuasive. Nothing plaintiffs submitted indicated that the disputed charges were properly billed as "WAR" charges. *See* Fitzgerald Decl. ¶¶ 8, 16. Indeed,

plaintiffs' presentation of a new theory — that these were "CON" or "COF" charges — suggested that plaintiffs had abandoned their prior position that these charges were properly classified as "WAR." *See id.* ¶¶ 9, 16. GSA also found plaintiffs' alternative theory unpersuasive, as additional waiting time caused by heightened security is not properly coded as "CON" or "COF" in this context. *See id.* ¶ 16; Clark Decl. ¶¶ 8-10, 12. That waiting time simply does not meet the definition of CON & COF contained in the SDDC clarification of those codes' meaning. *See* Clark Decl. ¶¶ 10, 12.

The regulations did not require GSA to restart the administrative claims process and issue new notices of overcharge to plaintiffs simply because plaintiffs presented new facts and theories in their post-notice communications with GSA. Instead, the regulations articulate a straightforward process in which GSA issues a notice of overcharge, the TSP has an opportunity to seek reconsideration of GSA's ruling, and GSA determines whether to reconsider the overcharge or collect the debt. The TSP's reconsideration petition or other communications may introduce new facts which GSA may deem relevant. However, GSA considers those facts after they have been raised, and determines whether those new facts warrant reexamination of GSA's prior determination of the TSP's entitlement to payment. Nothing in the text of Section 102-118.435 indicates that GSA must go back to the beginning of the settlement process and issue a new notice of overcharge each time a new fact arises that influences GSA's assessment of the disputed charges.

Plaintiffs' contrary assertions are untenable. As explained *supra*, plaintiffs face a very heavy burden of establishing that GSA's actions violate the plain language of the regulations or statute. *See Browner*, 127 F.3d at 1129; *Auer*, 519 U.S. at 461. The Court's role is not to ensure

that the agency's application of its regulations to the facts is the most natural or logical, the only possible interpretation, or the one that the Court would have adopted in the first instance, but only that it is reasonable and consistent with the regulations. *National Trust for Historic Preservation v. Dole*, 828 F.2d 776, 782 (D.C. Cir. 1987); *Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 685 (D.C. Cir. 1978). Thus, GSA's interpretation and application of its regulations must be accepted "unless it is manifestly unreasonable." *Liberty Maritime Corp. v. U.S.*, 928 F.2d 413, 419 (D.C. Cir.1991) (quoting *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 174 (D.C. Cir. 1982)).

Plaintiffs will be unable to satisfy that stringent standard. Section 102-118.435 contains no language indicating that GSA must re-issue notices of overcharge if a TSP identifies a new theory for its charges at a later stage in the audit and collection process. Instead, it contemplates that the notice of overcharge will be issued at the beginning of the process, as GSA did in this case. *See* 41 C.F.R. § 102-118.435. GSA interprets Section 102-118.435 as allowing it to move forward with debt collection whenever it deems such belated explanations for a carriers' charges unpersuasive. GSA has issued no prior rulings interpreting the rule in a different way, and Congress has not addressed the issue. Thus GSA's interpretation can hardly be deemed "manifestly unreasonable." *Liberty Maritime Corp.*, 928 F.2d at 419. Instead, it deserves deference, and must be upheld. *See Browner*, 127 F.3d at 1129; *Dole*, 828 F.2d at 782.

Plaintiffs' reading of Section 102-118.435, in contrast, would undermine the efficiency of the post-payment audit process, and significantly reduce GSA's ability to recoup excessive charges. Under plaintiffs' theory, a TSP could delay the collection process unilaterally by articulating a new justification for disputed charges after GSA has issued the overcharge notice, thereby requiring GSA to issue a new notice of overcharge. This process would end, and the debt

could be collected, only when the TSP ran out of theories to support its bills.  Such an implausible interpretation of the regulations cannot possibly trump the agency's reasonable interpretation of its rules.

### b. Plaintiffs Had More than Ample Opportunity to Rebut the Overcharges.

Plaintiffs also are quite unlikely to succeed on the merits of their claim that they were denied due process, or otherwise received an insufficient opportunity to respond to GSA's position in the overcharge dispute.  Plaintiffs contend that they were not given an opportunity to be heard before the offsets were deducted, and suggest that this violates their procedural due process rights.  *See* Compl. at 9; PI Mem. at 5.  But in reality, GSA gave plaintiffs several opportunities to justify their bills to GSA, and suspended collection of offsets for fifteen months while it reviewed plaintiffs' and other TSPs' contentions.  Accordingly, even assuming *arguendo* that plaintiffs have a constitutionally protected property interest in the relevant contract payments, they have no viable due process claim.

When reviewing due process claims, courts ask two questions: (1) were the plaintiffs "deprived of a protected [liberty or property] interest?"; and (2) "what process is due?"  *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Board of Trustees of the University of the District of Columbia*, 56 F.3d 1469, 1471, 1472 (D.C. Cir. 1995).  "[T]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Roth v. King*, 449 F.3d 1272, 1284 (D.C. Cir. 2006) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005).  As a general rule, notice and an opportunity to be heard must be provided before a person or entity is deprived of a constitutionally protected liberty or property interest.

-23-

*See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976); *UDC Chairs Chapter*, 56 F.3d at 1472.

Plaintiffs do not have a constitutionally protected interest in the funds at issue in this overcharge dispute. The Transportation Act clearly establishes the government's right to collect debts through offset, *i.e.*, to deduct overcharges from amounts the government would otherwise pay a carrier or freight forwarder for future transactions. *See* 31 U.S.C. § 3726(d). GSA's regulations reinforce that right, and authorize the GSA Audit Division to "offset an overcharge by any TSP from an amount subsequently found to be due that TSP." 41 C.F.R. § 102-118.435(f). Those provisions indicate that a TSP's right to receive payment for services or goods provided to the government is contingent upon the TSP's satisfaction of other government debts. Accordingly, a TSP has no legitimate claim of entitlement to funds due on government contracts when a post-payment audit of prior bills has revealed an overcharge.

Even if this case implicated a constitutionally recognized property interest, plaintiffs' claims would fail because they have received all the process they were due. As discussed *supra*, GSA's regulations contemplate that a TSP will receive a notice of overcharge and thereafter have an opportunity to protest the overcharge determination with a written request for reconsideration, *See* 41 C.F.R. § 102-118.435. Plaintiffs received those notices, and subsequently had several opportunities to present their position to GSA. Cartwright submitted a protest letter on April 18, 2006, which GSA reviewed and denied. *See* Fitzgerald Decl. ¶ 8. Although Foremost did not submit a written protest, its attorney presented arguments concerning the validity of the disputed charges. *See id.* ¶ 9. Oral and written discussions continued through July 2007 — over a year after the overcharge notices were sent — and GSA stayed offset actions during that period. *See id.* ¶ 17. Plaintiffs apparently desire still further opportunities to challenge the overcharge

determination.  But GSA's  regulations do not require it to defer collection actions indefinitely

while waiting for plaintiffs to articulate every possible justification for their bills.  Plaintiffs have

received notice and numerous opportunities to be heard, which is more than the Constitution

requires.

> ### c.  GSA Was Entitled to Initiate Offsets to Recoup the Overcharges.

Having determined that plaintiffs' bills contained excessive charges, GSA had the right to

resume the offset process.  The Transportation Act and GSA rules authorize GSA to offset

charges due under current bills against amounts a carrier owes on prior bills.  *See*  31 U.S.C. §

3726(d); 41 C.F.R. § 102-118.435(f); *see also Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014,

1020 (Fed. Cir. 1995) (noting "it has long been recognized that the government may set off loss . .

. overcharges against the payments to carriers authorized by Section 3726").  Offsets usually

begin automatically if a carrier does not respond to the Notice of Overcharge by paying or

submitting a written protest.  *See* Bates Decl. ¶ 7.  Although the regulations do not expressly

require GSA to suspend offsets after receiving a protest, in this case GSA held offsets in abeyance

pending its response to any protest filed by plaintiffs or other industry members and

representatives.  *See* Bates Decl. ¶ 6.  Offsets against plaintiffs' other bills were held in abeyance

for over fifteen months, until July 25, 2007, plus an additional 30-day abeyance period (beginning

August 13, 2007) that GSA adopted to permit the preliminary injunction motion to be briefed.

*See id.* ¶ 12; Fitzgerald Decl. ¶ 17.  GSA had no statutory or regulatory duty to defer collection

actions for that long, and certainly had the right to resume its collection efforts when it did.

> ### B.  Plaintiffs Will Suffer No Irreparable Harm Absent An Injunction.

No injunction may issue in the absence of an "irreparable injury," no matter how strongly

the other factors support the movant. *See CityFed Fin. Corp.*, 58 F.3d at 747; *Farris*, 453 F. Supp. 2d at 78. The moving party bears the burden of establishing that, absent an injunction, it will suffer an injury that is "both certain and great," and that "there is a clear and present need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). As the D.C. Circuit has recognized,

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 298 (emphasis in original; internal quotations omitted).

