**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CARTWRIGHT INTERNATIONAL VAN ) | |
| LINES, INC. et al., ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case Number:  1:07-1454 (EGS) |
| ) | **TRO Hearing: December 5, 2007** |
| LURITA ALEXIS DOAN, Administrator of ) | |
| General Services Administration, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

**INTRODUCTION AND SUMMARY**

Plaintiffs Cartwright International Van Lines, Inc. ("Cartwright") and Foremost Forwarders, Inc. ("Foremost") (collectively "plaintiffs") are not entitled to the extraordinary remedy of a temporary restraining order ("TRO"), and their motion requesting entry of a TRO should be denied.  This case arises out of a dispute between the General Services Administration ("GSA") and plaintiffs regarding overcharges billed to and paid by GSA for plaintiffs' shipments of household goods to military bases and military airports.  GSA conducted a post-payment audit of plaintiffs' bills, and determined that plaintiffs and several other transportation service providers ("TSPs") billed the Government for surcharges that exceeded allowable rates.  GSA suspended its collection of those debts for fifteen months, while it reviewed plaintiffs' justifications for those charges.  However, plaintiffs' arguments were unpersuasive, and GSA sustained the overcharges and resumed collecting the debts through deductions and administrative offsets.

Despite having had numerous discussions, meetings, and written communications with GSA concerning the disputed charges, plaintiffs claim that GSA's regulations require that GSA go back to the beginning of the process, and issue *new* notices of overcharge addressing the specific arguments raised during those post-notice discussions. Specifically, plaintiffs contend that GSA's decision to resume the deductions and offsets after those prolonged discussions is arbitrary and capricious and violates the Administrative Procedure Act, and that GSA instead should have issued new notices of overcharge rebutting the theories plaintiffs presented in those meetings. Plaintiffs' interpretation of the governing regulations, albeit creative, has no merit.

GSA has extended its voluntary abatement of deductions, to permit briefing of plaintiffs' prior preliminary injunction motion and defendant's motions to dismiss. However, that abatement ended November 29, 2007. Plaintiffs now seek a TRO barring GSA from continuing to collect the debts through deductions and offsets until the Court issues a decision. *See* Dkt. Entries 26, 27.[1]

Plaintiffs have not established that they are entitled to the extraordinary remedy of a TRO. Plaintiffs do not seek to preserve the status quo, but instead want to alter it by enjoining GSA from continuing to collect the overcharges through deductions and offsets against plaintiffs' other billings. Courts cannot grant requests for such sweeping mandatory injunctive relief absent a strong showing that all four elements of the TRO and preliminary injunction standard have been met, namely that: (1) plaintiffs have a substantial likelihood of success on the merits; (2) plaintiffs will suffer irreparable harm absent an injunction; (3) the injunction will not harm third parties;

---

[1] This opposition memorandum will refer to plaintiffs' TRO motion as "TRO Mot." and to the memorandum in support of that motion as "TRO Mem."

and (4) granting the injunction would be in the public interest. Plaintiffs fail all four elements of

that test. They cannot establish that the Court has jurisdiction, let alone that they will prevail on

the merits of their claims. GSA has afforded plaintiffs all of the notice that the regulations

require, and gave plaintiffs over a year to present arguments to justify the disputed bills. GSA's

regulations did not require it to issue new notices of overcharge in order to respond to plaintiffs'

subsequent arguments concerning the validity of the charges. Plaintiffs will not be irreparably

harmed, because this case involves purely financial losses and plaintiffs have already filed claims

against GSA for the full amount of the overcharges. The relief plaintiffs seek will undermine the

public interest in ensuring that the Government pays no more than what carriers are authorized to

charge pursuant to their government contracts, and deprive the public fisc of the funds GSA

desires to recoup.

## **BACKGROUND**

Defendant has set forth the relevant statutory, regulatory, and factual background in its

motion to dismiss, which is incorporated herein by reference. *See* Dkt. Entry 20. The following

paragraphs provide context for this TRO opposition.[2]

The shipments at issue in this case are Code J shipments, which involve plaintiffs'

movement of household goods to and from military bases and military airports. *See* Am. Compl.

¶¶ 12, 13. Plaintiffs and other TSPs frequently submit bills through the Electronic Data Interface

(EDI). *See* Decl. of Mary Bates, ¶ 5 (Exh. 1). Those electronically submitted bills are sent to the

Defense Finance and Accounting Service ("DFAS"), which pays the bills. *See id.* Bills

---

[2]For ease of reference, Defendant has re-submitted the declarations that were attached as
exhibits to the motion to dismiss as exhibits to this opposition memorandum.

submitted via EDI are paid without prepayment audit or verification, and effectively are paid automatically upon submission. *See* Decl. Of James Fitzgerald ¶ 4 (Exh. 2). DFAS subsequently provides the EDI data to GSA for post-payment audits. *See* Bates Decl. ¶ 5.

When conducting the post-payment audits for several of Plaintiffs' EDI billings, GSA auditors determined that the Government had paid plaintiffs and other TSPs transportation charges that exceeded the amounts allowable under the SDDC International Rate Solicitation. *See* Bates Decl. ¶ 5. Specifically, surcharges coded as "WAR" and "CON" were being billed inconsistently with the terms of that SDDC solicitation, due to the TSPs' misapplication of items 432 (household goods) and 433 (unaccompanied baggage). *See id.* "WAR" is the war risk surcharge, Decl. of Joyce Clark, ¶ 6 (Exh. 3), which the SDDC has defined as "insurance coverage for loss of goods resulting from an act of war or as a result of the vessel entering the war risk area when billed by the ocean/air TSP." *Id.* ¶ 7. "CON" is the port congestion surcharge, *id.* ¶ 6, defined as "an extra charge that is billed to the TSP for controlling the congestion of trucks/vessels entering/departing the port." *Id.* ¶ 8. Although SDDC's February 24, 2006 clarification of the SFRs indicated that "CON" surcharges could not be used for Code J shipments, SDDC issued a second clarification on April 11, 2006 which extended "CON" surcharges to Code J. *See* Bates Decl. ¶ 6; Clark Decl. ¶ 8.

On April 3, 2006, GSA issued notices of overcharge to plaintiffs and 36 other carriers based on the misuse of the "WAR" and "CON" charges. *See* Bates Decl. ¶ 6. The notices and accompanying statements identified the relevant government bills of lading (GBLs), the amount of the overcharge for each GBL, the basis for the overcharge, and the rate authority. *See id.* The Cartwright overcharge notice listed the amount paid, which totaled $3,839,121.02, and indicated

that the proper charge was $3,597,910.18, yielding an overcharge of $241,210.84.  *See id.*; *see also* Dkt. Entry 20 at Exh. 4 p. 1 (excerpt from TARPS Record of Notice of Overcharge to Cartwright).  The Foremost overcharge notice also listed the amount paid, which totaled $ 4,752,569.92, and indicated that the proper charge was $ 3,549,871.47, yielding an overcharge of $1,202,698.45.  *See* Bates Decl. ¶ 6 ; *see also* Dkt. Entry 20 at Exh. 5 p. 1 (excerpt from TARPS Record of Notice of Overcharge to Foremost).

The basis for the overcharge notices sent to plaintiffs was that the disputed charges were not properly billed as "WAR" and "CON" surcharges.  *See* Bates Decl. ¶ 6.  GSA relied upon a February 24, 2006 SDDC clarification of the "WAR," port congestion ("CON"), and port handling charges as the rate authority.  *See id.*   The explanation of the rate basis provided with the overcharge notices also indicated that port security handling surcharge (now coded as "COF") was not applicable.  *See* Bates Decl. ¶ 6.   "COF" is the port security handling surcharge, defined as "an extra charge that is billed to the TSP for security of their cargo while at the port of embarkation/debarkation."  Clark Decl. ¶¶ 6, 9.

After the overcharge notices were sent, plaintiffs and other industry members presented several arguments to GSA in an effort to defend the disputed charges.  Terry Head, as head of an industry trade group representing TSPs in the household goods industry, advised GSA that SDDC had modified its prior clarification.  *See* Fitzgerald Decl. ¶ 6.  Mr. Head argued that this second clarification made the disputed charges permissible for the items being shipped.  *See id.*  Cartwright submitted a letter of protest on April 18, 2006, contending that the charges were justified.  *See id.* ¶ 8.  GSA denied the protest on June 23, 2006, sustaining its notice of overcharge, and recommending that Cartwright enter into a repayment plan.  *See id.*  Foremost

did not file a written protest of the overcharge notice, but its attorney, Alan Wohlstetter (who also represented the industry trade association and several other industry members) presented arguments concerning the validity of the disputed charges.  *See id.* ¶ 9.  Mr. Wohlstetter and GSA exchanged several emails and letters concerning the charges, and those discussions continued for over a year.  *See id.* ¶¶ 9-14.  GSA temporarily suspended the offset and deduction process until a final determination could be made on the issue.  *See id.* ¶ 12; Bates Decl. ¶ 12.

On January 23, 2007, plaintiffs and other industry members submitted a letter which purported to rebut GSA's overcharge determination.  *See* Fitzgerald Decl. ¶ 13; Exh. 4 (Jan. 23, 2007 letter).  On July 25, 2007, GSA wrote a letter to Mr. Wohlstetter, expressing GSA's disagreement with the arguments raised in the January 23, 2007 letter.  *See* Fitzgerald Decl. ¶ 14.  GSA sent a letter to plaintiffs and other involved TSPs on July 27, 2007, advising them of GSA's decision.  *See id.*

GSA met with industry representatives again on August 2, 2007.  *See id.* ¶ 15.  During that meeting, plaintiffs and the other TSPs stated that the charges billed as "WAR" or "CON" were for time spent waiting at the gate of the airbases or for moving from one gate to another at that base.  *See id.* ¶ 16.  The TSPs offered no reasonable explanation for why these charges would not have been billed under the existing codes applicable to "waiting time."  *See id.*; Clark Decl. ¶ 12.  The fact that these charges were attributable to such delays in no way justified billing those charges as "WAR," "CON," or even "COF."  *See* Clark Decl. ¶¶ 7-10 (discussing definitions of "WAR," "CON," and "COF").

GSA resumed deductions on July 25, 2007, after providing the carriers with notice that it would do so.  *See* Bates Decl. ¶ 8.  GSA rejected the TSPs' proposal that deductions and offset

actions be suspended until plaintiffs had submitted a reply to the July 25, 2007 letter.  *See id.* ¶ 11.  By that time, GSA had suspended deductions for fifteen months, placing some of the debts beyond the three-year period in which GSA has authority to use deductions to collect debts.  *See id.* ¶ 12; Fitzgerald Decl. ¶ 17.  GSA therefore began collecting the overcharges from plaintiffs via offset and deductions.  *See* Dkt. Entry 14 at Exhs. 1, 2.