Purely economic loss, even when large sums of money are involved, typically will not constitute irreparable injury. *See Wisconsin Gas Co.*, 758 F.2d at 674 (noting it is "well settled that economic loss does not in and of itself constitute irreparable harm"); *Emily's List v. Federal Election Comm'n*, 362 F. Supp. 2d 43, 52 (D.D.C. 2005). Economic loss that threatens the survival of the movant's business may constitute irreparable harm. However, the movant may not rely on "bare allegations" that the business will not survive absent a preliminary injunction. *Wisconsin Gas Co.*, 758 F.2 at 674. Instead, the movant must substantiate its allegation of harm by showing that this threat to the business's viability is "certain to occur in the near future as a direct result of the threatened action." *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005); *see also Wisconsin Gas Co.*, 758 F.2d at 674.

Plaintiffs have not shown that they will suffer an "irreparable" injury absent a preliminary injunction. Plaintiffs contend that GSA's collection of the overcharges through offsets against

-26-

other government contracts irreparably harms them because it will deprive them of significant revenues from their other government contracts. *See* PI Mem. at 6-7. While that financial loss may harm plaintiffs, it is neither certain nor irreparable. Instead, it is a purely financial injury, which plaintiffs can avoid by entering into a payment plan, and can remedy by filing a claim against GSA for the amount of the overcharges.

Because the loss plaintiffs have identified is purely financial, it cannot support a finding of irreparable harm unless plaintiffs establish that these losses will threaten the continued existence of their businesses. Plaintiffs contend that the offsets will have such an effect, but have not substantiated those claims. First, the fact that Cartwright and Foremost remain solvent and operational belies any suggestion that the offsets withheld to date are sufficiently large that they will destroy plaintiffs' ability to continue operations. Second, plaintiffs have offered only general allegations that continued offsets would impair their working capital and interfere with their ability to service military shipments. *See* Decl. of Andrew W. Cartwright, ¶ 9 (Dkt. Entry 3); Decl. of Kenneth J. Sullivan, ¶ 5 (Dkt. Entry 3). They have not submitted audited financial statements or other detailed materials to demonstrate the impact these offsets would have on their viability, and the dollar amount at which the offsets allegedly would drive them out of business. Those "bare allegations" that the offsets threaten the existence of plaintiffs' business are insufficient to support a finding of irreparable harm. *See Wisconsin Gas Co.*, 758 F.2d at 654.

Further, even if plaintiffs had proven that the continued offsets would drive them out of business, they cannot establish that this risk is "certain." The offsets are but one of the debt collection mechanisms available to GSA. As GSA has repeatedly told plaintiffs and other industry members, carriers can avoid offsets by entering into a repayment plan with GSA. *See*

Bates Decl. ¶ 9; Fitzgerald Decl. ¶¶ 8, 10, 14.  Although the repayment plan would not eliminate the debt, it would allow plaintiffs to propose a repayment schedule that leaves them with sufficient funds to continue operations.  *See* Bates Decl. ¶ 9.  Thus it is far from certain that the offsets will reach a dollar amount so high that they would drive plaintiffs out of business. Plaintiffs have the ability to avoid that result, and the alleged threat to their viability will result from plaintiffs' decision not to elect a repayment plan.  Those factors weigh strongly against finding irreparable harm.  *See Sociedad Anonima Vina Santa Rita v. United States Dep't of Treasury*, 193 F. Supp. 2d 6, (D.D.C. 2001) (concluding harm was not "certain" to occur and was not irreparable because plaintiffs could petition the agency to change its decision and thereby avert the anticipated harm).

Finally, it bears noting that plaintiffs also may file an administrative claim against GSA for the amount of the overcharges.  *See* Bates Decl. ¶ 12; 41 C.F.R. §§ 102-118.450(b), 102-118.645.  If that claim is successful, plaintiffs would recover any offsets or other payments to which GSA was not entitled.  Plaintiffs could appeal any adverse decision to the Civilian Board of Contract Appeals.  *See* Bates Decl. ¶ 12; 41 C.F.R. § 102-118.650.

## C.    Suspending GSA's Ability to Collect On The Overcharges Would Cause Harm to Third Parties and Would Be Contrary To The Public Interest.

The remaining two elements of the preliminary injunction analysis also favor denial of plaintiffs' motion.  Those factors require the Court to evaluate the harms others would suffer if the injunction were granted, and to determine whether injunctive relief would promote the public interest.  *See Chaplaincy of Full Gospel Churches,* 454 F.3d at 297; *Serono Labs., Inc.*, 158 F.3d at 1318.  The potential harm to third parties and the public interest both outweigh the harms plaintiffs claim they will suffer absent an injunction.

-28-

Granting plaintiffs' injunction would undermine the public interest in the integrity of government contracts, and would hamper GSA's ability to collect on its debts. Federal agencies should be billed for no more than the amounts TSPs or other providers of goods and services are authorized to charge pursuant to the applicable tariff, agreement, or other rate source. *See* 31 U.S.C. § 3726(a)(1). Although Congress and GSA could have enacted requirements that freeze debt collection proceedings once a carrier challenges an overcharge, they have determined that carriers must pay, and then file a claim against the government for the disputed amount. *See* 31 U.S.C. § 3726(i)(1) (allowing carriers to request GSA review of the Administrator's decisions); 41 C.F.R. §§ 102-118.450(b) (explaining TSPs' right to file claim against an agency), 102-118.645 (explaining TSP's right to file claim involving collections triggered by GSA post-payment audits). Enjoining future collections pending resolution of the instant litigation would be contrary to the public interest in ensuring that these debt collection procedures are followed, and would create incentives for other carriers to file their own actions as a last-ditch effort to avoid repaying these excessive charges.

Further, the delay created by a preliminary injunction would prevent GSA from using offsets to collect on some of the bills at issue. GSA may deduct offsets within three years of when the bill was paid. *See* 31 U.S.C. § 3726(d). As many of these overcharges involve bills issued in 2004, that three-year period will expire soon. Indeed the three-year period for some bills expired during the voluntary abatement, and GSA already has lost its ability to collect portions of the debts through offset. *See* Fitzgerald Decl. ¶ 17. Although GSA could pursue those overcharges by filing claims against the carriers, offsets are a more efficient and less costly means of collecting debts.

In sum, plaintiffs have alleged purely financial harm, cloaked as an alleged procedural deprivation, as a result of GSA's resumption of collection actions. Even if that harm were irreparable, it would not outweigh the harm that the government and the public fisc will suffer if GSA is enjoined from collecting the overcharges from plaintiffs. The extraordinary remedy of a mandatory preliminary injunction is not warranted in such a case. *See American Fed'n of Gov't Employees, AFL-CIO v. United States*, 104 F. Supp. 2d 58, 79 (D.D.C. 2000) (considering "burden on the public fisc" when assessing public interest effects of injunction and denying preliminary injunction motion).

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court GRANT

Defendant's motion to dismiss, and DENY plaintiffs' motion for a preliminary injunction.

Dated: August 29, 2007                          Respectfully submitted,


_____/s/ Jeffrey A. Taylor, by DCH_____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.

_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov


**Of Counsel:**

Raymond J.M. Wong
GENERAL SERVICES ADMINISTRATION,
Office of General Counsel

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CARTWRIGHT INTERNATIONAL VAN LINES, INC. et al., )<br>Plaintiffs, )<br><br>v. )<br><br>LURITA ALEXIS DOAN, Administrator of General Services Administration, )<br><br>Defendant. ) | No.: 1:07-1454 (EGS) |

## DECLARATION OF MARY BATES

1. I am the Deputy Director of the Transportation Audit Division (QMCA), Office of Travel and Transportation Services, Federal Acquisition Service, U. S. General Services Administration. My responsibilities include coordinating the work of three branches, the Accounts and Collections Branch, the Audit Policy and Review Branch and the Disputes Resolution Branch.

2. I make this declaration based on my knowledge of work processes employed to achieve organization objectives. I have a comprehensive understanding of the audit function, policies and procedures, and regulations governing Federal claims, collection standards and procedures, and bankruptcy procedures. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3. I coordinate the work of three branches of highly specialized auditors and support personnel engaged in the pre and post-audit of payments made to carriers and forwarders in all modes of transportation, maintain oversight of the analysis and settlement of claims, and review the basis for complaints before regulatory agencies or courts when the United States is either the plaintiff or defendant. My managerial tasks include developing reports and related proposals for changes in personnel, work assignments, methods and procedures that enhance the effectiveness of the organization.

4. GSA conducts post-payment audits of transportation bills of any Federal Agency, including SDDC, under the authority of 31 U.S.C § 3726 to verify their correctness. Prepayment audits are the responsibility of the paying agency and are conducted by audit contractors or government employees as best suits the needs of the agency. Post-payment audits are conducted on all paid bills including those that were prepayment audited.
To minimize auditing a transaction more than once, post-payment audits are conducted on a lag time basis to ensure that all bills arising from a particular transaction have been filed. The TSP can file a claim for transportation services within three years after providing the service. During that same three year period, the Government may collect overcharges by offset, i.e., deduct the overcharge from an amount subsequently due a TSP.