Shortly thereafter, plaintiffs initiated this litigation and filed a preliminary injunction motion simultaneously with the complaint.  Plaintiffs alleged that GSA did not give them sufficient notice of the basis for the overcharges, and argued that this violated GSA regulations. In light of the complaint and preliminary injunction motion, GSA voluntarily adopted an additional 30-day abatement of deductions, beginning August 13, 2007.  *See* Fitzgerald Decl. ¶ 17; Bates Decl. ¶ 12.  That abatement was extended through November 29, 2007, in light of the Court's November 7, 2007 status hearing, and to permit the Court to review the amended complaint and Defendant's motion to dismiss.  Plaintiffs filed an amended complaint November 9, 2007, and moved for a temporary restraining order on November 30, 2007.

## STANDARD OF REVIEW

A temporary restraining order or preliminary injunction is an "extraordinary and drastic remedy."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  The "standard for issuance of . . . a temporary restraining order . . . is very high."  *RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp. 2d 70, 71 (D.D.C. 2007).  The moving party must show:

> (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Al-Fayed v. Central Intelligence Agency*, 254 F.3d 300, 303 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505-06 (D.C. Cir. 1995); *NTEU v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991); *Randolph-Sheppard Vendors v. Weinberger*, 795 F.2d 90, 110 (D.C. Cir. 1986). Those four factors "interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc.*, 158 F.3d at 1318. However, if the moving party fails to show a likelihood of success on the merits, the court may deny the TRO without reaching the other three factors. *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) (finding preliminary injunction "never will be granted unless a claimant can demonstrate a 'fair ground for litigation'"). A party's failure to establish any irreparable injury can be equally fatal. *See CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

The movant bears the burden of persuasion, and may obtain a temporary restraining order only upon a "clear showing" that it is entitled to that extraordinary remedy. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. That burden is even heavier where, as here, the motion does not seek to preserve the status quo, but instead requests far-reaching mandatory relief. *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F.Supp. 2d 30, 36 (D.D.C. 2000). Such motions are disfavored, and "the movant must show *clearly* that she is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006) (emphasis added).

## ARGUMENT

**A.     Plaintiffs Are Not Likely to Succeed on the Merits**.

A plaintiff that cannot demonstrate a significant likelihood of success on the merits has no

hope of obtaining a temporary restraining order.  *See Trudeau v. Federal Trade Comm'n*, 456

F.3d 178, 182 n.2 (D.C. Cir. 2006); *Katz*, 246 F.3d at 688; *Apex, Inc. v. FDA*, 449 F.3d 1249,

1253-54 (D.C. Cir. 2006); *RCM Technologies, Inc.*, 502 F. Supp. 2d at 73.  "[A]bsent a

'substantial indication' of likelihood of success on the merits, 'there would be no justification for

the court's intrusion into the ordinary processes of administration and judicial review.'" *Biovail*

*Corp. v. FDA*, 448 F. Supp. 2d 154, (D.D.C. 2006) (quoting *American Bankers Ass'n v. Nat'l*

*Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)).  Plaintiffs are unlikely to succeed

on the merits for two reasons.  First, they cannot prove that this Court has jurisdiction to review

their claims.  Second, GSA reasonably determined that plaintiffs' belated re-characterization of

the disputed "WAR" charges as "waiting time" charges did not require GSA to re-commence the

post-payment audit process and issue a new notice of overcharge.  Like all TSPs, plaintiffs had an

affirmative duty to fully document and support their billings, and if they fail to do so, GSA will

issue and enforce overcharges.

### 1.     The Court Lacks Jurisdiction.

Plaintiffs have no chance of success on the merits because their claims will not survive

defendant's motion to dismiss.  As discussed in Defendant's pending motion to dismiss, plaintiffs

should have filed this action in the Court of Federal Claims.  *See* Dkt. Entry 20.  Given that

plaintiffs cannot litigate (let alone prevail on) their claims in this Court, they cannot obtain a

TRO.  *See Tanner v. Federal Bureau of Prisons*, 433 F. Supp. 2d 117, 122 n.5 (D.D.C. 2006);

*Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 205 (D.D.C. 2005) ("[T]he plaintiff is not likely to succeed on the merits because this Court is barred by statute from having subject matter jurisdiction in this case.").

> **2.    GSA Has Complied With Its Regulations And Its Interpretation and Application of The Relevant Regulations Was Not Arbitrary, Capricious, or Contrary to Law.**

Even if this Court could review plaintiffs' claims on the merits, plaintiffs would be unable to satisfy the exceedingly high standard for having agency action declared arbitrary and capricious. To prevail on their Administrative Procedure Act claims, plaintiffs must show that GSA's issuance of notices of overcharge, and its subsequent enforcement of those notices through deductions and offsets, violated the plain language of the controlling regulations or statute. Plaintiffs will be unable to make that showing.

Plaintiffs' entire argument rests on the false premise that GSA failed to give them notice of the basis for the notices of overcharge, and collected the debts based on a different rationale than what was provided in the notices of overcharge. *See* Am. Compl. ¶¶ 1, 16; TRO Mot. ¶ 3; TRO Mem. ¶ 3. The notices of overcharge alerted plaintiffs to the nature of the overcharge, and referenced the SDDC definitions of the relevant surcharges. That is all the regulations required. The rationale has not changed — these charges were not, and still are not, properly billed as "WAR," "CON," or "COF."

GSA gave plaintiffs multiple opportunities to justify the disputed charges, and suspended offsets for over a year, while plaintiffs proffered various theories and explanations of those charges. That forecloses plaintiffs' claim that they received an inadequate opportunity to be heard, or to present their objections. GSA concluded that plaintiffs had not established that these

charges should be billed as "WAR," "CON," or "COF," and that the overcharges should be sustained. GSA was fully entitled to resume offsets after making that determination. To the extent plaintiffs seek further relief, they must file a claim for the amount of the offsets (as they already have done in the Civilian Board of Contract Appeals), and/or enter into a repayment plan.

> **a.    GSA's Interpretation Of Its Regulations Must Be Given Substantial Deference.**

"There is a presumption in favor of the validity of administrative action." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 216 (D.D.C. 1996). Thus courts apply a deferential standard under which agency action may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action must be upheld if it is rational, based upon relevant factors, and within the agency's authority. *See Motor Vehicle Mfrs. Ass'n of the United Sates, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003).

Where, as here, plaintiffs challenge an agency's interpretation of its own regulations, that standard requires courts to accord "substantial deference" to the agency's view. *National Wildlife Fed. v. Browner*, 127 F.3d 1126, 1129 (D.C. Cir. 1997); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997). The agency's interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (internal quotations omitted); *see also Mistick PBT v. Chao*, 440 F.3d 503, 511 (D.C. Cir. 2006) (quoting same); *Browner*, 127 F.3d at 1129 ("Provided the interpretation does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."). That is, courts must "defer to [the agency's] view unless an alternative reading is compelled by the regulation's plain language or by other indications of the agency's intent at the time of the

11

regulation's promulgation." *Air Transport Ass'n of America v. FAA*, 291 F.3d 49, 53 (D.C. Cir.

2002). The agency may present its interpretation of the relevant regulation in a legal brief. *See*

*Auer*, 519 U.S. at 462; *Drake*, 291 F.3d at 68-69.

> b.     **The Notices of Overcharge Complied With the Applicable Regulations.**

The notices of overcharge issued to Cartwright and Foremost contained the information

contemplated by the GSA regulations. Section 102-118.435 indicates that a notice of overcharge

"states the amount paid, the basis for the proper charge for the document reference number, and

cites applicable tariff or tender along with other data relied on to support the overcharge." 41

C.F.R. § 102-118.435. GSA issued a notice of overcharge to Cartwright on March 31,2006. The

Cartwright notice listed the amount paid, which totaled $3,839,121.02, and indicated that the

proper charge was $3,597,910.18. *See* Dkt. Entry 20 at Exh. 4 (TARPS Record of Notice of

Overcharge to Cartwright). As the Basis and Authority to support the overcharge, the notice

stated as follows:

> This Notice of Overcharge is issued to recover charges that were  erroneously
> billed by your company for War Risk Surcharges (WAR),  Port/Terminal Security
> Handling Surcharges (COF), and Port Congestion Surcharges (CON), applied to
> codes T, 5, and J  shipments.
> The Surface Deployment and Distribution Command (SDDC) issued a letter dated
> February 24, 2006, clarifying the description and application of these surcharges.
> The letter states in Note 1 that, "Air fuel, bunker, War Risk, Port/Terminal
> Security Handling, and Port Congestion surcharges are not applicable on shipment
> codes of service T, 5, and J." Further, SDDC refers to this statement as a
> clarification of the billing procedure, not a change. In accordance with this
> explanation of the appropriate billing of surcharges, the Audit Division is
> requesting a refund of excess charges related to the improper application of
> surcharges to Codes T, 5, and J shipments.
> The following DRN's are included in this overcharge:  [a list of DRNs followed
> with the dollar amounts for each] .

*See id.* at 2-3.

GSA issued a notice of overcharge to Foremost on March 31, 2006. Like the Cartwright notice, the Foremost notice listed the amount paid, which totaled $ 4,752,569.92, and indicated that the proper charge was $ 3,549,871.47. *See* Bates Decl. ¶ 6; Dkt. Entry 20 at Exh. 5 p. 2-3 (excerpt from TARPS Record of Notice of Overcharge to Foremost). That notice was supported by a Basis and Authority statement identical to the Cartwright notice in all respects except for the list of DRNs included in the overcharge. *See* Dkt. Entry 20 at Exh. 5 p. 2-3. Thus, both notices provided plaintiffs with the information referenced in the regulations, and put plaintiffs on notice of the basis for the overcharges.

After GSA issued the notices of overcharge, plaintiffs and other industry members who had billed the Government for similar charges communicated with GSA concerning the legitimacy of the war risk ("WAR") and port-congestion ("CON") surcharges. *See* Fitzgerald Decl. ¶¶ 6-16. Cartwright submitted a written protest to the overcharge, but Foremost did not. *See id.* ¶¶ 8-9. However, plaintiffs' attorney — Alan Wolhstetter — participated in those written and oral discussions with GSA on behalf of the industry and several clients. *See id.* ¶ 9. In light of those discussions, GSA suspended its collection of the overcharges from plaintiffs and other TSPs for fifteen months. *See id.* ¶ 17. During that process, plaintiffs' attorney informed GSA that certain charges had been miscoded as "WAR," and should have been coded as port congestion ("CON") or port/terminal security handling surcharge ("COF"). *See* Fitzgerald Decl. ¶¶ 9, 10, 15. Plaintiffs' attorney subsequently informed GSA that due to tightened security at the military air bases after September 11, 2001, the time involved in the pick-up and delivery of Code J shipments had substantially increased for the port agents. *See* Fitzgerald Decl. ¶ 16; Exh. 6 at 3 (Jan. 23, 2007 letter). Plaintiffs contended that their charges were legitimate expenses incurred

for that additional waiting time.  *See* Exh. 6; Fitzgerald Decl. ¶ 16.  Plaintiffs did not submit

corrected bills listing the "CON" and "COF" codes instead of "WAR," or listing the charges

under any other rate code  *See* Fitzgerald Decl. ¶ 9.