5. A Notice of Overcharge is issued for charges that are unsupported or not authorized by the underlying transportation contracts. The terms of transportation contracts establish the basis for establishing the correctness of TSP billings and determining whether the charges are excessive. The subject overcharges were issued during the audit of billings made through Electronic Data Interface (EDI), where the TSP sends bills electronically to the Defense Finance and Accounting Service (DFAS). After the bill is paid, DFAS provides the data to GSA by an electronic feed for post payment audit. The Audit comprises review of all payment data; carrier provided documentation and the terms and conditions under which the transportation of goods and property occurred. In this instance, auditors established that the Government had paid certain TSPs excess transportation charges based on the Surface Deployment and Distribution Command (SDDC) International Rate Solicitation I-13 (as amended). The auditors noticed WAR and CON surcharges being billed inconsistently with the terms of the Rate Solicitation, due to the TSPs misapplication of Item 432 (household goods) and Item 433 (unaccompanied baggage). These items define the services that are included in the SFRs for the transportation of personal property. There had been some confusion on the part of the TSPs concerning what services were incorporated into the SFR for these items until a final clarification was issued by SDDC on February 24, 2006.

6. GSA issued 38 Notices of Overcharge on April 3, 2006 based on the Surface Deployment and Distribution Command (SDDC) Clarification 1, dated February 24, 2006. Clarification 1, defined the Port Congestion Surcharge (CON), the Port /Terminal Security Handling Surcharge (COF) and the WAR surcharge. Note 1 specifically excluded codes of service 5, J and T. Prior to February, 24, 2006, only CON and WAR were at issue. COF was introduced in Clarification 1 (2/24/06) and Clarification 2

(4/11/2006). Notices of Overcharge are issued using the Transportation and Accounts Receivable/Payable System (TARPS) when auditors determine that excess transportation charges have been assessed by a transportation service provider (TSP).These overcharges were issued to 38 carriers including Cartwright International Van Lines Inc (CRWV) and Foremost Forwarders Inc (FOFD). The Cartwright overcharge notice listed the amount paid, which totaled $3,839,121.02, and indicated that the proper charge was $3,597,910.18 for an amount due (overcharge) of $241,210.84, and the Foremost overcharge notice listed the amount paid, which totaled $ 4,752,569.92, and indicated that the proper charge was $ 3,549,871.47 for an amount due (overcharge) of $1,202,698.45. Each notice was assigned a document reference number (DRN) that consisted of the Standard Carrier Alpha Code (SCAC) plus the numbers "0001." Each NOC identified : (1) multiple Government Bills of Lading (GBLs) for that TSP, (2) the amount of overcharge for each GBL, (3) the basis for the overcharge, which consisted of a single issue concerning the applicability of the surcharges, and (4) rate authority (SDDC clarification of WAR, CON, and COF). If other overcharges were/are discovered based on another issue, NOCs would be issued employing the individual GBL number as the DRN. (41 CFR 102-118.435). The carriers received written Notices of Overcharge and had the opportunity to either pay the amount requested or protest the basis of the notice. Any protest of the overcharge held collection action in abeyance until the protest was answered.

7. In response to a Notice of Overcharge, TSPs may submit a payment, or protest letter which defers collection action. After a protest is considered, GSA advises the TSP by letter whether the Notice of Overcharge has been sustained, amended (amount changed), or canceled. If a TSP's protest is denied or amended, the overcharge is referred to the Defense Finance and Accounting Service (DFAS) for administrative offset or deduction. Following deduction, the TSP may present a reclaim, a request for a refund with written explanation of the basis upon which he makes the claim. The TSP should provide any documentation and additional information that justifies the correctness of his charges and proves his right to a refund. GSA will review the TSPs reclaim and determine whether the carrier is due a refund. If the TSP's reclaim is approved, a Certificate of Settlement will be issued and payment authorized. If, the reclaim is disallowed, a Settlement Certificate is issued denying the reclaim and outlining the basis for the denial. If the TSP disagrees with the denial of the reclaim, he may ask for a review of the settlement action. At each step, the TSP has the opportunity to respond to GSA's decision. After the denial of reconsideration, the TSP can ask for a review by the Civilian Board of Contract Appeals (CBCA) or the Court of Federal Claims.

8. Subsequent to the Notice of Overcharge, GSA procedures (41 CFR 102-118.440 and 102-118.640) provides for the administrative offset, through a

government finance center, of debt that is owed by a TSP. Offsets usually begin automatically when a carrier does not respond to the Notice of Overcharge with either payment or a written protest within proscribed time frames, usually 60 days from issuance. Initially, GSA did not immediately commence offsets.  GSA wanted to confirm SDDC would sustain its last policy statement (clarification 2). When some of the subject overcharges in TARPS were diverted from the automatic deduction process, and were manually processed through Defense Finance and Accounting (DFAS), Norfolk, VA, TSPs alerted GSA that some administrative offsets had been accomplished.  Under the automatic deduction process overcharge data is sent by electronic feed to DFAS Indianapolis on a weekly basis. In the manual collection process, personnel at other finance centers are contacted directly by a collection technician and expedited collections are requested. The Director of the Transportation Audit Division, James Fitzgerald, directed the Accounts and Collections Branch to stop the manual process on the balance. The administrative offset process resumed July 25, 2007 following notification to the TSPs that offsets would commence.

9.  CRWV submitted a letter of protest on April 18, 2006 which was entered into TARPS on June 14, 2006 and denied (Notice of Overcharge sustained) on June 23, 2006. James Fitzgerald, Director of the Audit Division recommended that the TSP enter into a repayment plan in a letter dated June 14, 2006. Repayment plans generally consist of the execution of a promissory note in favor of the Government to be paid in an agreed number of installments over a definite period of time. This is a viable alternative for TSPs to minimize financial hardship. Otherwise, the offset process would resume.

10.  On November 29, 2006, GSA met with A. Wohlstetter, T. Head and several TSPs to discuss the November 1, 2006 letter. They asked that GSA stop setoff action until they could submit their requests for reconsideration. GSA agreed to temporarily stop the offset process until a final determination could be made on those requests; this stoppage was for all involved carriers, including CRWV and FOFD.

11.  GSA met with industry and representatives on August 2, 2007. The industry and TSP representatives proposed that offset action be suspended until a reply to the July 25, 2007 GSA letter could be submitted to GSA for consideration. Additionally, the industry suggested surety bonds in conjunction with a waiver of the statute of limitation. GSA rejected the industry's proposal in favor of GSA's recommended repayment plans (which constitute stoppage of offsets, an orderly repayment of debt, a confessed judgment in case of default, and allow the TSP to continue its appeal process).

12. GSA has abated the offset process for the 38 TSPs involved in this broader overcharge dispute --- including Cartwright International Van Lines (CRWW) and Foremost Forwarders Inc (FOFD) ---since the Notices were issued on April 3, 2006, a period of 15 months (from June 2006 until August 2007. In addition, GSA has voluntarily adopted an additional 30-day abatement of collection of the debt for Cartwright   International Van Lines (CRWV) and Foremost Forwarders Inc (FOFD) in light of the instant litigation and the preliminary injunction motion filed by A. Wohlstetter. The TSPs have not been deprived of the right to dispute the Notices. TSPs may dispute collection actions by submitting an administrative claim for any amounts collected, documenting the basis for repayment of the amounts collected. In addition, TSPs may appeal adverse decisions to the Civilian Board of Contract Appeals.

Executed on August _29_, 2007.


_Mary C. Bates_

Mary C. Bates
Deputy Director,
Transportation Audits
Division

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARTWRIGHT INTERNATIONAL VAN LINES, INC. et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No.: 1:07-1454 (EGS) ) |
| LURITA ALEXIS DOAN, Administrator of General Services Administration, | ) ) ) ) |
| Defendant. | ) ) ) |

## DECLARATION OF JAMES F.FITZGERALD

1. I am the Director of the Transportation Audit Division (QMCA), Office of Travel and Transportation Services, Federal Acquisition Service, U. S. General Services Administration. I have served in this position for 15 years.  My primary responsibilities are to  oversee the detection and recovery of overcharges and overpayments paid by federal agencies to transportation service providers ("TSPs").

2. I make this declaration based on my knowledge of work processes employed to achieve organization objectives. I have a comprehensive understanding of the audit function, policies and procedures, and regulations governing Federal claims, collection standards and procedures, and bankruptcy procedures. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3. I oversee the work of three branches of highly specialized auditors and support personnel including contract audit firms engaged in the pre and post-payment audit of payments made to carriers and forwarders in all modes of transportation, maintain oversight of the analysis and settlement of claims, and review the basis for complaints before regulatory agencies or courts when the United States is either the plaintiff or defendant.  My responsibilities include making decisions based on the facts presented to me, conducting investigations and initiating collection actions to recover funds due the Government.

4. The TSPs can submit bills for payment in three ways: in paper format, or via two different electronic payment systems: Electronic Data Interface (EDI), or Powertrack. Bills submitted via EDI are paid without audit or verification. Effectively, they are paid automatically upon submission.