GSA considered the arguments advanced by Mr. Wohlstetter and other industry

representatives, but found them unpersuasive.  Nothing plaintiffs submitted indicated that the

disputed charges were properly billed as "WAR" charges.  *See* Fitzgerald Decl. ¶¶ 8, 16.  Indeed,

plaintiffs' presentation of a new theory — that these were "CON" or "COF" charges — suggested

that plaintiffs had abandoned their prior position that these charges were properly classified as

"WAR." *See id.* ¶¶ 9, 16. GSA also found plaintiffs' alternative theory unpersuasive, as additional

waiting time caused by heightened security is not properly coded as "CON" or "COF" in this

context.  *See id.* ¶ 16; Clark Decl. ¶¶ 8-10, 12.  That waiting time simply does not meet the

definition of CON & COF contained in the SDDC clarification of those codes' meaning.  *See*

Clark Decl. ¶¶ 10, 12.

The regulations do not require GSA to restart the administrative claims process and issue

new notices of overcharge to plaintiffs simply because plaintiffs presented new facts and theories

after the original notices were issued.  Instead, the regulations articulate a straightforward process

in which GSA issues a notice of overcharge, the TSP has an opportunity to seek reconsideration

of GSA's ruling, and GSA determines whether to reconsider the overcharge or collect the debt.

The TSP's reconsideration petition or other communications may introduce new facts which GSA

may deem relevant.  However, GSA considers those facts after they have been raised, and

determines whether those new facts warrant reexamination of GSA's prior determination of the

TSP's entitlement to payment (which is the ultimate goal of the governing statute and regulation).

Nothing in the text of Section 102-118.435 indicates that GSA must go back to the beginning of the settlement process and issue a new notice of overcharge each time a new fact arises that influences GSA's assessment of the disputed charges.

Plaintiffs' contrary assertions are untenable. As explained *supra*, plaintiffs face a very heavy burden of establishing that GSA's actions violate the plain language of the regulations or statute. *See Browner*, 127 F.3d at 1129; *Auer*, 519 U.S. at 461. The Court's role is not to ensure that the agency's application of its regulations to the facts is the most natural or logical, the only possible interpretation, or the one that the Court would have adopted in the first instance, but only that it is reasonable and consistent with the regulations. *National Trust for Historic Preservation v. Dole*, 828 F.2d 776, 782 (D.C. Cir. 1987); *Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 685 (D.C. Cir. 1978). Thus, GSA's interpretation and application of its regulations must be accepted "unless it is manifestly unreasonable." *Liberty Maritime Corp. v. U.S.*, 928 F.2d 413, 419 (D.C. Cir.1991) (quoting *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 174 (D.C. Cir. 1982)).

Plaintiffs will be unable to satisfy that stringent standard. Section 102-118.435 contains no language indicating that GSA must re-issue notices of overcharge if a TSP identifies a new theory for its charges at a later stage in the audit and collection process. Nor does it require GSA to issue new notices of overcharge prior to responding to any such theory a TSP presents after the original overcharge notice was issued. Instead, it contemplates that the notice of overcharge will be issued at the beginning of the process, as GSA did in this case. *See* 41 C.F.R. § 102-118.435. GSA interprets Section 102-118.435 as allowing it to move forward with debt collection whenever it deems such belated explanations for a carriers' charges unpersuasive. GSA has issued no prior rulings interpreting the rule in a different way, and Congress has not addressed the

issue.  Thus GSA's interpretation can hardly be deemed "manifestly unreasonable."  *Liberty Maritime Corp.*, 928 F.2d at 419.  Instead, it deserves deference, and must be upheld.  *See Browner*, 127 F.3d at 1129; *Dole*, 828 F.2d at 782.

Plaintiffs' reading of Section 102-118.435, in contrast, would undermine the efficiency of the post-payment audit process, and significantly reduce GSA's ability to recoup excessive charges.   Under plaintiffs' theory, a TSP could delay the collection process unilaterally by articulating a new justification for disputed charges after GSA has issued the overcharge notice, thereby requiring GSA to issue a new notice of overcharge.  This process would end, and the debt could be collected, only when the TSP ran out of theories to support its bills.  Such an implausible interpretation of the regulations cannot possibly trump the agency's reasonable interpretation of the rules implementing GSA's statutory authority.

### c.   Plaintiffs Had More than Ample Opportunity to Rebut the Overcharges.

Plaintiffs also are quite unlikely to succeed on the merits of their claim that they were denied an adequate opportunity to respond to the overcharge notices.  Plaintiffs contend that they were not given an opportunity to be heard before the offsets were deducted, and suggest that this violates their right to protest the overcharge.[3]  *See* Am. Compl.¶ 1; TRO Mot. ¶ 3.  But in reality, GSA gave plaintiffs several opportunities to justify their bills to GSA, and suspended collection of offsets for fifteen months while it reviewed plaintiffs' and other TSPs' contentions.

---

[3] Plaintiffs' preliminary injunction motion suggests that this violated their due process rights.  *See* Dkt. Entry 3.  As Defendant has explained, plaintiffs have no constitutionally protected property interest in the payments, and received all the process they were due.  *See* Dkt. Entry 8 at 23-25.  Plaintiffs appear to have abandoned their due process theory, as the amended complaint does not include a due process claim and the TRO motion does not frame this as a due process issue.

Plaintiffs have received more than ample opportunities to protest the overcharge notices. As discussed *supra*, GSA's regulations contemplate that a TSP will receive a notice of overcharge and thereafter have an opportunity to protest the overcharge determination with a written request for reconsideration.  *See* 41 C.F.R. § 102-118.435.  Plaintiffs received those notices, and subsequently had several opportunities to present their position to GSA.  Cartwright submitted a protest letter on April 18, 2006, which GSA reviewed and denied.  *See* Fitzgerald Decl. ¶ 8. Although Foremost did not submit a written protest, its attorney presented arguments concerning the validity of the disputed charges.  *See id.* ¶ 9.  Oral and written discussions continued through July 2007 — over a year after the overcharge notices were sent — and GSA stayed offset actions during that period.  *See id.* ¶ 17.  Plaintiffs had no legitimate expectation that GSA would defer collection of the deductions and offsets for such an extended period of time.  Indeed, given that Foremost failed to file a protest, it should have expected that deductions and offsets would be collected immediately.  Plaintiffs apparently desire still further opportunities to challenge GSA's overcharge determinations.  But GSA's  regulations do not require it to defer collection actions indefinitely while waiting for plaintiffs to articulate every possible justification for their bills. TSPs have an affirmative duty to fully support and document their bills at the time they are submitted. Plaintiffs have received notice and numerous opportunities to be heard, which is more than the applicable regulations require.

### d.    GSA Was Entitled to Initiate Offsets to Recoup the Overcharges.

Having determined that plaintiffs' bills contained excessive charges, GSA had the right to resume deductions.  The Transportation Act and GSA rules authorize GSA to deduct charges due under current bills against amounts a carrier owes on prior bills.  *See*  31 U.S.C. § 3726(d); 41

C.F.R. § 102-118.435(f); *see also Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1020 (Fed. Cir. 1995) (noting "it has long been recognized that the government may set off loss . . . overcharges against the payments to carriers authorized by Section 3726"). Deductions usually begin automatically if a carrier does not respond to the Notice of Overcharge by paying or submitting a written protest. *See* Bates Decl. ¶ 7. Although the regulations do not expressly require GSA to suspend deductions after receiving a protest, in this case GSA held deductions in abeyance pending its response to any protest filed by plaintiffs or other industry members and representatives. *See* Bates Decl. ¶ 6. Deductions and offsets against plaintiffs' other bills were held in abeyance for over fifteen months, until July 25, 2007, plus an additional abeyance period (beginning August 13, 2007) that GSA adopted to permit the preliminary injunction motion to be briefed. *See id.* ¶ 12; Fitzgerald Decl. ¶ 17; Dkt. Entry 15 (status report advising Court of end of abeyance period). GSA had no statutory or regulatory duty to defer collection actions for that long, and certainly had the right to resume its collection efforts when it did.

### B.    Plaintiffs Will Suffer No Irreparable Harm Absent An Injunction.

No TRO or preliminary injunction may issue in the absence of an "irreparable injury," no matter how strongly the other factors support the movant. *See CityFed Fin. Corp.*, 58 F.3d at 747; *Farris*, 453 F. Supp. 2d at 78. The moving party bears the burden of establishing that, absent an injunction, it will suffer an injury that is "both certain and great," and that "there is a clear and present need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). As the D.C. Circuit has recognized,

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or

> other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 298 (emphasis in original; internal quotations omitted).

Purely economic loss, even when large sums of money are involved, typically will not constitute irreparable injury.  *See Wisconsin Gas Co.*, 758 F.2d at 674 (noting it is "well settled that economic loss does not in and of itself constitute irreparable harm"); *Emily's List v. Federal Election Comm'n*, 362 F. Supp. 2d 43, 52 (D.D.C. 2005).  Economic loss that threatens the survival of the movant's business may constitute irreparable harm.  However, the movant may not rely on "bare allegations" that the business will not survive absent a preliminary injunction.  *Wisconsin Gas Co.*, 758 F.2 at 674.   Instead, the movant must substantiate its allegation of harm by showing that this threat to the business's viability is "certain to occur in the near future as a direct result of the threatened action."  *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005); *see also Wisconsin Gas Co.*, 758 F.2d at 674.

Plaintiffs have not shown that they will suffer an "irreparable" injury absent a preliminary injunction.  Plaintiffs contend that GSA's collection of the overcharges through deductions and offsets against other government contracts irreparably harms them because it will deprive them of significant revenues from their other government contracts.  *See* TRO Mot. ¶ 5.  While that financial loss may harm plaintiffs, it is neither certain nor irreparable.  Instead, it is a purely financial injury, which plaintiffs can avoid by entering into a payment plan, and will be remedied if they succeed on their pending claims against GSA for the amount of the overcharges.

Because the loss plaintiffs have identified is purely financial, it cannot support a finding of irreparable harm unless plaintiffs establish that these losses will threaten the continued

existence of their businesses. Plaintiffs contend that the offsets will have such an effect, but have not substantiated those claims. First, the fact that Cartwright and Foremost remain solvent and operational belies any suggestion that the deductions and offsets withheld to date are sufficiently large that they will destroy plaintiffs' ability to continue operations, or that the prospect that additional deductions and offsets will be applied in the future has such an effect. Second, plaintiffs rely on general allegations that continued offsets would impair their working capital and interfere with their ability to service military shipments. *See*, *e.g.*, Decl. of Andrew W. Cartwright, ¶ 9 (Dkt. Entry 3); Decl. of Kenneth J. Sullivan, ¶ 5 (Dkt. Entry 3). They have not submitted audited financial statements or other detailed materials to demonstrate the impact these offsets would have on their viability, and the dollar amount at which the deductions and offsets allegedly would drive them out of business. Those "bare allegations" that the offsets threaten the existence of plaintiffs' business are insufficient to support a finding of irreparable harm. *See Wisconsin Gas Co.*, 758 F.2d at 654.