5. GSA conducts post-payment audits of transportation bills of any Federal Agency, including SDDC) under the authority of 31 U.S.C § 3726 to verify their correctness. Prepayment audits are the responsibility of the paying agency and are conducted by audit contractors or government employees as best suits the needs of the agency. Post-payment audits are conducted on all paid bills including those that were prepayment audited. To minimize auditing a transaction more than once, post-payment audits are conducted on a lag time basis to ensure that all bills arising from a particular transaction have been filed. The TSP can file a claim for transportation services within three years after providing the service. During that same three year period, the Government may collect overcharges by offset, i.e., deduct the overcharge from an amount subsequently due a TSP.

6. Following receipt of the Notices of Overcharge to the TSPs, on April 11, 2006, Mr. Terry Head, Household Goods Forwarders Association of America, Inc (HHGFAA), as head of the industry trade group representing the TSPs in the household goods industry, contacted GSA. Mr. Head advised GSA that the SDDC clarification in the February 24, 2006 memorandum that been modified by SDDC to restore the applicability of the services for which GSA had issued the Notices of Overcharge based on the application of Items 432 and 433.

7. SDDC issued a second clarification dated April 11, 2006 further defining the application of Items 432 and 433 to Code 5 ,J and T, and did not effect the GSA position or overcharges.

8. CRWV submitted a letter of protest on April 18, 2006 which was entered into TARPS on June 14, 2006 and denied (Notice of Overcharge sustained) on June 23, 2006. James Fitzgerald, Director of the Audit Division recommended that the TSP enter into a repayment plan in a letter dated June 14, 2006. Repayment plans generally consist of the execution of a promissory note in favor of the Government to be paid in an agreed number of installments over a definite period of time. This is a viable alternative for TSPs to minimize financial hardship. Otherwise, the offset process would resume.

9. Foremost Forwarders Inc (FOFD) did not file a written protest of the Notice of Overcharge. However, FOFD's attorney, Alan Wohlstetter, presented arguments concerning the validity of the disputed charges to GSA. It was unclear whether Mr. Wohlstetter was representing FOFD

specifically, or a larger group of TSPs. On June 16, 2006 GSA received an e-mail from Mr. Alan Wohlstetter, attorney representing the industry association, Household Goods Forwarders Association of America, as well as some industry members, including Cartwright and Foremost, that had been issued NOCs, and it proposed procedures for rebilling surcharges (i.e., submit corrected invoices coded as CON or COF with third party support) Letter stated that CON and COF were miscoded as WAR. GSA has not received any corrected billings from the TSPs but GSA is not aware if any corrected billings have been sent for payment via EDI.

10. October 20, 2006 Mr. Wohlstetter requested suspension of the collection process and time to allow TSPs to rebill correctly. GSA sent e-mail dated October 26, 2006 advising Mr. Alan Wohlstetter concerning the status of the issue and agreeing to meet with him. GSA sent e-mail reply dated November 2, 2006 advising that some TSPs (not including Foremost and Cartwright) received a November 1, 2006 letter sustaining the NOCs and recommending a repayment plan.  The letter stated the charges billed were not properly filed as required by 49 USC 13702.

11. After some discussion with A. Wohlstetter (attorney for several TSPs including CRWW and FOFD), GSA issued a letter, dated November 1, 2006 to each of the other TSPs who had filed protests, denying the TSPs' contention that they were due the charges. GSA again recommended repayment plans. FOFD did not receive a written response, as they had not filed a written protest.

12. On November 29, 2006, GSA met with A. Wohlstetter, T. Head and several TSPs including FOFD and CRWV, to discuss the November 1, 2006 letter. They asked that GSA stop setoff action until they could submit their requests for reconsideration. GSA agreed to temporarily stop the offset process until a final determination could be made on those requests, this stoppage was for all involved carriers , including CRWV and FOFD.

13. On January 23, 2007, A. Wohlstetter submitted an industry rebuttal to the November 1, 2006 letter on behalf of the industry association, the Household Goods Forwarders Association of America, Inc. including his clients, Cartwright International Van Lines and Foremost Forwarders Inc.

14. On July 25, 2007, GSA wrote a letter to Mr. Wohlstetter which expressed GSA's disagreement with the arguments raised in the industry's January 23, 2007 rebuttal letter, and advised industry that offset actions would resume against the TSPs. Again repayment plans were recommended to ease the burden on the TSPs.  On July 27, 2007 GSA sent a letter to all the TSPs involved, including CRWV and FOFD advising them of GSA

decision. This was done since many of them did not take part of the meetings and discussions.

15. GSA met with industry and representatives on August 2, 2007. The industry and TSP representatives proposed that offset action be suspended until a reply to the July 25, 2007 GSA letter could be submitted to GSA for consideration. Additionally, the industry suggested surety bonds in conjunction with a waiver of the statute of limitation. GSA rejected the industry's proposal because no details were provided about the underlying terms of the proposed surety bonds in favor of GSA's recommended repayment plans (which constitute stoppage of offsets, an orderly repayment of debt, a confessed judgment in case of default, and allow the TSP to continue its appeal process).

16. During the meeting on August 2, 2007, CRWV, FOFD and the other TSPs present acknowledged that the charges billed as WAR or CON were for waiting time at the gate of the airbases or for moving from one gate to another at that base. No reasonable explanation was offered as to why these charges were not billed under the existing provisions and charges for "waiting time".

17. GSA had stopped the offset process for, a period of 15 months (from June 2006 until August 2007,on the Notices that were issued on April 3, 2006, for the 38 TSPs involved in this broader overcharge dispute --- including Cartwright International Van Lines (CRWW) and Foremost Forwarders Inc (FOFD) --- In addition, GSA has now voluntarily adopted an additional 30-day abatement of collection of the debt for Cartwright International Van Lines (CRWV) and Foremost Forwarders Inc (FOFD) in light of the instant litigation and the preliminary injunction motion filed by A. Wohlstetter. The result of the holdup of offsets action has resulted in GSA's inability to ever collect part of this debt by offset. The TSPs have not been deprived of the right to dispute the Notices. TSPs may dispute collection actions by submitting an administrative claim for any amounts collected, documenting the basis for repayment of the amounts collected. In addition, TSPs may appeal adverse decisions to the Civilian Board of Contract Appeals.

Executed on August 29, 2007.

JAMES F. FITZGERALD
Director, Transportation Audit Division

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>CARTWRIGHT INTERNATIONAL VAN )<br>LINES, INC. et al., )<br>　　　　　　　　　Plaintiffs, )<br> )<br>　　　　　v. )<br> )<br>LURITA ALEXIS DOAN, Administrator of )<br>General Services Administration, )<br> )<br>　　　　　　　　　Defendant. )<br> )<br>_____ ) | No.:  1:07-1454 (EGS) |

## DECLARATION OF JOYCE CLARK

1. I am a Supervisory Transportation Specialist in the Transportation Audit Division (QMCA), Office of Travel and Transportation Services, Federal Acquisition Service, U. S. General Services Administration.  My previous position was serving as Chief of the Audit Policy Branch for 10 years. My responsibilities include monitoring complex transportation matters and developing related policy in accordance with regulations,  procedures and statutory guidelines governing the audit of transportation documents.

2. I make this declaration based on my knowledge, and experience reviewing, researching, interpreting and applying policy and procedure, regulations, and statutory guidelines to controversial issues. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3. I review transportation issues that result from the pre and post-payment audit of transportation documents. The result of a review may be stated by writing a letter to the affected parties, issuing a Certificate of Settlement or Settlement Certificate, or replying to appellate bodies. Specifically, I am responsible for drafting responses to the Civilian Board of Contract Appeals (CBCA) and supporting GSA's general counsel in preparing submissions in response to litigation

4. Once a protest (regulations require a written submission) is presented, collection action is abated until the protest has been denied. A TSP may appeal audit actions to the Audit Division; and subsequent settlement

actions to the Administrator and the CBCA. Collection action in no way impedes the appeal process. Collection action and appeals are not mutually exclusive in that the processes may run concurrently. At any point in the processes that the TSP is able to substantiate an entitlement to payment, a Certificate of Settlement may be issued certifying payment.

5. The Surface Deployment and Distribution Command (SDDC), an agency of the Department of Army, administers transportation programs, including those for the shipment of unaccompanied baggage (UB; Code J) and household goods (HHG; Codes T and 5) for the benefit of military members.  The charges for the services provided under the programs are in rates filed periodically by the TSPs in response to rate solicitations. These single-factor-rates (SFRs) for the transportation of UB or HHG are fixed price in that the elements of costs to provide the service that can be incorporated into the SFR, as well as those elements of costs that cannot be incorporated into the SFR, are delineated in the solicitation.  The SFR is applied as a multiplier to the weight of the goods being transported to compute the compensation due the TSP for its costs of operations and profit.  Additionally, the solicitation may provide for the reimbursement of some of the elements of costs that were not incorporated into the SFR.

6. Cost elements that are not incorporated in the SFR include the war risk surcharge (WAR), port congestion surcharge (CON), port/terminal security handling surcharge (COF), and waiting time.  WAR, CON, and COF are defined in clarification 2 (Surcharge, Definition and Application – Updated on the web) dated April 11, 2006 and subsequently published in International Personal Property Rate Solicitation I-17, Item 252.

7. WAR is defined as "[i]nsurance coverage for loss of goods resulting from an act of war or as a result of the vessel "entering" the war risk area when billed by the ocean/air TSP.  This charge is only applicable to areas deemed "war risk" areas, as provided for on the SDDC website…. This code is applicable to codes of service 1, 2, 3, 4, 6, 7, and 8."