Plaintiffs also have not presented evidence concerning the volume and value of invoices they will submit for services provided to the Government in the near future. Absent such information, it is impossible to assess the financial impact of continued deductions. The deductions are applied against new invoices plaintiffs submit. Thus, when Government business is slow, the deductions may involve minimal amounts of money which would be unlikely to have any significant impact on plaintiffs' viability. The volume of Government business also determines the pace at which deductions are applied; if plaintiffs will have few Government billings in the next several months, the deductions and offsets might not reach business-threatening levels until well *after* this Court issues a ruling on the pending motions.

Further, even if plaintiffs had proven that the continued deductions and offsets would drive them out of business, they cannot establish that this risk is "certain." Deductions are but one of the debt collection mechanisms available to GSA. As GSA has repeatedly told plaintiffs and other TSPs, carriers can avoid deductions and offsets by entering into a repayment plan with GSA. *See* Bates Decl. ¶ 9; Fitzgerald Decl. ¶¶ 8, 10, 14. Although the repayment plan would not eliminate the debt, it would allow plaintiffs to propose a repayment schedule that leaves them with sufficient funds to continue operations. *See* Bates Decl. ¶ 9. Thus it is far from certain that the deductions and offsets will reach a dollar amount so high that they would drive plaintiffs out of business. Further, as noted, it is unclear *when* (if ever) the deductions and offsets would reach a monetary amount that could have such an effect. Plaintiffs have the ability to avoid that result, and the alleged threat to their viability will result from plaintiffs' decision not to elect a repayment plan.[4] Those factors weigh strongly against finding irreparable harm. *See Sociedad Anonima Vina Santa Rita v. United States Dep't of Treasury*, 193 F. Supp. 2d 6, (D.D.C. 2001) (concluding harm was not "certain" to occur and was not irreparable because plaintiffs could petition the agency to change its decision and thereby avert the anticipated harm).

The fact that plaintiffs have filed claims in the Civilian Board of Contract Appeals ("CBCA") against GSA for the amount of the overcharges also undercuts their allegation that these financial harms are certain and irreparable. *See* Dkt. Entry 14 (notice providing copies of administrative claims); *see generally* 41 C.F.R. §§ 102-118.450(b), 102-118.645. Plaintiffs' CBCA claims expressly seek review of the deductions that have been taken and the issuance of

---

[4] Plaintiffs claim that they have offered to provide a bond. *See* TRO Mot. ¶ 3. However, the regulations and GSA's policies do not contemplate bonds; repayment plans are the mechanism TSPs and other debtors may use to avoid or minimize deductions.

"Notices of Overcharges, which have not yet been deducted to date." Dkt. Entry 14 at Exhs. 1, 2. The claims ask the CBCA to direct GSA "to cancel the outstanding Notices of Overcharge . . . and not deduct any additional monies for GBLs subject to those Notices of Overcharge." *Id.* If those claims are successful, plaintiffs will recover any deductions or other payments to which GSA was not entitled, and no further deductions would be taken. That would remedy any financial harm plaintiffs contend the deductions and offsets will cause them to suffer.

> **C.     Suspending GSA's Ability to Collect On The Overcharges Would Cause Harm to Third Parties and Would Be Contrary To the Public Interest.**

The remaining two elements of the TRO analysis also favor denial of plaintiffs' motion. Those factors require the Court to evaluate the harms others would suffer if the TRO were granted, and to determine whether injunctive relief would promote the public interest. *See Chaplaincy of Full Gospel Churches,* 454 F.3d at 297; *Serono Labs., Inc.,* 158 F.3d at 1318. The potential harm to third parties and the public interest both outweigh the harms plaintiffs claim they will suffer absent a TRO.

Granting plaintiffs' motion would undermine the public interest in the integrity of Government contracts, and would hamper GSA's ability to collect on its debts. Federal agencies should be billed for no more than the amounts TSPs or other providers of goods and services are authorized to charge pursuant to the applicable tariff, agreement, or other rate source. *See* 31 U.S.C. § 3726(a)(1). Although Congress and GSA could have enacted requirements that freeze debt collection proceedings once a carrier challenges an overcharge, they have determined that carriers must pay any overcharges as a debt, and then file a claim against the Government for the disputed amount. *See* 31 U.S.C. § 3726(i)(1) (allowing carriers to request GSA review of the Administrator's decisions); 41 C.F.R. §§ 102-118.450(b) (explaining TSPs' right to file claim

22

against an agency), 102-118.645 (explaining TSP's right to file claim involving collections

triggered by GSA post-payment audits). Enjoining future collections pending the Court's

resolution of the pending motions would be contrary to the public interest in ensuring that these

debt collection procedures are followed, and would create incentives for other carriers to file their

own actions as a last-ditch effort to avoid repaying these excessive charges.

Further, the delay created by a TRO would prevent GSA from using deductions to collect

on some of the bills at issue. GSA may use deductions to collect debts within three years of when

the bill was paid. *See* 31 U.S.C. § 3726(d). This is not a statute of limitations, but a condition on

GSA's ability to use the deduction process. *See id.* As many of these overcharges involve bills

issued in 2004, that three-year period will expire soon. Indeed the three-year period for some

bills expired during the voluntary abatement, and GSA already has lost its ability to collect

portions of the debts through deductions. *See* Fitzgerald Decl. ¶ 17. Although GSA could pursue

those overcharges by filing claims against the carriers, deductions and offsets are a more efficient

and less costly means of collecting debts.

In sum, plaintiffs have alleged purely financial harm, cloaked as an alleged procedural

deprivation, as a result of GSA's resumption of collection actions. Even if that harm were

irreparable, it would not outweigh the harm that the Government and the public fisc will suffer if

GSA is enjoined from collecting the overcharges from plaintiffs. The extraordinary remedy of a

temporary restraining order is not warranted in such a case. *See American Fed'n of Gov't*

*Employees, AFL-CIO v. United States*, 104 F. Supp. 2d 58, 79 (D.D.C. 2000) (considering

"burden on the public fisc" when assessing public interest effects of injunction and denying

preliminary injunction motion).

## CONCLUSION

Plaintiffs' motion for a temporary restraining order should be DENIED.

Dated: December 3, 2007                    Respectfully submitted,


_____/s/ by DCH_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.

_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov


**Of Counsel:**

Raymond J.M. Wong
Aaron Pound
GENERAL SERVICES ADMINISTRATION,
Office of General Counsel

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARTWRIGHT INTERNATIONAL VAN LINES, INC. et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) No.: 1:07-1454 (EGS) |
| LURITA ALEXIS DOAN, Administrator of General Services Administration, | ) ) ) ) |
| Defendant. | ) ) ) ) |

### DECLARATION OF MARY BATES

1. I am the Deputy Director of the Transportation Audit Division (QMCA), Office of Travel and Transportation Services, Federal Acquisition Service, U. S. General Services Administration. My responsibilities include coordinating the work of three branches, the Accounts and Collections Branch, the Audit Policy and Review Branch and the Disputes Resolution Branch.

2. I make this declaration based on my knowledge of work processes employed to achieve organization objectives. I have a comprehensive understanding of the audit function, policies and procedures, and regulations governing Federal claims, collection standards and procedures, and bankruptcy procedures. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3. I coordinate the work of three branches of highly specialized auditors and support personnel engaged in the pre and post-audit of payments made to carriers and forwarders in all modes of transportation, maintain oversight of the analysis and settlement of claims, and review the basis for complaints before regulatory agencies or courts when the United States is either the plaintiff or defendant. My managerial tasks include developing reports and related proposals for changes in personnel, work assignments, methods and procedures that enhance the effectiveness of the organization.

4. GSA conducts post-payment audits of transportation bills of any Federal Agency, including SDDC, under the authority of 31 U.S.C § 3726 to verify their correctness. Prepayment audits are the responsibility of the paying agency and are conducted by audit contractors or government employees as best suits the needs of the agency. Post-payment audits are conducted on all paid bills including those that were prepayment audited. To minimize auditing a transaction more than once, post-payment audits are conducted on a lag time basis to ensure that all bills arising from a particular transaction have been filed. The TSP can file a claim for transportation services within three years after providing the service. During that same three year period, the Government may collect overcharges by offset, i.e., deduct the overcharge from an amount subsequently due a TSP.

5. A Notice of Overcharge is issued for charges that are unsupported or not authorized by the underlying transportation contracts. The terms of transportation contracts establish the basis for establishing the correctness of TSP billings and determining whether the charges are excessive. The subject overcharges were issued during the audit of billings made through Electronic Data Interface (EDI), where the TSP sends bills electronically to the Defense Finance and Accounting Service (DFAS). After the bill is paid, DFAS provides the data to GSA by an electronic feed for post payment audit. The Audit comprises review of all payment data; carrier provided documentation and the terms and conditions under which the transportation of goods and property occurred. In this instance, auditors established that the Government had paid certain TSPs excess transportation charges based on the Surface Deployment and Distribution Command (SDDC) International Rate Solicitation I-13 (as amended). The auditors noticed WAR and CON surcharges being billed inconsistently with the terms of the Rate Solicitation, due to the TSPs misapplication of Item 432 (household goods) and Item 433 (unaccompanied baggage). These items define the services that are included in the SFRs for the transportation of personal property. There had been some confusion on the part of the TSPs concerning what services were incorporated into the SFR for these items until a final clarification was issued by SDDC on February 24, 2006.

6. GSA issued 38 Notices of Overcharge on April 3, 2006 based on the Surface Deployment and Distribution Command (SDDC) Clarification 1, dated February 24, 2006. Clarification 1, defined the Port Congestion Surcharge (CON), the Port /Terminal Security Handling Surcharge (COF) and the WAR surcharge. Note 1 specifically excluded codes of service 5, J and T. Prior to February, 24, 2006, only CON and WAR were at issue. COF was introduced in Clarification 1 (2/24/06) and Clarification 2

(4/11/2006). Notices of Overcharge are issued using the Transportation and Accounts Receivable/Payable System (TARPS) when auditors determine that excess transportation charges have been assessed by a transportation service provider (TSP).These overcharges were issued to 38 carriers including Cartwright International Van Lines Inc (CRWV) and Foremost Forwarders Inc (FOFD). The Cartwright overcharge notice listed the amount paid, which totaled $3,839,121.02, and indicated that the proper charge was $3,597,910.18 for an amount due (overcharge) of $241,210.84, and the Foremost overcharge notice listed the amount paid, which totaled $ 4,752,569.92, and indicated that the proper charge was $ 3,549,871.47 for an amount due (overcharge) of $1,202,698.45. Each notice was assigned a document reference number (DRN) that consisted of the Standard Carrier Alpha Code (SCAC) plus the numbers "0001." Each NOC identified : (1) multiple Government Bills of Lading (GBLs) for that TSP, (2) the amount of overcharge for each GBL, (3) the basis for the overcharge, which consisted of a single issue concerning the applicability of the surcharges, and (4) rate authority (SDDC clarification of WAR, CON, and COF). If other overcharges were/are discovered based on another issue, NOCs would be issued employing the individual GBL number as the DRN. (41 CFR 102-118.435). The carriers received written Notices of Overcharge and had the opportunity to either pay the amount requested or protest the basis of the notice. Any protest of the overcharge held collection action in abeyance until the protest was answered.