8. CON is defined as "[a]n extra charge that is billed to the TSP for controlling the congestion of trucks/vessels entering/departing the port. This surcharge is applicable to codes of service 1, 2, 3, 4, 5, 6, 7, T, and J."

9. COF is defined as "[a]n extra charge that is billed to the TSP for security of their cargo while at the port of embarkation/debarkation.  This surcharge is applicable to codes of service 1, 2, 3, 4, 5, 6, 7, 8, T, and J." Before 10/1/03, there was no official provision for port security.  TSPs were billing it as WAR or CON.   Effective 10/1/03, port security was added to the international rate solicitation as part of CON until 10/1/06 when it became independent COF. Before 10/1/06, there was only WAR and CON (w/ port

security as subset of CON, but only effective as of 10/1/03).  After 10/1/06, there was WAR, CON, and COF.  Note that Clarification 2 precipitated the amended provision dated 10/1/06.

10. Waiting Time is discussed in Item 503 of the rate solicitations.  Free waiting time is provided for (i.e., as part of the TSP's cost of doing business; varying from 1 to 3 hours depending on the circumstances) before additional waiting time (which requires the prior approval of the Personal Property Shipping Office (PPSO) may be chargeable.

11. Item 426 of the rate solicitations require that all billings must be supported by appropriate documents.  Item 432 discussed the Transportation SFR for HHGs. It provides that the WAR, CON, and COF surcharges must be separately stated and supported.  Item 433 has a similar provision for the Transportation SFR for UB.

12. During the meeting on August 2, 2007, CRWV, FOFD and the other TSPs present acknowledged that the surcharges billed were for waiting time at the gate of the airbases or for moving from one gate to another at that base. No reasonable explanation was offered as to why these charges were not billed under the existing provisions and charges for "waiting time".

Executed on August __29th___, 2007.


Joyce Clark
Supervisory
Transportation Specialist

Document Name: GSAC1

```
08/29/07                              TARPS                           11:43:06
PAGE 1                          RECEIVABLES INQUIRY                     S61100

       CARRIER NAME: CARTWRIGHT INTL VAN LINES INC
             STATUS: O            DOCUMENT REFERENCE NUMBER: CRWV0001
CARRIER BILL NUMBER: Various      STANDARD CARRIER ALPHA CODE: CRWV
        AGENCY CODE: 21 -   -             SPECIAL ISSUE CODE: 150
          IATA CODE:


AUDITOR STAMP NUMBER:                 TIME SPENT BY AUDITOR:   0  (MINUTES)
REVIEW STAMP NUMBER:                 TIME SPENT BY REVIEWER:   0  (MINUTES)
CONTRACT AUDITOR CODE 06MSF              PREPAYMENT AUDITOR:

        AMOUNT PAID:   3839121.02           DATE BILL PAID: 01/01/04
   OVERCHARGE AMOUNT:   241210.84         SHOULD BE AMOUNT: 3597910.18
    INTEREST CHARGES:        0.00   ADMINISTRATIVE CHARGES:        0.00
     PENALTY CHARGES:        0.00   ***TOTAL AMOUNT DUE***:   228040.05

    AMOUNT COLLECTED:    15214.38      AMOUNT WRITTEN OFF:        0.00
        DATE CLOSED:                    OVERCHARGE ISSUED: 03/31/06
          BOX #: 06MSF0018 TRANSMITTAL #: T00119 DOC #:D26
   F2=MAIN MENU    F3=SB SYS MENU  F4=PRIOR MENU   F5=NEXT SCRN     F6=DOCUMENT LOC
SF11=PROTESTS
```

Document Name: GSAC1

```
08/29/07                          TARPS                         11:43:14
PAGE 2                  RECEIVABLES HISTORY INQUIRY               S61110

ORIGIN CITY:                              STATE:    COUNTRY:
DESTIN CITY:                              STATE:    COUNTRY:
MODE: FHG  SHIPPING DATE: 12/31/03  SHIP SPECIFIC REFERENCE: Various
GTR/GBL INDICATOR:  F
ROUTING:
        Various


BASIS AND AUTHORITY:      MORE? Y
        This Notice of Overcharge is issued to recover charges that were
        erroneously billed by your company for War Risk Surcharges (WAR),
        Port/Terminal Security Handling Surcharges (COF), and Port
        Congestion Surcharges (CON), applied to codes T, 5, and J
        shipments.

        The Surface Deployment and Distribution Command (SDDC) issued a


 F2=MAIN MENU     F3=SB SYS MENU  F4=PRIOR MENU    F5=NEXT SCRN     F6=PREV SCRN
```

Document Name: GSAC1

08/29/07                          TARPS                          11:43:21
   PAGE 3                 RECEIVABLES HISTORY INQUIRY                S61115

DRN: CRWV0001

BASIS AND AUTHORITY:
The Surface Deployment and Distribution Command (SDDC) issued a
letter dated February 24, 2006, clarifying the description and
application of these surcharges. The letter states in Note 1
that, "Air fuel, bunker, War Risk, Port/Terminal Security
Handling, and Port Congestion surcharges are not applicable on
shipment codes of service T, 5, and J." Further, SDDC refers to
this statement as a clarification of the billing procedure, not a
change. In accordance with this explanation of the appropriate
billing of surcharges, the Audit Division is requesting a refund
of excess charges related to the improper application of
surcharges to Codes T, 5, and J shipments.

The following DRN's are included in this overcharge:


  F2=MAIN MENU     F3=SB SYS MENU   F4=PRIOR MENU   F6=PREV SCRN     F7=NEXT PAGE
  F8=PREV PAGE     SF11=MGMT MENU

Date: 8/29/2007 Time: 12:43:23 PM

Document Name: GSAC1

```
08/29/07                          TARPS                          11:43:39
PAGE 1                      RECEIVABLES INQUIRY                    S61100

          CARRIER NAME: FOREMOST FORWARDERS INC
                STATUS: O            DOCUMENT REFERENCE NUMBER: FOFD0001
   CARRIER BILL NUMBER: Various      STANDARD CARRIER ALPHA CODE: FOFD
           AGENCY CODE: 21 -    -.       SPECIAL ISSUE CODE: 150
            IATA CODE:

AUDITOR STAMP NUMBER:                 TIME SPENT BY AUDITOR:   0  (MINUTES)
 REVIEW STAMP NUMBER:                 TIME SPENT BY REVIEWER:  0  (MINUTES)
CONTRACT AUDITOR CODE 06MSF               PREPAYMENT AUDITOR:

           AMOUNT PAID:   4752569.92       DATE BILL PAID: 01/01/04
     OVERCHARGE AMOUNT:   1202698.45      SHOULD BE AMOUNT:  3549871.47
      INTEREST CHARGES:      7678.40  ADMINISTRATIVE CHARGES:      0.00
       PENALTY CHARGES:         0.00  ***TOTAL AMOUNT DUE***:  1210376.85

      AMOUNT COLLECTED:      2511.12    AMOUNT WRITTEN OFF:        0.00
           DATE CLOSED:                 OVERCHARGE ISSUED: 03/31/06
             BOX #: 06MSF0018 TRANSMITTAL #: T00120 DOC #:D02


   F2=MAIN MENU     F3=SB SYS MENU   F4=PRIOR MENU   F5=NEXT SCRN
```

Document Name: GSAC1

```
08/29/07                          TARPS                        11:43:43
PAGE 2                  RECEIVABLES HISTORY INQUIRY             S61110

ORIGIN CITY:                                  STATE:    COUNTRY:
DESTIN CITY:                                  STATE:    COUNTRY:
MODE: FHG  SHIPPING DATE: 12/31/03  SHIP SPECIFIC REFERENCE: Various
GTR/GBL INDICATOR:   F
ROUTING:
       Various


BASIS AND AUTHORITY:      MORE? Y
       This Notice of Overcharge is issued to recover charges that were
       erroneously billed by your company for War Risk Surcharges (WAR),
       Port/Terminal Security Handling Surcharges (COF), and Port
       Congestion Surcharges (CON), applied to codes T, 5, and J
       shipments.

       The Surface Deployment and Distribution Command (SDDC) issued a



   F2=MAIN MENU     F3=SB SYS MENU   F4=PRIOR MENU    F5=NEXT SCRN     F6=PREV SCRN
```

Document Name: GSAC1

08/29/07                             TARPS                          11:43:47
  PAGE 3                  RECEIVABLES HISTORY INQUIRY                  S61115

DRN: FOFD0001

BASIS AND AUTHORITY:
The Surface Deployment and Distribution Command (SDDC) issued a
letter dated February 24, 2006, clarifying the description and
application of these surcharges. The letter states in Note 1
that, "Air fuel, bunker, War Risk, Port/Terminal Security
Handling, and Port Congestion surcharges are not applicable on
shipment codes of service T, 5, and J." Further, SDDC refers to
this statement as a clarification of the billing procedure, not a
change. In accordance with this explanation of the appropriate
billing of surcharges, the Audit Division is requesting a refund
of excess charges related to the improper application of
surcharges to Codes T, 5, and J shipments.