7.  In response to a Notice of Overcharge, TSPs may submit a payment, or protest letter which defers collection action. After a protest is considered, GSA advises the TSP by letter whether the Notice of Overcharge has been sustained, amended (amount changed), or canceled. If a TSP's protest is denied or amended, the overcharge is referred to the Defense Finance and Accounting Service (DFAS) for administrative offset or deduction. Following deduction, the TSP may present a reclaim, a request for a refund with written explanation of the basis upon which he makes the claim. The TSP should provide any documentation and additional information that justifies the correctness of his charges and proves his right to a refund. GSA will review the TSPs reclaim and determine whether the carrier is due a refund. If the TSP's reclaim is approved, a Certificate of Settlement will be issued and payment authorized. If, the reclaim is disallowed, a Settlement Certificate is issued denying the reclaim and outlining the basis for the denial. If the TSP disagrees with the denial of the reclaim, he may ask for a review of the settlement action. At each step, the TSP has the opportunity to respond to GSA's decision. After the denial of reconsideration, the TSP can ask for a review by the Civilian Board of Contract Appeals (CBCA) or the Court of Federal Claims.

8.  Subsequent to the Notice of Overcharge, GSA procedures (41 CFR 102-118.440 and 102-118.640) provides for the administrative offset, through a

government finance center, of debt that is owed by a TSP. Offsets usually begin automatically when a carrier does not respond to the Notice of Overcharge with either payment or a written protest within proscribed time frames, usually 60 days from issuance. Initially, GSA did not immediately commence offsets. GSA wanted to confirm SDDC would sustain its last policy statement (clarification 2). When some of the subject overcharges in TARPS were diverted from the automatic deduction process, and were manually processed through Defense Finance and Accounting (DFAS), Norfolk, VA, TSPs alerted GSA that some administrative offsets had been accomplished. Under the automatic deduction process overcharge data is sent by electronic feed to DFAS Indianapolis on a weekly basis. In the manual collection process, personnel at other finance centers are contacted directly by a collection technician and expedited collections are requested. The Director of the Transportation Audit Division, James Fitzgerald, directed the Accounts and Collections Branch to stop the manual process on the balance. The administrative offset process resumed July 25, 2007 following notification to the TSPs that offsets would commence.

9.  CRWV submitted a letter of protest on April 18, 2006 which was entered into TARPS on June 14, 2006 and denied (Notice of Overcharge sustained) on June 23, 2006. James Fitzgerald, Director of the Audit Division recommended that the TSP enter into a repayment plan in a letter dated June 14, 2006. Repayment plans generally consist of the execution of a promissory note in favor of the Government to be paid in an agreed number of installments over a definite period of time. This is a viable alternative for TSPs to minimize financial hardship. Otherwise, the offset process would resume.

10. On November 29, 2006, GSA met with A. Wohlstetter, T. Head and several TSPs to discuss the November 1, 2006 letter. They asked that GSA stop setoff action until they could submit their requests for reconsideration. GSA agreed to temporarily stop the offset process until a final determination could be made on those requests; this stoppage was for all involved carriers, including CRWV and FOFD.

11. GSA met with industry and representatives on August 2, 2007. The industry and TSP representatives proposed that offset action be suspended until a reply to the July 25, 2007 GSA letter could be submitted to GSA for consideration. Additionally, the industry suggested surety bonds in conjunction with a waiver of the statute of limitation. GSA rejected the industry's proposal in favor of GSA's recommended repayment plans (which constitute stoppage of offsets, an orderly repayment of debt, a confessed judgment in case of default, and allow the TSP to continue its appeal process).

12. GSA has abated the offset process for the 38 TSPs involved in this broader overcharge dispute --- including Cartwright International Van Lines (CRWW) and Foremost Forwarders Inc (FOFD) ---since the Notices were issued on April 3, 2006, a period of 15 months (from June 2006 until August 2007. In addition, GSA has voluntarily adopted an additional 30-day abatement of collection of the debt for Cartwright   International Van Lines (CRWV) and Foremost Forwarders Inc (FOFD) in light of the instant litigation and the preliminary injunction motion filed by A. Wohlstetter. The TSPs have not been deprived of the right to dispute the Notices. TSPs may dispute collection actions by submitting an administrative claim for any amounts collected, documenting the basis for repayment of the amounts collected. In addition, TSPs may appeal adverse decisions to the Civilian Board of Contract Appeals.

Executed on August  29 , 2007.


_____

Mary C. Bates
Deputy Director,
Transportation Audits
Division

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CARTWRIGHT INTERNATIONAL VAN LINES, INC. et al., <br><br> Plaintiffs, <br><br> v. <br><br> LURITA ALEXIS DOAN, Administrator of General Services Administration, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

No.: 1:07-1454 (EGS)

## DECLARATION OF JAMES F.FITZGERALD

1. I am the Director of the Transportation Audit Division (QMCA), Office of Travel and Transportation Services, Federal Acquisition Service, U. S. General Services Administration. I have served in this position for 15 years.  My primary responsibilities are to  oversee the detection and recovery of overcharges and overpayments paid by federal agencies to transportation service providers ("TSPs").

2. I make this declaration based on my knowledge of work processes employed to achieve organization objectives. I have a comprehensive understanding of the audit function, policies and procedures, and regulations governing Federal claims, collection standards and procedures, and bankruptcy procedures. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3. I oversee the work of three branches of highly specialized auditors and support personnel including contract audit firms engaged in the pre and post-payment audit of payments made to carriers and forwarders in all modes of transportation, maintain oversight of the analysis and settlement of claims, and review the basis for complaints before regulatory agencies or courts when the United States is either the plaintiff or defendant.  My responsibilities include making decisions based on the facts presented to me, conducting investigations and initiating collection actions to recover funds due the Government.

4.  The TSPs can submit bills for payment in three ways: in paper format, or via two different electronic payment systems: Electronic Data Interface (EDI), or Powertrack.  Bills submitted via EDI are paid without audit or verification.  Effectively, they are paid automatically upon submission.

5.  GSA conducts post-payment audits of transportation bills of any Federal Agency, including SDDC) under the authority of 31 U.S.C § 3726 to verify their correctness. Prepayment audits are the responsibility of the paying agency and are conducted by audit contractors or government employees as best suits the needs of the agency.  Post-payment audits are conducted on all paid bills including those that were prepayment audited.  To minimize auditing a transaction more than once, post-payment audits are conducted on a lag time basis to ensure that all bills arising from a particular transaction have been filed.  The TSP can file a claim for transportation services within three years after providing the service.  During that same three year period, the Government may collect overcharges by offset, i.e., deduct the overcharge from an amount subsequently due a TSP.

6.  Following receipt of the Notices of Overcharge to the TSPs, on April 11, 2006, Mr. Terry Head, Household Goods Forwarders Association of America, Inc (HHGFAA), as head of the industry trade group representing the TSPs in the household goods industry, contacted GSA. Mr. Head advised GSA that the SDDC clarification in the February 24, 2006 memorandum that been modified by SDDC to restore the applicability of the services for which GSA had issued the Notices of Overcharge based on the application of Items 432 and 433.

7.  SDDC issued a second clarification dated April 11, 2006 further defining the application of Items 432 and 433 to Code 5 ,J and T, and did not effect the GSA position or overcharges.

8.  CRWV submitted a letter of protest on April 18, 2006 which was entered into TARPS on June 14, 2006 and denied (Notice of Overcharge sustained) on June 23, 2006. James Fitzgerald, Director of the Audit Division recommended that the TSP enter into a repayment plan in a letter dated June 14, 2006. Repayment plans generally consist of the execution of a promissory note in favor of the Government to be paid in an agreed number of installments over a definite period of time. This is a viable alternative for TSPs to minimize financial hardship. Otherwise, the offset process would resume.

9.  Foremost Forwarders Inc (FOFD) did not file a written protest of the Notice of Overcharge. However, FOFD's attorney, Alan Wohlstetter, presented arguments concerning the validity of the disputed charges to GSA.  It was unclear whether Mr. Wohlstetter was representing FOFD

specifically, or a larger group of TSPs. On June 16, 2006 GSA received an e-mail from Mr. Alan Wohlstetter, attorney representing the industry association, Household Goods Forwarders Association of America, as well as some industry members, including Cartwright and Foremost, that had been issued NOCs, and it proposed procedures for rebilling surcharges (i.e., submit corrected invoices coded as CON or COF with third party support) Letter stated that CON and COF were miscoded as WAR. GSA has not received any corrected billings from the TSPs but GSA is not aware if any corrected billings have been sent for payment via EDI.

10. October 20, 2006 Mr. Wohlstetter requested suspension of the collection process and time to allow TSPs to rebill correctly. GSA sent e-mail dated October 26, 2006 advising Mr. Alan Wohlstetter concerning the status of the issue and agreeing to meet with him. GSA sent e-mail reply dated November 2, 2006 advising that some TSPs (not including Foremost and Cartwright) received a November 1, 2006 letter sustaining the NOCs and recommending a repayment plan.  The letter stated the charges billed were not properly filed as required by 49 USC 13702.

11. After some discussion with A. Wohlstetter (attorney for several TSPs including CRWW and FOFD), GSA issued a letter, dated November 1, 2006 to each of the other TSPs who had filed protests, denying the TSPs' contention that they were due the charges. GSA again recommended repayment plans. FOFD did not receive a written response, as they had not filed a written protest.

12. On November 29, 2006, GSA met with A. Wohlstetter, T. Head and several TSPs including FOFD and CRWV, to discuss the November 1, 2006 letter. They asked that GSA stop setoff action until they could submit their requests for reconsideration. GSA agreed to temporarily stop the offset process until a final determination could be made on those requests, this stoppage was for all involved carriers , including CRWV and FOFD.

13. On January 23, 2007, A. Wohlstetter submitted an industry rebuttal to the November 1, 2006 letter on behalf of the industry association, the Household Goods Forwarders Association of America, Inc. including his clients, Cartwright International Van Lines and Foremost Forwarders Inc.

14. On July 25, 2007, GSA wrote a letter to Mr. Wohlstetter which expressed GSA's disagreement with the arguments raised in the industry's January 23, 2007 rebuttal letter, and advised industry that offset actions would resume against the TSPs. Again repayment plans were recommended to ease the burden on the TSPs.  On July 27, 2007 GSA sent a letter to all the TSPs involved, including CRWV and FOFD advising them of GSA

decision. This was done since many of them did not take part of the meetings and discussions.