The following DRN's are included in this overcharge:


    F2=MAIN MENU     F3=SB SYS MENU   F4=PRIOR MENU   F6=PREV SCRN     F7=NEXT PAGE
    F8=PREV PAGE     SF11=MGMT MENU

Document Name: GSAC1

```
08/29/07                           TARPS                        11:43:39
PAGE 1                      RECEIVABLES INQUIRY                   S61100

          CARRIER NAME: FOREMOST FORWARDERS INC
                STATUS: O          DOCUMENT REFERENCE NUMBER: FOFD0001
   CARRIER BILL NUMBER: Various    STANDARD CARRIER ALPHA CODE: FOFD
           AGENCY CODE: 21 -    -.      SPECIAL ISSUE CODE: 150
            IATA CODE:


  AUDITOR STAMP NUMBER:            TIME SPENT BY AUDITOR:   0  (MINUTES)
   REVIEW STAMP NUMBER:            TIME SPENT BY REVIEWER:  0  (MINUTES)
 CONTRACT AUDITOR CODE 06MSF             PREPAYMENT AUDITOR:


          AMOUNT PAID:   4752569.92       DATE BILL PAID: 01/01/04
    OVERCHARGE AMOUNT:   1202698.45      SHOULD BE AMOUNT: 3549871.47
     INTEREST CHARGES:      7678.40   ADMINISTRATIVE CHARGES:      0.00
      PENALTY CHARGES:         0.00   ***TOTAL AMOUNT DUE***: 1210376.85

     AMOUNT COLLECTED:      2511.12     AMOUNT WRITTEN OFF:         0.00
          DATE CLOSED:                  OVERCHARGE ISSUED: 03/31/06
            BOX #: 06MSF0018 TRANSMITTAL #: T00120 DOC #:D02


    F2=MAIN MENU     F3=SB SYS MENU   F4=PRIOR MENU    F5=NEXT SCRN
```

Document Name: GSAC1

```
08/29/07                        TARPS                      11:43:43
PAGE 2              RECEIVABLES HISTORY INQUIRY             S61110

ORIGIN CITY:                              STATE:   COUNTRY:
DESTIN CITY:                              STATE:   COUNTRY:
MODE: FHG  SHIPPING DATE: 12/31/03  SHIP SPECIFIC REFERENCE: Various
GTR/GBL INDICATOR:  F
ROUTING:
        Various


BASIS AND AUTHORITY:      MORE? Y
        This Notice of Overcharge is issued to recover charges that were
        erroneously billed by your company for War Risk Surcharges (WAR),
        Port/Terminal Security Handling Surcharges (COF), and Port
        Congestion Surcharges (CON), applied to codes T, 5, and J
        shipments.

        The Surface Deployment and Distribution Command (SDDC) issued a



   F2=MAIN MENU     F3=SB SYS MENU  F4=PRIOR MENU   F5=NEXT SCRN     F6=PREV SCRN
```

Document Name: GSAC1

08/29/07                              TARPS                          11:43:47
  PAGE 3                  RECEIVABLES HISTORY INQUIRY                  S61115

DRN: FOFD0001

BASIS AND AUTHORITY:
The Surface Deployment and Distribution Command (SDDC) issued a
letter dated February 24, 2006, clarifying the description and
application of these surcharges. The letter states in Note 1
that, "Air fuel, bunker, War Risk, Port/Terminal Security
Handling, and Port Congestion surcharges are not applicable on
shipment codes of service T, 5, and J." Further, SDDC refers to
this statement as a clarification of the billing procedure, not a
change. In accordance with this explanation of the appropriate
billing of surcharges, the Audit Division is requesting a refund
of excess charges related to the improper application of
surcharges to Codes T, 5, and J shipments.

The following DRN's are included in this overcharge:


  F2=MAIN MENU     F3=SB SYS MENU   F4=PRIOR MENU    F6=PREV SCRN    F7=NEXT PAGE
  F8=PREV PAGE     SF11=MGMT MENU

LAW OFFICES
**DENNING & WOHLSTETTER**
815 CONNECTICUT AVENUE, N.W.
SUITE 500
WASHINGTON, DC 20006

WILLIAM I. DENNING (1883-1977)
ALAN F. WOHLSTETTER
STANLEY I. GOLDMAN

TELEPHONE: (202) 833-8884
CABLE: DENWOHL
FAX: (202) 833-8886
E-mail: awohlstetter@aol.com

January 23, 2007

Mr. James F. Fitzgerald
james.fitzgerald@gsa.gov
Director Audit Division (FBA)
General Services Administration
2200 Crystal Drive, Room 300
Arlington, VA  20406

Dear Mr. Fitzgerald:

On behalf of the carriers I represent, as well as the Household Goods Forwarders Association of America (HHGFAA), I want to express my appreciation for the opportunity to explain why the Notices of Overcharge covering the pass-through of congestion expenses should be rescinded.

Preliminarily, I can confirm that all of the principal baggage carriers participating in the DOD international personal property program, namely American World Forwarders, Cartwright International, Covan International, Jet Forwarding and Foremost, were represented by executives of those companies and Deseret International offered to have an executive back to attend the meeting but I advised that it was unnecessary since its position would be adequately covered by those present.  In addition, Terry Head appeared as president of the HHGFAA, in which organization all baggage carriers are members.

This is a very important matter since in the aggregate Notices of Overcharge were originally issued which totaled over $2,200.000.  This amount has been increasing and the total current estimate of exposure to these carriers, should the pass-through not be allowed, has increased to $3,150,000.  There is little doubt that the collection of these Notices of Overcharge will have a severe and unexpected adverse financial impact on the carriers involved and will destroy the intense competition in the unaccompanied baggage procurement administered by SDDC. We therefore appreciate your agreement to defer collection of these overcharges until you have evaluated this presentation.

Your letter of November 1, 2006, which was sent to all TSPs which billed the government for the port congestion pass-through, as amplified by the discussion at our meeting of November 29th, makes clear that the Notices of Overcharge are based upon the assumption that the charges billed by the port agents were not properly filed with the appropriate regulatory agency "as required by 49 U.S.C. §13702" and for that reason are not allowable.

With all due respect, it is clear that the legal assumption upon which the Notices of Overcharge are based is incorrect. As shown by the referenced United States Code, only ocean carriers in the non-contiguous domestic trade, viz. to or from Hawaii, Alaska or U.S. territories and possessions, are required to file tariffs with the regulatory agency, namely the Surface Transportation Board (STB), the successor to the former Interstate Commerce Commission. (49 U.S.C. §13702(b)). On the other hand, there is no legal requirement for port agents to issue a tariff. Even if the port agent is a household goods motor carrier the tariff charges are not required to be filed with any regulatory agency (49 U.S.C. §13702(c)). Further, if the motor carrier is a general freight hauler,[1] such as port agent Cassil Freight, it does not have to issue a tariff. (49 U.S.C. §13101 et seq.). Moreover, when the charges are assessed on the basis of contractual arrangements between a household goods carrier and a non-C.O.D. shipper,[2] as is the case here, such charges are not required to be filed or even published. (49 U.S.C. §14101). Lastly, if the air terminal and port agent's facility are located within the terminal area, the transportation is exempt and no tariff requirement apply. (49 U.S.C. §13503(a)).

If the congestion charges were incurred and billed by an ocean carrier, they previously would have to be published in the ocean carrier's tariff and filed with the Federal Maritime Commission (FMC). However, with the passage of the Ocean Shipping Reform Act of 1998 (OSRA), ocean carrier tariffs were no longer required to be filed with the Federal Maritime Commission or with any other regulatory agency and the Commission has no authority whatever to regulate the level of the charges of an ocean carrier.

---

[1] Code J shipments are transported in tri-wall or similar type containers. They are not packed by the hauler, a specialized service of household goods carriers. As a result the Interstate Commerce Commission held that such containerized shipments of household goods can be transported by freight carriers. American Red Ball Transit v. McLean Trucking, 67 M.C.C. 305 (1956).

[2] 49 U.S.C. §13102 makes clear that the tariff requirements apply to the transportation of household goods only when the service is performed for a householder who pays his own charges. That is not the case here.

Lastly, the charges which form the basis of the Notices of Overcharge are the subject of contractual arrangements in the form of Compensation Schedules under which the carrier appoints a company serving the ocean port or airport as its exclusive port agent, usually for at least a traffic cycle, and most frequently for a number of years, and the agent agrees to perform the required services, including pick-up and delivery to the military air terminal on Code J shipments tendered to its carrier principal by the Military.

I would like emphasize that this is not the usual overcharge situation where the auditor takes the position that the money is not due the carrier because it did not provide a service requested by the government. In this case, there is no question that the government requested the service, the carrier performed the service, through its port agent, and the carrier has paid the port agent for this service. Pursuant to the terms of the solicitation, the carrier billed the government the exact amount which it was charged by its port agent, without assessing any administrative charge or mark-up. Collection of the claimed overcharges would therefore result in the government's having obtained the demanded services without paying for them.