15. GSA met with industry and representatives on August 2, 2007. The industry and TSP representatives proposed that offset action be suspended until a reply to the July 25, 2007 GSA letter could be submitted to GSA for consideration. Additionally, the industry suggested surety bonds in conjunction with a waiver of the statute of limitation. GSA rejected the industry's proposal because no details were provided about the underlying terms of the proposed surety bonds in favor of GSA's recommended repayment plans (which constitute stoppage of offsets, an orderly repayment of debt, a confessed judgment in case of default, and allow the TSP to continue its appeal process).

16. During the meeting on August 2, 2007, CRWV, FOFD and the other TSPs present acknowledged that the charges billed as WAR or CON were for waiting time at the gate of the airbases or for moving from one gate to another at that base. No reasonable explanation was offered as to why these charges were not billed under the existing provisions and charges for "waiting time".

17. GSA had stopped the offset process for, a period of 15 months (from June 2006 until August 2007,on the Notices that were issued on April 3, 2006, for the 38 TSPs involved in this broader overcharge dispute --- including Cartwright International Van Lines (CRWW) and Foremost Forwarders Inc (FOFD) --- In addition, GSA has now voluntarily adopted an additional 30-day abatement of collection of the debt for Cartwright International Van Lines (CRWV) and Foremost Forwarders Inc (FOFD) in light of the instant litigation and the preliminary injunction motion filed by A. Wohlstetter. The result of the holdup of offsets action has resulted in GSA's inability to ever collect part of this debt by offset. The TSPs have not been deprived of the right to dispute the Notices. TSPs may dispute collection actions by submitting an administrative claim for any amounts collected, documenting the basis for repayment of the amounts collected. In addition, TSPs may appeal adverse decisions to the Civilian Board of Contract Appeals.

Executed on August 29, 2007.

JAMES F. FITZGERALD
Director, Transportation Audit Division

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
CARTWRIGHT INTERNATIONAL VAN          )
LINES, INC. et al.,                                 )
                              Plaintiffs,            )
                                                    )
              v.                                    )   No.:  1:07-1454 (EGS)
                                                    )
LURITA ALEXIS DOAN, Administrator of   )
General Services Administration,            )
                                                    )
                              Defendant.             )
                                                    )
                                                    )
_____)

<u>DECLARATION OF JOYCE CLARK</u>

1.  I am a Supervisory Transportation Specialist in the Transportation Audit
    Division (QMCA), Office of Travel and Transportation Services, Federal
    Acquisition Service, U. S. General Services Administration.  My previous
    position was serving as Chief of the Audit Policy Branch for 10 years. My
    responsibilities include monitoring complex transportation matters and
    developing related policy in accordance with regulations,  procedures and
    statutory guidelines governing the audit of transportation documents.

2.  I make this declaration based on my knowledge, and experience
    reviewing, researching, interpreting and applying policy and procedure,
    regulations, and statutory guidelines to controversial issues. In the event I
    am called as a witness, I could competently testify to the facts contained in
    this declaration.

3.  I review transportation issues that result from the pre and post-payment
    audit of transportation documents. The result of a review may be stated by
    writing a letter to the affected parties, issuing a Certificate of Settlement or
    Settlement Certificate, or replying to appellate bodies. Specifically, I am
    responsible for drafting responses to the Civilian Board of Contract
    Appeals (CBCA) and supporting GSA's general counsel in preparing
    submissions in response to litigation

4.  Once a protest (regulations require a written submission) is presented,
    collection action is abated until the protest has been denied. A TSP may
    appeal audit actions to the Audit Division; and subsequent settlement

actions to the Administrator and the CBCA. Collection action in no way impedes the appeal process. Collection action and appeals are not mutually exclusive in that the processes may run concurrently. At any point in the processes that the TSP is able to substantiate an entitlement to payment, a Certificate of Settlement may be issued certifying payment.

5. The Surface Deployment and Distribution Command (SDDC), an agency of the Department of Army, administers transportation programs, including those for the shipment of unaccompanied baggage (UB; Code J) and household goods (HHG; Codes T and 5) for the benefit of military members.  The charges for the services provided under the programs are in rates filed periodically by the TSPs in response to rate solicitations. These single-factor-rates (SFRs) for the transportation of UB or HHG are fixed price in that the elements of costs to provide the service that can be incorporated into the SFR, as well as those elements of costs that cannot be incorporated into the SFR, are delineated in the solicitation.  The SFR is applied as a multiplier to the weight of the goods being transported to compute the compensation due the TSP for its costs of operations and profit.  Additionally, the solicitation may provide for the reimbursement of some of the elements of costs that were not incorporated into the SFR.

6. Cost elements that are not incorporated in the SFR include the war risk surcharge (WAR), port congestion surcharge (CON), port/terminal security handling surcharge (COF), and waiting time.  WAR, CON, and COF are defined in clarification 2 (Surcharge, Definition and Application – Updated on the web) dated April 11, 2006 and subsequently published in International Personal Property Rate Solicitation I-17, Item 252.

7. WAR is defined as "[i]nsurance coverage for loss of goods resulting from an act of war or as a result of the vessel "entering" the war risk area when billed by the ocean/air TSP.  This charge is only applicable to areas deemed "war risk" areas, as provided for on the SDDC website…. This code is applicable to codes of service 1, 2, 3, 4, 6, 7, and 8."

8. CON is defined as "[a]n extra charge that is billed to the TSP for controlling the congestion of trucks/vessels entering/departing the port. This surcharge is applicable to codes of service 1, 2, 3, 4, 5, 6, 7, T, and J."

9. COF is defined as "[a]n extra charge that is billed to the TSP for security of their cargo while at the port of embarkation/debarkation.  This surcharge is applicable to codes of service 1, 2, 3, 4, 5, 6, 7, 8, T, and J." Before 10/1/03, there was no official provision for port security.  TSPs were billing it as WAR or CON.   Effective 10/1/03, port security was added to the international rate solicitation as part of CON until 10/1/06 when it became independent COF. Before 10/1/06, there was only WAR and CON (w/ port

security as subset of CON, but only effective as of 10/1/03). After 10/1/06, there was WAR, CON, and COF. Note that Clarification 2 precipitated the amended provision dated 10/1/06.

10. Waiting Time is discussed in Item 503 of the rate solicitations. Free waiting time is provided for (i.e., as part of the TSP's cost of doing business; varying from 1 to 3 hours depending on the circumstances) before additional waiting time (which requires the prior approval of the Personal Property Shipping Office (PPSO) may be chargeable.

11. Item 426 of the rate solicitations require that all billings must be supported by appropriate documents. Item 432 discussed the Transportation SFR for HHGs. It provides that the WAR, CON, and COF surcharges must be separately stated and supported. Item 433 has a similar provision for the Transportation SFR for UB.

12. During the meeting on August 2, 2007, CRWV, FOFD and the other TSPs present acknowledged that the surcharges billed were for waiting time at the gate of the airbases or for moving from one gate to another at that base. No reasonable explanation was offered as to why these charges were not billed under the existing provisions and charges for "waiting time".

Executed on August ___29th___, 2007.

Joyce Clark
Supervisory
Transportation Specialist

LAW OFFICES
**DENNING & WOHLSTETTER**
815 CONNECTICUT AVENUE, N.W.
SUITE 500
WASHINGTON, DC 20006

WILLIAM I. DENNING (1883-1977)
ALAN F. WOHLSTETTER
STANLEY I. GOLDMAN

TELEPHONE: (202) 833-8884
CABLE: DENWOHL
FAX: (202) 833-8886
E-mail: awohlstetter@aol.com

January 23, 2007

Mr. James F. Fitzgerald
james.fitzgerald@gsa.gov
Director Audit Division (FBA)
General Services Administration
2200 Crystal Drive, Room 300
Arlington, VA  20406

Dear Mr. Fitzgerald:

On behalf of the carriers I represent, as well as the Household Goods Forwarders Association of America (HHGFAA), I want to express my appreciation for the opportunity to explain why the Notices of Overcharge covering the pass-through of congestion expenses should be rescinded.

Preliminarily, I can confirm that all of the principal baggage carriers participating in the DOD international personal property program, namely American World Forwarders, Cartwright International, Covan International, Jet Forwarding and Foremost, were represented by executives of those companies and Deseret International offered to have an executive back to attend the meeting but I advised that it was unnecessary since its position would be adequately covered by those present.  In addition, Terry Head appeared as president of the HHGFAA, in which organization all baggage carriers are members.

This is a very important matter since in the aggregate Notices of Overcharge were originally issued which totaled over $2,200.000.  This amount has been increasing and the total current estimate of exposure to these carriers, should the pass-through not be allowed, has increased to $3,150,000.  There is little doubt that the collection of these Notices of Overcharge will have a severe and unexpected adverse financial impact on the carriers involved and will destroy the intense competition in the unaccompanied baggage procurement administered by SDDC. We therefore appreciate your agreement to defer collection of these overcharges until you have evaluated this presentation.

Your letter of November 1, 2006, which was sent to all TSPs which billed the government for the port congestion pass-through, as amplified by the discussion at our meeting of November 29th, makes clear that the Notices of Overcharge are based upon the assumption that the charges billed by the port agents were not properly filed with the appropriate regulatory agency "as required by 49 U.S.C. §13702" and for that reason are not allowable.

With all due respect, it is clear that the legal assumption upon which the Notices of Overcharge are based is incorrect. As shown by the referenced United States Code, only ocean carriers in the non-contiguous domestic trade, viz. to or from Hawaii, Alaska or U.S. territories and possessions, are required to file tariffs with the regulatory agency, namely the Surface Transportation Board (STB), the successor to the former Interstate Commerce Commission. (49 U.S.C. §13702(b)). On the other hand, there is no legal requirement for port agents to issue a tariff. Even if the port agent is a household goods motor carrier the tariff charges are not required to be filed with any regulatory agency (49 U.S.C. §13702(c)). Further, if the motor carrier is a general freight hauler,[1] such as port agent Cassil Freight, it does not have to issue a tariff. (49 U.S.C. §13101 et seq.). Moreover, when the charges are assessed on the basis of contractual arrangements between a household goods carrier and a non-C.O.D. shipper,[2] as is the case here, such charges are not required to be filed or even published. (49 U.S.C. §14101). Lastly, if the air terminal and port agent's facility are located within the terminal area, the transportation is exempt and no tariff requirement apply. (49 U.S.C. §13503(a)).

If the congestion charges were incurred and billed by an ocean carrier, they previously would have to be published in the ocean carrier's tariff and filed with the Federal Maritime Commission (FMC). However, with the passage of the Ocean Shipping Reform Act of 1998 (OSRA), ocean carrier tariffs were no longer required to be filed with the Federal Maritime Commission or with any other regulatory agency and the Commission has no authority whatever to regulate the level of the charges of an ocean carrier.