It was recognized after September 11, 2001 (9/11) that security measures at all military bases were tightened and enhanced which resulted in significant delays in serving them and that additional expenses were incurred by port agents servicing military air terminals. This cost was billed to carriers which in turn billed the government as a pass-through as provided for in the solicitation. Mr. Head, in his capacity of president of HHGFAA, told its members that the charges would be repaid as a pass-through under Items 432 and 433. (Declarations of Appleton, Borders/Standley, Cartwright, Coleman, Rowe and Sullivan). This is reflected in the e-mail from Hank Spieler, HQ MTMC, dated October 16, 2001. (Head Declaration). After observing that the solicitation would be amended to cover any port security/congestion surcharges, Mr. Spieler specifically gave as an example of an appropriate pass-through "a delay of [a] port agent at the aerial port gate for delivery of shipments" "when billed by [the[...port agent." The solicitation was amended, effective October 1, 2001 in the form of Amendment 3. (Head Declaration). It should be noted that this summary did not condition the pass-through upon the charge being billed "pursuant to regularly filed tariff(s) with Regulatory Bodies or Commissions." Lastly, on March 25, 2006, SDDC issued a clarification of this pass-through and stated:

collection of monies pursuant to GSA's Notices of Overcharge. An analogy exists under the legal doctrine known as "Cy-Pres." Black's Law Dictionary defines Cy-Pres as "As near as possible" and states:

> "The rule of <u>cy-pres</u> is a rule for the construction of instruments in equity by which the intention of the party is carried out <u>as near as may be</u>, when it would be impossible...to give it literal effect." (Emphasis in original text).

See also: <u>Democratic Central Committee v. WMATA</u>, 84 F.3d 451 (D.C. Cir. 1996) where the Court determined it was not feasible to refund to riders overcharges of bus companies and, pursuant to the cy-pres doctrine, directed the use of these funds to the purchase of new buses.

Although an equitable doctrine, we respectfully submit that the intentions of the parties should be given effect and not frustrated by the MTMC/SDDC legal error that the charges in question are required to be filed with a regulatory agency. In this regard, we point out that these charges have been consistently allowed under the pre-audit of carriers' billings and that for at least two years GSA did not dispute these pass-throughs in its final audits.

In any event, several facts are clear. First, the government demanded the service; second, the carriers provided the service; third, the port agents billed the carriers for the services, which billings they paid; and fourth, the charges were repaid to the carriers by the government. Even if the pass-through item is determined to be inapplicable because the surcharges were not filed with a regulatory agency, the carriers are entitled to compensation in <u>quantum meruit</u> for providing a service requested by the government. <u>Trans Ocean Van Service v. United States</u>, 426 F.2d 329, 348 (Ct. Cl. 1970); <u>Allstates Van Lines Corp. v. United States</u>, 215 Ct. Cl. 1075 (1978); <u>American Ensign Van Service v. United States</u> 220 Ct. Cl. 681 (1979).

It would be most inequitable were the government to get the service involved for free and the carriers not be reimbursed for paying its port agents for the service when they were precluded by the express terms of the solicitation from reflecting this cost in their SFRs. Not only would this be inequitable but it is inconsistent with GSA's treatment of these surcharge billings during the years 2001 and 2002, and perhaps 2003, and is inconsistent with the present treatment of bunker fuel surcharges and war risk surcharges, none of which are filed with any regulatory agency. Moreover, the collection of monies pursuant to the Notices of Overcharge will have a substantial adverse financial impact on the carriers who,

"4. SDDC has reviewed the feedback and invoices provided from industry and have incorporated codes T, J and 5 into billing code COF.

\*   \*   \*

"10. If there have been charges denied in the past that were valid and fall under our recent clarification, TSPs [carriers] have the ability to rebill these lines items."[3]

It is beyond dispute that at the time the solicitation was amended to cover charges assessed carriers by port agents for expenses incurred as the result of delays at military air terminals those charges were not required to be filed with any regulatory agency. We have discussed this fully in the first part of the letter. Nevertheless, a history of this item indicates why MTMC improperly assumed this filing was a proper requirement. Initially the pass-through tender item covered matters in ocean carrier tariffs, e.g. bunker fuel surcharge, war risk surcharge, which tariffs were then required to be filed with the Federal Maritime Commission. However, as shown in the first part of this letter, this filing requirement was eliminated with the passage of OSRA in 1998 when the Commission was also deprived of any authority to determine the reasonableness of any tariff charges. Apparently, neither SDDC nor GSA is concerned with this change since the pass-through of bunker fuel surcharges is routinely allowed although not contained in any tariff on file with the Federal Maritime Commission or any other regulatory agency.

In any event, relying on MTMC's advice that the charges they paid their port agents for the additional costs incurred in picking up and delivering baggage shipments at military air terminals would be repaid as a pass-through, the carriers did not include these charges in their single-factor rates. (Declarations of Appleton, Borders/Standley, Cartwright, Coleman, Rowe and Sullivan). As a matter of fact, Item 433a, (4) (d) of the solicitation excepts bunker fuel surcharges, port congestion surcharges, etc. from inclusion in the single-factor rates.

It clearly is not the carriers' fault that MTMC erroneously assumed that the surcharges listed in Items 432 and 433 are required to be filed with a regulatory agency, viz., either the Surface Transportation Board or the Federal Maritime Commission. The intention of MTMC and its successor, SDDC, was to compensate carriers for this additional cost. That intent should not be frustrated by

---

[3] Payment was not conditioned upon the charges being contained in a tariff filed with a regulatory agency.

4

collection of monies pursuant to GSA's Notices of Overcharge. An analogy exists under the legal doctrine known as "Cy-Pres." Black's Law Dictionary defines Cy-Pres as "As near as possible" and states:

> "The rule of cy-pres is a rule for the construction of instruments in equity by which the intention of the party is carried out as near as may be, when it would be impossible...to give it literal effect." (Emphasis in original text).

See also: Democratic Central Committee v. WMATA, 84 F.3d 451 (D.C. Cir. 1996) where the Court determined it was not feasible to refund to riders overcharges of bus companies and, pursuant to the cy-pres doctrine, directed the use of these funds to the purchase of new buses.

Although an equitable doctrine, we respectfully submit that the intentions of the parties should be given effect and not frustrated by the MTMC/SDDC legal error that the charges in question are required to be filed with a regulatory agency. In this regard, we point out that these charges have been consistently allowed under the pre-audit of carriers' billings and that for at least two years GSA did not dispute these pass-throughs in its final audits.

In any event, several facts are clear. First, the government demanded the service; second, the carriers provided the service; third, the port agents billed the carriers for the services, which billings they paid; and fourth, the charges were repaid to the carriers by the government. Even if the pass-through item is determined to be inapplicable because the surcharges were not filed with a regulatory agency, the carriers are entitled to compensation in quantum meruit for providing a service requested by the government. Trans Ocean Van Service v. United States, 426 F.2d 329, 348 (Ct. Cl. 1970); Allstates Van Lines Corp. v. United States, 215 Ct. Cl. 1075 (1978); American Ensign Van Service v. United States 220 Ct. Cl. 681 (1979).

It would be most inequitable were the government to get the service involved for free and the carriers not be reimbursed for paying its port agents for the service when they were precluded by the express terms of the solicitation from reflecting this cost in their SFRs. Not only would this be inequitable but it is inconsistent with GSA's treatment of these surcharge billings during the years 2001 and 2002, and perhaps 2003, and is inconsistent with the present treatment of bunker fuel surcharges and war risk surcharges, none of which are filed with any regulatory agency. Moreover, the collection of monies pursuant to the Notices of Overcharge will have a substantial adverse financial impact on the carriers who,

responding to the Military's request that the carriers pay their port agents for the additional expense they incurred as the result of increased security at military air terminals required to be used in servicing Code J baggage shipments, did so in reliance on the promised reimbursement which until now has consistently been paid.

Lastly, it is clear that filing with a regulatory agency was not imposed to determine whether or not the charges were to be pass-throughs; its purpose was solely to give the government some comfort that the charges were reasonable. In 2001, the surcharge discussed with SDDC was $5 per cwt. (Head Declaration). Charges assessed three to five years later in the range of $2.50 - $7.50 per cwt. cannot be considered to be unreasonable. (Coleman Declaration).

In light of the above, we respectfully ask you to rescind the Notices of Overcharge identified in this letter. Should you have any questions after considering this letter, I would be pleased to meet with you should you deem that helpful in brining this matter to a favorable close.

Very cordially yours,

DENNING & WOHLSTETTER

By _Alan F. Wohlstetter_

Alan F. Wohlstetter
Attorneys for
American World Forwarders, Inc.
Cartwright International Van Lines, Inc.
Covan International, Inc.
Deseret Forwarding International, Inc.
Foremost Forwarding, Inc.
Jet Forwarding, Inc.
Household Goods Forwarders Association
   of America, Inc.