---

[1] Code J shipments are transported in tri-wall or similar type containers. They are not packed by the hauler, a specialized service of household goods carriers. As a result the Interstate Commerce Commission held that such containerized shipments of household goods can be transported by freight carriers. American Red Ball Transit v. McLean Trucking, 67 M.C.C. 305 (1956).

[2] 49 U.S.C. §13102 makes clear that the tariff requirements apply to the transportation of household goods only when the service is performed for a householder who pays his own charges. That is not the case here.

Lastly, the charges which form the basis of the Notices of Overcharge are the subject of contractual arrangements in the form of Compensation Schedules under which the carrier appoints a company serving the ocean port or airport as its exclusive port agent, usually for at least a traffic cycle, and most frequently for a number of years, and the agent agrees to perform the required services, including pick-up and delivery to the military air terminal on Code J shipments tendered to its carrier principal by the Military.

I would like emphasize that this is not the usual overcharge situation where the auditor takes the position that the money is not due the carrier because it did not provide a service requested by the government. In this case, there is no question that the government requested the service, the carrier performed the service, through its port agent, and the carrier has paid the port agent for this service. Pursuant to the terms of the solicitation, the carrier billed the government the exact amount which it was charged by its port agent, without assessing any administrative charge or mark-up. Collection of the claimed overcharges would therefore result in the government's having obtained the demanded services without paying for them.

It was recognized after September 11, 2001 (9/11) that security measures at all military bases were tightened and enhanced which resulted in significant delays in serving them and that additional expenses were incurred by port agents servicing military air terminals. This cost was billed to carriers which in turn billed the government as a pass-through as provided for in the solicitation. Mr. Head, in his capacity of president of HHGFAA, told its members that the charges would be repaid as a pass-through under Items 432 and 433. (Declarations of Appleton, Borders/Standley, Cartwright, Coleman, Rowe and Sullivan). This is reflected in the e-mail from Hank Spieler, HQ MTMC, dated October 16, 2001. (Head Declaration). After observing that the solicitation would be amended to cover any port security/congestion surcharges, Mr. Spieler specifically gave as an example of an appropriate pass-through "a delay of [a] port agent at the aerial port gate for delivery of shipments" "when billed by [the[...port agent." The solicitation was amended, effective October 1, 2001 in the form of Amendment 3. (Head Declaration). It should be noted that this summary did not condition the pass-through upon the charge being billed "pursuant to regularly filed tariff(s) with Regulatory Bodies or Commissions." Lastly, on March 25, 2006, SDDC issued a clarification of this pass-through and stated:

collection of monies pursuant to GSA's Notices of Overcharge. An analogy exists under the legal doctrine known as "Cy-Pres." Black's Law Dictionary defines Cy-Pres as "As near as possible" and states:

> "The rule of cy-pres is a rule for the construction of instruments in equity by which the intention of the party is carried out as near as may be, when it would be impossible...to give it literal effect." (Emphasis in original text).

See also: Democratic Central Committee v. WMATA, 84 F.3d 451 (D.C. Cir. 1996) where the Court determined it was not feasible to refund to riders overcharges of bus companies and, pursuant to the cy-pres doctrine, directed the use of these funds to the purchase of new buses.

Although an equitable doctrine, we respectfully submit that the intentions of the parties should be given effect and not frustrated by the MTMC/SDDC legal error that the charges in question are required to be filed with a regulatory agency. In this regard, we point out that these charges have been consistently allowed under the pre-audit of carriers' billings and that for at least two years GSA did not dispute these pass-throughs in its final audits.

In any event, several facts are clear. First, the government demanded the service; second, the carriers provided the service; third, the port agents billed the carriers for the services, which billings they paid; and fourth, the charges were repaid to the carriers by the government. Even if the pass-through item is determined to be inapplicable because the surcharges were not filed with a regulatory agency, the carriers are entitled to compensation in quantum meruit for providing a service requested by the government. Trans Ocean Van Service v. United States, 426 F.2d 329, 348 (Ct. Cl. 1970); Allstates Van Lines Corp. v. United States, 215 Ct. Cl. 1075 (1978); American Ensign Van Service v. United States 220 Ct. Cl. 681 (1979).

It would be most inequitable were the government to get the service involved for free and the carriers not be reimbursed for paying its port agents for the service when they were precluded by the express terms of the solicitation from reflecting this cost in their SFRs. Not only would this be inequitable but it is inconsistent with GSA's treatment of these surcharge billings during the years 2001 and 2002, and perhaps 2003, and is inconsistent with the present treatment of bunker fuel surcharges and war risk surcharges, none of which are filed with any regulatory agency. Moreover, the collection of monies pursuant to the Notices of Overcharge will have a substantial adverse financial impact on the carriers who,

"4. SDDC has reviewed the feedback and invoices provided from industry and have incorporated codes T, J and 5 into billing code COF.

                              *    *    *

"10. If there have been charges denied in the past that were valid and fall under our recent clarification, TSPs [carriers] have the ability to rebill these lines items."[3]

It is beyond dispute that at the time the solicitation was amended to cover charges assessed carriers by port agents for expenses incurred as the result of delays at military air terminals those charges were not required to be filed with any regulatory agency. We have discussed this fully in the first part of the letter. Nevertheless, a history of this item indicates why MTMC improperly assumed this filing was a proper requirement. Initially the pass-through tender item covered matters in ocean carrier tariffs, e.g. bunker fuel surcharge, war risk surcharge, which tariffs were then required to be filed with the Federal Maritime Commission. However, as shown in the first part of this letter, this filing requirement was eliminated with the passage of OSRA in 1998 when the Commission was also deprived of any authority to determine the reasonableness of any tariff charges. Apparently, neither SDDC nor GSA is concerned with this change since the pass-through of bunker fuel surcharges is routinely allowed although not contained in any tariff on file with the Federal Maritime Commission or any other regulatory agency.

In any event, relying on MTMC's advice that the charges they paid their port agents for the additional costs incurred in picking up and delivering baggage shipments at military air terminals would be repaid as a pass-through, the carriers did not include these charges in their single-factor rates. (Declarations of Appleton, Borders/Standley, Cartwright, Coleman, Rowe and Sullivan). As a matter of fact, Item 433a, (4) (d) of the solicitation excepts bunker fuel surcharges, port congestion surcharges, etc. from inclusion in the single-factor rates.

It clearly is not the carriers' fault that MTMC erroneously assumed that the surcharges listed in Items 432 and 433 are required to be filed with a regulatory agency, viz., either the Surface Transportation Board or the Federal Maritime Commission. The intention of MTMC and its successor, SDDC, was to compensate carriers for this additional cost. That intent should not be frustrated by

---

[3] Payment was not conditioned upon the charges being contained in a tariff filed with a regulatory agency.

collection of monies pursuant to GSA's Notices of Overcharge. An analogy exists under the legal doctrine known as "Cy-Pres." Black's Law Dictionary defines Cy-Pres as "As near as possible" and states:

> "The rule of cy-pres is a rule for the construction of instruments in equity by which the intention of the party is carried out as near as may be, when it would be impossible...to give it literal effect." (Emphasis in original text).

See also: Democratic Central Committee v. WMATA, 84 F.3d 451 (D.C. Cir. 1996) where the Court determined it was not feasible to refund to riders overcharges of bus companies and, pursuant to the cy-pres doctrine, directed the use of these funds to the purchase of new buses.

Although an equitable doctrine, we respectfully submit that the intentions of the parties should be given effect and not frustrated by the MTMC/SDDC legal error that the charges in question are required to be filed with a regulatory agency. In this regard, we point out that these charges have been consistently allowed under the pre-audit of carriers' billings and that for at least two years GSA did not dispute these pass-throughs in its final audits.

In any event, several facts are clear. First, the government demanded the service; second, the carriers provided the service; third, the port agents billed the carriers for the services, which billings they paid; and fourth, the charges were repaid to the carriers by the government. Even if the pass-through item is determined to be inapplicable because the surcharges were not filed with a regulatory agency, the carriers are entitled to compensation in quantum meruit for providing a service requested by the government. Trans Ocean Van Service v. United States, 426 F.2d 329, 348 (Ct. Cl. 1970); Allstates Van Lines Corp. v. United States, 215 Ct. Cl. 1075 (1978); American Ensign Van Service v. United States 220 Ct. Cl. 681 (1979).

It would be most inequitable were the government to get the service involved for free and the carriers not be reimbursed for paying its port agents for the service when they were precluded by the express terms of the solicitation from reflecting this cost in their SFRs. Not only would this be inequitable but it is inconsistent with GSA's treatment of these surcharge billings during the years 2001 and 2002, and perhaps 2003, and is inconsistent with the present treatment of bunker fuel surcharges and war risk surcharges, none of which are filed with any regulatory agency. Moreover, the collection of monies pursuant to the Notices of Overcharge will have a substantial adverse financial impact on the carriers who,

responding to the Military's request that the carriers pay their port agents for the additional expense they incurred as the result of increased security at military air terminals required to be used in servicing Code J baggage shipments, did so in reliance on the promised reimbursement which until now has consistently been paid.

Lastly, it is clear that filing with a regulatory agency was not imposed to determine whether or not the charges were to be pass-throughs; its purpose was solely to give the government some comfort that the charges were reasonable. In 2001, the surcharge discussed with SDDC was $5 per cwt. (Head Declaration). Charges assessed three to five years later in the range of $2.50 - $7.50 per cwt. cannot be considered to be unreasonable. (Coleman Declaration).

In light of the above, we respectfully ask you to rescind the Notices of Overcharge identified in this letter. Should you have any questions after considering this letter, I would be pleased to meet with you should you deem that helpful in brining this matter to a favorable close.

Very cordially yours,

DENNING & WOHLSTETTER

By _Alan F. Wohlstetter_____

Alan F. Wohlstetter
Attorneys for
American World Forwarders, Inc.
Cartwright International Van Lines, Inc.
Covan International, Inc.
Deseret Forwarding International, Inc.
Foremost Forwarding, Inc.
Jet Forwarding, Inc.
Household Goods Forwarders Association
    of America, Inc.

Attachments (7)

cc: Janet Harney, Esq.
janet.harney@usa.gov



**"Serving Those Who Serve"**

## DECLARATION OF ANDREW W. CARTWRIGHT

1.    My name is Andrew W. Cartwright (Andy) W. Cartwright. I am president of Cartwright International Van Lines, Inc., a participant in SDDC's International Through Government Bill of Lading (ITGBL) program. My company is actively involved in the handling of Code J shipments of unaccompanied baggage which involves the movement to and from military air terminals. Shortly after September 11, 2001 my port agents at the three military air terminals, namely Travis AFB in California, McGuire AFB in New Jersey and Dover AFB in Delaware, advised me that due to tightened security at the military air base they served as our agent, the time involved in the pick-up and delivery of Code J shipments had substantially increased, which in turn, increased their cost. I communicated this to Terry Head, president of the Household Goods Forwarders Association of America (HHGFAA), and he subsequently advised me that SDDC, acting through Colonel Patricia Hunt (USAF), then MTMC Deputy Chief of Staff for Passenger and Personal Property, and Mr. Hank Spieler, the Chief Civilian at MTMC at the time, recognized the problem and agreed to reimburse carriers for this additional expense. I was told that this would a pass-through and therefore did not attempt to include it in my single-factor rates (SFRs).