Attachments (7)

cc: Janet Harney, Esq.
    janet.harney@usa.gov

6



"Serving Those Who Serve"

## DECLARATION OF ANDREW W. CARTWRIGHT

1.    My name is Andrew W. Cartwright (Andy) W. Cartwright.  I

am president of Cartwright International Van Lines, Inc., a participant in

SDDC's International Through Government Bill of Lading (ITGBL)

program.  My company is actively involved in the handling of Code J

shipments of unaccompanied baggage which involves the movement to and

from military air terminals.  Shortly after September 11, 2001 my port

agents at the three military air terminals, namely Travis AFB in California,

McGuire AFB in New Jersey and Dover AFB in Delaware, advised me that

due to tightened security at the military air base they served as our agent, the

time involved in the pick-up and delivery of Code J shipments had

substantially increased, which in turn, increased their cost.  I communicated

this to Terry Head, president of the Household Goods Forwarders

Association of America (HHGFAA), and he subsequently advised me that

SDDC, acting through Colonel Patricia Hunt (USAF), then MTMC Deputy

Chief of Staff for Passenger and Personal Property, and Mr. Hank Spieler,

the Chief Civilian at MTMC at the time, recognized the problem and agreed

to reimburse carriers for this additional expense.  I was told that this would a

pass-through and therefore did not attempt to include it in my single-factor

rates (SFRs).

2.    Although our billing for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $241,210.84 on April 3, 2006. With the passage of time, I estimate that as of December 12, 2006, these surcharges have increased to $309,548.33.

3.    As I read the solicitation, Cartwright was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.    In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for their disallowance. In fact, Mr. Head advised me that during the negotiation

2

of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.    It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Cartwright International Van Lines and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Cartwright International Van Lines, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Cartwright International Van Lines and other carriers would be performing this service without payment therefor by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.    I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range between $2.50 and $7.50 per hundredweight, and we are now in a time

3

frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Andrew W. Cartwright

Date:   January 3, 2007



GENERAL OFFICES: #1 COVAN DRIVE • POST OFFICE BOX 960 • MIDLAND CITY, ALABAMA 36350 • (334) 983-6500 • (334) 983-4717 FAX

## DECLARATION OF JEFFREY F. COLEMAN

1.    My name is Jeffrey (Jeff) F. Coleman.  I am president of Covan

International, Inc., a participant in SDDC's International Through

Government Bill of Lading (ITGBL) program.  My company is actively

involved in the handling of Code J shipments of unaccompanied baggage

which involves the movement to and from military air terminals.  Shortly

after September 11, 2001 my port agents at the three military air terminals,

namely Travis AFB in California, McGuire AFB in New Jersey and Dover

AFB in Delaware, advised me that due to tightened security at the military

air base they served as our agent, the time involved in the pick-up and

delivery of Code J shipments had substantially increased, which in turn,

increased their cost.  I communicated this to Terry Head, president of the

Household Goods Forwarders Association of America (HHGFAA), and he

subsequently advised me that SDDC, acting through Colonel Patricia Hunt

(USAF), then MTMC Deputy Chief of Staff for Passenger and Personal

Property, and Mr. Hank Spieler, the Chief Civilian at MTMC at the time,

recognized the problem and agreed to reimburse carriers for this additional

expense. I was told that this would a pass-through and therefore did not attempt to include it in my single-factor rates (SFRs).

2.    Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $524,725.65 on April 3, 2006. With the passage of time, these surcharges have increased to $742,697 as of December 12, 2006.

3.    As I read the solicitation, Covan was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.    In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for

their disallowance. In fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.      It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Covan International and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Covan International, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Covan International and other carriers would be performing this service without payment therefor by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.      I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range

between $2.50 and $7.50 per hundred weight, and we are now in a time frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Jeffrey F. Coleman

Date: JANUARY 8, 2007



# DESERET
## FORWARDING INTERNATIONAL, INC

### <u>DECLARATION OF BILL APPLETON, JR.</u>

1.    My name is Bill Appleton, Jr.  I am president of Deseret

Forwarding International, Inc., a participant in SDDC's International Through

Government Bill of Lading (ITGBL) program.  My company is actively

involved in the handling of Code J shipments of unaccompanied baggage which

involves the movement to and from military air terminals.  Shortly after

September 11, 2001 my port agents at the three military air terminals, namely

Travis AFB in California, McGuire AFB in New Jersey and Dover AFB in

Delaware, advised me that due to tightened security at the military air base they

served as our agent, the time involved in the pick-up and delivery of Code J

shipments had substantially increased, which in turn, increased their cost.  I

communicated this to Terry Head, president of the Household Goods

Forwarders Association of America (HHGFAA), and he subsequently advised

me that SDDC, acting through Colonel Patricia Hunt (USAF), then MTMC

Deputy Chief of Staff for Passenger and Personal Property, and Mr. Hank

Spieler, the Chief Civilian at MTMC at the time, recognized the problem and

agreed to reimburse carriers for this additional expense.  I was told that this

1760 Airway Blvd., Suite 103
El Paso, Texas 79925
(915) 778-0861  •  Fax: (915) 774-5177

would be a pass-through, and therefore did not attempt to include it in my single-factor rates (SFRs).

2.    Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $146,568.09 on April 3, 2006. With the passage of time, I estimate that these surcharges have increased to $356,294 as of November 3, 2006.

3.    As I read the solicitation, Deseret was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs, but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.    In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for their disallowance. In

fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.     It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Deseret Forwarding International and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Deseret Forwarding, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Deseret Forwarding International and other carriers would be performing this service without payment therefore by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.     I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range between $2.50 and $7.50 per

3

hundred weight, and we are now in a time frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

_Bill Appleton_

Bill Appleton, Jr.

Date: 01/08/2007

4



*"Your First 'n' Foremost Mover"*

## DECLARATION OF KENNETH J. SULLIVAN

1.    My name is Kenneth (Ken) J. Sullivan.  I am president of Foremost

Forwarders, Inc., a participant in SDDC's International Through Government

Bill of Lading (ITGBL) program.  My company is actively involved in the

handling of Code J shipments of unaccompanied baggage which involves the

movement to and from military air terminals.  Shortly after September 11, 2001

my port agents at three military air terminals, namely Travis AFB in California,

McGuire AFB in New Jersey and Dover AFB in Delaware, advised me that due

to heightened security at the military air force bases they served as our agent,

the time involved in the pick-up and delivery of Code J shipments had

substantially increased, which in turn, increased their cost.  I communicated this

to Terry Head, president of the Household Goods Forwarders Association of

America (HHGFAA), and he subsequently advised me that SDDC, acting

through Colonel Patricia Hunt (USAF), then MTMC Deputy Chief of Staff for

Passenger and Personal Property, and Mr. Hank Spieler, the Chief Civilian at

MTMC at the time, recognized the problem and agreed to reimburse carriers for

this additional expense.  I was told that this would be a pass-through and

therefore did not attempt to include it in my single-factor rates (SFRs).

2.    Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $1,202,698.45 on April 3, 2006. With the passage of time, I estimate that these surcharges have increased to $1,644,452.48 as of December 12, 2006.

3.    As I read the solicitation, Foremost was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.    In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for their disallowance. In fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no

2

tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.    It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Foremost Forwarders and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Foremost Forwarders, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Foremost Forwarders and other carriers would be performing this service without payment therefore by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.    I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range between $2.50 and $7.50 per hundredweight, and we are now in a time frame six years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable. The pass-through of these funds is well

3

documented with port agent invoices and cashed checks. Until we received the Notice of Overcharge from GSA in the amount of $1,202,698.45 dated April 3, 2006 which was six years after we began forwarding these pass-through's no mention by the government was made that these charges were not in order. If GSA proceeds with this set off action, Foremost Forwarders, Inc. will be caused irreparable harm from which we will be unable to recover.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Kenneth J. Sullivan

Date: Tuesday, January 02, 2007

4



## JET FORWARDING INC.

### DECLARATION OF DAVID C. ROWE

1.    My name is David C. Rowe.  I am Executive Vice President of Jet

Forwarding Inc., a participant in SDDC's International Through Government

Bill of Lading (ITGBL) program.  My company is actively involved in the

handling of Code J shipments of unaccompanied baggage which involves the

movement to and from military air terminals.  Shortly after September 11, 2001

my port agents at the three military air terminals, namely Travis AFB in

California, McGuire AFB in New Jersey and Dover AFB in Delaware, advised

me that due to tightened security at the military air base they served as our

agent, the time involved in the pick-up and delivery of Code J shipments had

substantially increased, which in turn, increased their cost.  I communicated this

to Terry Head, president of the Household Goods Forwarders Association of

America (HHGFAA), and he subsequently advised me that SDDC, acting

through Colonel Patricia Hunt (USAF), then MTMC Deputy Chief of Staff for

Passenger and Personal Property, and Mr. Hank Spieler, the Chief Civilian at

MTMC at the time, recognized the problem and agreed to reimburse carriers for

this additional expense. I was told that this would a pass-through and therefore did not attempt to include it in my single-factor rates (SFRs).

2.    Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $46,683.54 on April 3, 2006. With the passage of time, I estimate that these surcharges have increased to $70,119 as of December 13, 2006.

3.    As I read the solicitation, Jet was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.    In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with

2

a regulatory agency cannot reasonably be the basis for their disallowance. In fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.    It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Jet Forwarding and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Jet Forwarding, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Jet Forwarding and other carriers would be performing this service without payment therefor by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.    I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range between $2.50 and $7.50 per

3

hundredweight, and we are now in a time frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

_____
David C. Rowe

Date:  1-9-07

4