2.    Although our billing for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $241,210.84 on April 3, 2006. With the passage of time, I estimate that as of December 12, 2006, these surcharges have increased to $309,548.33.

3.    As I read the solicitation, Cartwright was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.    In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for their disallowance. In fact, Mr. Head advised me that during the negotiation

of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing.  This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.     It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement.  Cartwright International Van Lines and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Cartwright International Van Lines, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Cartwright International Van Lines and other carriers would be performing this service without payment therefor by the government.  There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.     I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges.  However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to.  Since the charges now range between $2.50 and $7.50 per hundredweight, and we are now in a time

3

frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Andrew W. Cartwright

Date:   January 3, 2007

4



GENERAL OFFICES: #1 COVAN DRIVE • POST OFFICE BOX 960 • MIDLAND CITY, ALABAMA 36350 • (334) 983-6500 • (334) 983-4717 FAX

## DECLARATION OF JEFFREY F. COLEMAN

1.      My name is Jeffrey (Jeff) F. Coleman.  I am president of Covan

International, Inc., a participant in SDDC's International Through

Government Bill of Lading (ITGBL) program.  My company is actively

involved in the handling of Code J shipments of unaccompanied baggage

which involves the movement to and from military air terminals.  Shortly

after September 11, 2001 my port agents at the three military air terminals,

namely Travis AFB in California, McGuire AFB in New Jersey and Dover

AFB in Delaware, advised me that due to tightened security at the military

air base they served as our agent, the time involved in the pick-up and

delivery of Code J shipments had substantially increased, which in turn,

increased their cost.  I communicated this to Terry Head, president of the

Household Goods Forwarders Association of America (HHGFAA), and he

subsequently advised me that SDDC, acting through Colonel Patricia Hunt

(USAF), then MTMC Deputy Chief of Staff for Passenger and Personal

Property, and Mr. Hank Spieler, the Chief Civilian at MTMC at the time,

recognized the problem and agreed to reimburse carriers for this additional

expense. I was told that this would a pass-through and therefore did not attempt to include it in my single-factor rates (SFRs).

2.     Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $524,725.65 on April 3, 2006. With the passage of time, these surcharges have increased to $742,697 as of December 12, 2006.

3.     As I read the solicitation, Covan was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.     In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for

their disallowance. In fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.    It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Covan International and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Covan International, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Covan International and other carriers would be performing this service without payment therefor by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.    I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range

between $2.50 and $7.50 per hundred weight, and we are now in a time frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Jeffrey F. Coleman

Date: JANUARY 8, 2007



# DESERET
FORWARDING INTERNATIONAL, INC

## DECLARATION OF BILL APPLETON, JR.

1.      My name is Bill Appleton, Jr.  I am president of Deseret

Forwarding International, Inc., a participant in SDDC's International Through

Government Bill of Lading (ITGBL) program.  My company is actively

involved in the handling of Code J shipments of unaccompanied baggage which

involves the movement to and from military air terminals.  Shortly after

September 11, 2001 my port agents at the three military air terminals, namely

Travis AFB in California, McGuire AFB in New Jersey and Dover AFB in

Delaware, advised me that due to tightened security at the military air base they

served as our agent, the time involved in the pick-up and delivery of Code J

shipments had substantially increased, which in turn, increased their cost.  I

communicated this to Terry Head, president of the Household Goods

Forwarders Association of America (HHGFAA), and he subsequently advised

me that SDDC, acting through Colonel Patricia Hunt (USAF), then MTMC

Deputy Chief of Staff for Passenger and Personal Property, and Mr. Hank

Spieler, the Chief Civilian at MTMC at the time, recognized the problem and

agreed to reimburse carriers for this additional expense.  I was told that this

1760 Airway Blvd., Suite 103
El Paso, Texas 79925
(915) 778-0861  •  Fax: (915) 774-5177

would be a pass-through, and therefore did not attempt to include it in my single-factor rates (SFRs).

2.     Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $146,568.09 on April 3, 2006. With the passage of time, I estimate that these surcharges have increased to $356,294 as of November 3, 2006.

3.     As I read the solicitation, Deseret was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs, but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.     In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for their disallowance. In

2

fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.    It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Deseret Forwarding International and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Deseret Forwarding, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Deseret Forwarding International and other carriers would be performing this service without payment therefore by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.    I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range between $2.50 and $7.50 per

hundred weight, and we are now in a time frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.


_____
Bill Appleton, Jr.


Date:  01/08/2007

4



*"Your First 'n' Foremost Mover"*

## DECLARATION OF KENNETH J. SULLIVAN

1.      My name is Kenneth (Ken) J. Sullivan. I am president of Foremost

Forwarders, Inc., a participant in SDDC's International Through Government

Bill of Lading (ITGBL) program. My company is actively involved in the

handling of Code J shipments of unaccompanied baggage which involves the

movement to and from military air terminals. Shortly after September 11, 2001

my port agents at three military air terminals, namely Travis AFB in California,

McGuire AFB in New Jersey and Dover AFB in Delaware, advised me that due

to heightened security at the military air force bases they served as our agent,

the time involved in the pick-up and delivery of Code J shipments had

substantially increased, which in turn, increased their cost. I communicated this

to Terry Head, president of the Household Goods Forwarders Association of

America (HHGFAA), and he subsequently advised me that SDDC, acting

through Colonel Patricia Hunt (USAF), then MTMC Deputy Chief of Staff for

Passenger and Personal Property, and Mr. Hank Spieler, the Chief Civilian at

MTMC at the time, recognized the problem and agreed to reimburse carriers for

this additional expense. I was told that this would be a pass-through and

therefore did not attempt to include it in my single-factor rates (SFRs).

Foremost Forwarders, Inc.  •  2505 SW Spring Garden St., Suite 100  •  Portland, OR  97219-3966
P. O. Box 23758  •  Tigard, OR 97281-3758
Local: 503.245.1090 • Toll Free: 866.378.1428 • Fax: 503.245.1395 • www.fofdforemost.com

2.      Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $1,202,698.45 on April 3, 2006. With the passage of time, I estimate that these surcharges have increased to $1,644,452.48 as of December 12, 2006.

3.      As I read the solicitation, Foremost was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.      In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with a regulatory agency cannot reasonably be the basis for their disallowance. In fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no

2

tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.    It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Foremost Forwarders and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Foremost Forwarders, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Foremost Forwarders and other carriers would be performing this service without payment therefore by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.    I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range between $2.50 and $7.50 per hundredweight, and we are now in a time frame six years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable. The pass-through of these funds is well

3

documented with port agent invoices and cashed checks.  Until we received the Notice of Overcharge from GSA in the amount of $1,202,698.45 dated April 3, 2006 which was six years after we began forwarding these pass-through's no mention by the government was made that these charges were not in order.  If GSA proceeds with this set off action, Foremost Forwarders, Inc. will be caused irreparable harm from which we will be unable to recover.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Kenneth J. Sullivan

Date:  Tuesday, January 02, 2007



# JET FORWARDING INC.

## DECLARATION OF DAVID C. ROWE

1.      My name is David C. Rowe. I am Executive Vice President of Jet

Forwarding Inc., a participant in SDDC's International Through Government

Bill of Lading (ITGBL) program. My company is actively involved in the

handling of Code J shipments of unaccompanied baggage which involves the

movement to and from military air terminals. Shortly after September 11, 2001

my port agents at the three military air terminals, namely Travis AFB in

California, McGuire AFB in New Jersey and Dover AFB in Delaware, advised

me that due to tightened security at the military air base they served as our

agent, the time involved in the pick-up and delivery of Code J shipments had

substantially increased, which in turn, increased their cost. I communicated this

to Terry Head, president of the Household Goods Forwarders Association of

America (HHGFAA), and he subsequently advised me that SDDC, acting

through Colonel Patricia Hunt (USAF), then MTMC Deputy Chief of Staff for

Passenger and Personal Property, and Mr. Hank Spieler, the Chief Civilian at

MTMC at the time, recognized the problem and agreed to reimburse carriers for

this additional expense. I was told that this would a pass-through and therefore did not attempt to include it in my single-factor rates (SFRs).

2.    Although our billings for this service were subject to both pre-audit and final audit, my company was consistently reimbursed for these surcharges until receiving the present Notice of Overcharge in the amount of $46,683.54 on April 3, 2006. With the passage of time, I estimate that these surcharges have increased to $70,119 as of December 13, 2006.

3.    As I read the solicitation, Jet was not authorized to include the charges resulting from congestion at the military air terminals in its SFRs but was required to bill those charges to the government as a pass-through without mark-up or administrative compensation. I saw to it that my company followed this direction.

4.    In the letter, dated November 1, 2006, GSA takes the position that these pass-through charges were improperly paid because they were required to be contained in a tariff on file with a regulatory agency and were not. My attorney has advised me that there is no such filing requirement. In its letter GSA points out that the specific terms of Item 433 condition the pass-through upon the charges being filed with a federal regulatory agency. However, the government's misunderstanding of whether these surcharges are to be filed with

a regulatory agency cannot reasonably be the basis for their disallowance. In fact, Mr. Head advised me that during the negotiation of this pass-through, he told Mr. Spieler that there would not be a "paper trail" since there would be no tariff filing. This did not stop Mr. Spieler from advising Mr. Head that the pass-through would be honored.

5.      It is clear that the required filing of these charges with a regulatory agency, even if it were correct, would not determine whether or not a carrier is entitled to reimbursement. Jet Forwarding and all other carriers were precluded by the terms of the solicitation from including this charge in their SFRs and the only way that carriers, such as Jet Forwarding, could be compensated for this additional charge assessed by its port agents is through reimbursement. Absent this reimbursement, Jet Forwarding and other carriers would be performing this service without payment therefor by the government. There is no logic which supports a conclusion that the government should obtain this service without paying for it.

6.      I fully understand that the purpose of the requirement that the surcharge be in a filed tariff was to protect the government from the assessment of unreasonable charges. However, Mr. Head has advised us that during the course of negotiations with Mr. Spieler a charge of $5 per cwt. was discussed and not objected to. Since the charges now range between $2.50 and $7.50 per

3

hundredweight, and we are now in a time frame two years or more later than the negotiations with MTMC, there does not appear to be any basis to conclude that the charges are unreasonable.

For the reasons set forth in the previous paragraphs of my declaration, I respectfully request that the Notices of Charges issued by GSA be rescinded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

_____
David C. Rowe

Date: /- 9- 07

4